1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

JESUS BUSTAMANTE,

Civil No.        03cv0276-L (CAB)

11

Petitioner,

12

vs.

**REPORT AND RECOMMENDATION
RE: DENIAL OF PETITION FOR WRIT
OF HABEAS CORPUS**

13

S. GARCIA, Warden,

14

Respondent.

15

**I.        INTRODUCTION**

16

        Jesus (Jesse) Bustamante ("Bustamante") a state prisoner proceeding pro se, has filed a

17

Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254 challenging his San

18

Diego Superior Court conviction in case number CR138189 for second degree murder, being armed

19

with a firearm and personally using a deadly and dangerous weapon.  (Lodgment No. 1, Vol. 1 of 1

20

at 0210.)  He contends his federal constitutional rights were violated as follows:  (1) the trial court

21

improperly denied his motion to dismiss, (2) the trial court improperly instructed the jury, (3) the

22

trial court failed to rule on an objection during closing argument, (4) the trial court improperly

23

denied his severance motion, (5) the trial court was biased against him, (6) the prosecutor committed

24

misconduct, (7) his trial counsel rendered ineffective assistance, (8) his appellate counsel rendered

25

ineffective assistance, and (9) there was insufficient evidence introduced to support his conviction.

26

(*See* Pet'rs Ex. A at 71-188.)

27

        The Court has considered the Petition and Exhibits, Respondent's Answer, Petitioner's

28

Traverse and all the supporting documents submitted by the parties.  Based upon the documents and

1  evidence presented in this case, and for the reasons set forth below, the Court recommends that the

2  Petition be **DENIED**.

3  **II.**   **FACTUAL BACKGROUND**

4        This Court gives deference to state court findings of fact and presumes them to be correct;

5  Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28

6  U.S.C.A. § 2254(e)(1)(West 2007); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding

7  findings of historical fact, including inferences properly drawn from such facts, are entitled to

8  statutory presumption of correctness). The facts as found by the state appellate court are as follows:

9        I.   Factual Background

10          A.   The Witnesses' Relationships

11        The principal prosecution witnesses were Tina Carranza (Tina), Nathan Truehitt
(Nathan) and Sherry Jacobson (Sherry). These three persons and the victim [Kevin

12  Schaum] were involved in a web of relationships.

13        In the late spring of 1992 Tina met Nathan. At that time Tina had been dating
[Kevin]. However, on meeting Nathan she broke up with [Kevin] and a week later began

14  seeing Nathan. Shortly thereafter, Tina began living with Nathan. She lived with Nathan
until approximately one week before the August 15, 1992 murder. Nathan threw Tina

15  out of the Wardlow house because he was jealous of her continued relationship with
[Kevin] and because Tina was unable to get along with Sherry, who was to move into the

16  Wardlow house. [footnote 2: Tina conceded she and [Kevin] had been intimate while
Nathan was in jail during July 1992 and had also spent the night with [Kevin] the night

17  prior to Nathan's throwing her out. Sherry had reported her suspicions of Tina's
infidelity to Nathan while Nathan was in jail, and Nathan and Tina had violent arguments

18  over Tina's relationship to [Kevin].]

19        Sherry was a friend of Nathan's daughter, became close to Nathan and viewed
him as an uncle. Sherry was a methamphetamine user. Nathan provided her with a

20  home, money and drugs; in return she sold drugs for Nathan.

21        Sherry first met [Kevin] through Tina in June 1992 when Tina requested [Kevin]
to repair Sherry's car. Although Sherry at first liked [Kevin], she became antagonistic

22  when convinced [Kevin] had stolen property belonging to Nathan and her. [footnote 3:
During July 1992 Nathan was jailed for possession of methamphetamine. While Nathan

23  was in jail, Tina and [Kevin] packed and moved Nathan's belongings from his old house
and stored them in a U-Haul truck at a friend's home. Sherry believed [Kevin] had stolen

24  some of the property while it was being stored. Sherry enlisted the help of Bustamante
and Mr. Jacobo to try to convince [Kevin] to return the property. After [Kevin] refused,

25  Bustamante used a small knife to puncture the tire of the U-Haul.] Sherry also disliked
[Kevin] because she suspected he was sleeping with Tina while Nathan was in jail. Sherry

26  reported her suspicions of the Tina-victim relationship to Nathan.

27  / / /

28  / / /

03cv0276

B.     The Relationship of the Codefendants

Sherry met Bustamante through a Mr. Jacobo and began dating Bustamante in the summer of 1992. [footnote 4: Mr. Jacobo and Nathan were business acquaintances in the drug business.] Bustamante introduced [co-defendant] Gonzalez to Sherry about 10 days before the murder, stating Gonzalez was like a brother to him and that he (Bustamante) would die for Gonzalez. Bustamante also introduced [co-defendant] Flores to Sherry about a week before the murder, stating Flores was like a brother to him. Sherry saw Bustamante give Flores a knife as a gift.

Sherry introduced Bustamante to Nathan sometime during the two weeks prior to the murder. Bustamante was staying at the Wardlow house (with Nathan and Sherry) for several days prior to the murder. Nathan met the other codefendants at the Wardlow house when Nathan arrived home on the day of the murder and found them and many others at the house.

C.     The Shooting

On the evening of August 15, 1992, Nathan, Tina, Sherry, Jacobo, a Ms. Morris, a Mr. Pagel, the three codefendants and others were at the Wardlow house. During the day, Bustamante was drinking with his friends. Several people, including Gonzalez and Nathan, were ingesting drugs.

During the same day, Sherry saw Gonzalez in the living room of the Wardlow house showing off a large revolver and heard Gonzalez comment: "Imagine what this can do with a hollow point bullet." Jacobo was present while Gonzalez and Bustamante examined the gun and Jacobo looked at it before returning it to Gonzalez. Jacobo later told police he had seen some hollow point bullets Gonzalez had for the revolver and that the revolver was a .44 caliber special. [footnote 5: Jacobo was testifying under a grant of immunity. At trial, he denied seeing any hollow point ammunition in Gonzalez's possession and claimed that his statement to police about the ammunition was untruthful. He claimed to have told police what they wanted to hear because he feared being charged in the murder. However, police testified Jacobo told them of the hollow point ammunition before they had revealed to him the type of ammunition recovered at the scene. Sherry confirmed seeing Jacobo holding hollow point bullets prior to the shooting.] Another person present, Mr. Guadiana, saw Gonzalez lift his shirt to display the gun tucked in Gonzalez's waistband. Jacobo also told police he had seen Flores with a knife earlier that day and Flores would occasionally pull it from his pocket and play with it. Jacobo told police the knife was "legal" because the blade was less than three inches long.

At approximately 8 p.m., [Kevin] unexpectedly arrived at the Wardlow house and pulled his car into the driveway. Ms. Morris went outside to see what [Kevin] wanted and then returned to the house to tell Tina that [Kevin] wanted to see her. When Tina did not go outside, Sherry went out, spoke with [Kevin] and then returned inside to tell Tina that [Kevin] was waiting for her. Sherry then went back outside to tell [Kevin] that Tina would be right out.

Tina, accompanied by Nathan, went outside. Tina went to the passenger side window, began screaming at [Kevin] and asked, "What are you doing here? How did you know where I lived?" While Tina was yelling, Nathan went to the driver's side and told [Kevin] to leave. Sherry heard the yelling from inside and came back outside.

Sherry then saw Bustamante, followed by Flores and Gonzalez, emerge from the house and walk toward the car. Sherry, seeing they had angry looks on their faces, told

them not to do anything stupid or crazy, but Flores had a smirk on his face and rolled his eyes. Sherry testified Flores and Bustamante went to the passenger side window, leaned through it and made striking motions at [Kevin]. Nathan testified that he saw Bustamante on the passenger side attacking [Kevin] and that Gonzalez was leaning in through the driver's side window. Nathan saw someone inside the car wielding a bottle but could not tell who it was.

Tina screamed at Sherry to tell them to stop. Ten to twenty seconds after the codefendants began their attack a shot rang out. Sherry heard the gunshot, saw the flash and ran inside. Tina saw the car jerk as if the clutch pedal had been released. Nathan saw the flash of the shot, saw [Kevin]'s head go forward and immediately thereafter saw a gun in Gonzalez's hand.

When Tina heard the shot she turned and saw Nathan standing near the left front wheel of [Kevin]'s car holding his hands in the air and saying, "Oh, my god, they shot him." Sherry came back outside and saw Nathan holding his head and saying, "I can't believe they did this" and saw Tina crying hysterically and yelling, "Oh, my god, they shot him." Nathan almost immediately told Sherry that Gonzalez had been the shooter.

Jacobo, who was inside when the shot was fired, ran out and saw Nathan, Bustamante, Gonzalez and Flores standing around the car. Jacobo heard someone say, "Let's get out of here." Then Jacobo (along with Flores, Bustamante and Guadiana) got into Jacobo's car and left. As he and the others left the scene, Jacobo saw Gonzalez putting a gun into his waistband. Gonzalez left in his own car.

D.   Post Shooting Events

Nathan remained at the Wardlow house waiting for police to arrive, cleaning up beer bottles and disposing of the drugs around the house. Nathan instructed Sherry and Tina not to go near the car because they might disturb the fingerprints.

Jacobo, accompanied by Flores and Bustamante, drove to a house owned by Bustamante's brother, Sergio Bustamante (Sergio). During the trip, Flores was laughing and bragging that Flores "stuck him." Flores also told Bustamante: "You're my family. I'd kill for you." While at Sergio's house, Flores told Gonzalez: "I got him." He also told Gonzalez: "If you want, I'll do time for it." Bustamante stated he had struck [Kevin] in the face with a beer bottle and had left a beer bottle at the scene, saying, "Damn, they got my fingerprints."

Sergio later told police Gonzalez said he had hit [Kevin] and the gun accidentally discharged. Sergio also told police Gonzalez said he had used a .44 or .45 caliber revolver.

Bustamante told police he was one of the first to come out of the Wardlow house and he had a beer bottle in his hands which may have dropped inside [Kevin]'s car. Bustamante also told police the shooter was pistol-whipping [Kevin] when the gun discharged by accident.

E.   Physical Evidence

Police recovered beer bottles from around the car and inside the car. A palm print taken from the passenger side door of [Kevin]'s car matched Flores's prints.

The bullet retrieved from [Kevin] was a hollow point .44 caliber, which only one company manufactures. The bullet could only have been fired from a .44 caliber

revolver and the criminalist explained that because of the design of the revolver it cannot fire by accident; firing requires that someone pull the trigger.

The pathologist found [Kevin] had suffered three stab wounds in the right chest area consistent with a single-edged folding knife of less than three inches in length. [Kevin] also had a gunshot wound to his head that indicted the gun had been fired at very close range. [Kevin] also had cuts on the right side of his face. The cause of death was the gunshot wound to the head and two of the three stab wounds which had punctured the lungs.

F.     The Defense Theory

Gonzalez denied owning a gun or showing a gun around the Wardlow house. He claimed he saw a gun at the house that day when Nathan opened a drawer to retrieve drugs for them to consume. Gonzalez's version was as follows:

Gonzalez came out of the bathroom and saw Nathan pacing back and forth. Gonzalez then went outside and saw Tina arguing with someone as she stood next to the driver's window of a car. Nathan then ran up to Tina, pulled her away and began yelling at [Kevin] and poking [Kevin] with his finger. As the fight escalated Bustamante pulled Tina away. Gonzalez saw Nathan lean into the car and then saw a flash and heard a gunshot. Bustamante jumped back from the car. Gonzalez heard someone say, "Let's get out of here." Gonzalez then left. Later the next morning Gonzalez learned, through Jacobo, that Nathan was accusing Gonzalez of the shooting.

The defense also relied on Tina's testimony that Nathan was a violent person and had a tendency to become angry after ingesting methamphetamine. Nathan was under the influence of methamphetamine that day and was behaving irrationally. Jacobo claimed Nathan had threatened violence against [Kevin] prior to the shooting. After the shooting, Nathan threatened Tina with "the same thing done to you that was done to Kevin."

(Lodgment No. 5 at 3-9.)

**III.     PROCEDURAL BACKGROUND**

On July 28, 1993, the San Diego County District Attorney's Office filed a second amended second consolidated information charging Ernesto Gonzalez, Philip Antonio Flores and Jesus (Jesse) Ramirez Bustamante with one count of murder, a violation of Penal Code section 187(a). (*See* Lodgment No. 1, Vol. 1 of 2 at 0093-95.) The information also alleged that Bustamante was armed with a firearm, within the meaning of Penal Code section 12022(b) and that Bustamante had suffered a prior felony conviction which made him ineligible for probation, within the meaning of Penal Code section 1203(e)(4). (*Id.*) A jury found Bustamante guilty of second degree murder and found the Penal Code section 12022(b) allegation to be true. (Lodgment No. 1, Vol. 1 at 0210.)

Bustamante filed a direct appeal challenging his conviction in the California Court of Appeal, Fourth Appellate District, Division One. (Lodgment Nos. 3, 4.) On January 30, 1996, the state

1   appellate court affirmed Bustamante's conviction in an unpublished opinion. (Lodgment No. 5.) He

2   did not file a Petition for Review in the California Supreme Court.

3          Bustamante next filed a habeas corpus petition in the California Court of Appeal, Fourth

4   Appellate District, Division One, which that court denied in a brief unpublished opinion on February

5   21, 2001. (Lodgment Nos. 6, 7.) He filed another habeas corpus petition, together with a Motion for

6   Production of Documents, in the San Diego Superior Court, which was denied in an unpublished

7   opinion on November 21, 2001. (Lodgment Nos. 8, 9.) Bustamante then filed a second habeas

8   corpus petition in the state appellate court, which was denied in an unpublished opinion on April 4,

9   2002. (Lodgment Nos. 10, 11.) Finally, Bustamante filed a habeas corpus petition in the California

10  Supreme Court, which that court denied without citation of authority on January 29, 2003.

11  (Lodgment Nos. 12, 13.)

12         Bustamante then filed a habeas corpus petition pursuant to 28 U.S.C. § 2254 (West 2007) in

13  this Court on February 10, 2003 [doc. no. 1]. Respondent filed a motion to dismiss on May 28,

14  2003, which was granted on February 23, 2004 [doc. nos. 12, 13, 18, 24]. Bustamante appealed the

15  dismissal to the Ninth Circuit Court of Appeals, which vacated the dismissal order and remanded the

16  case to this Court for further proceedings [doc. nos. 26, 31, 36, 37].

17         An order setting a briefing schedule on the merits of the petition was filed on August 26,

18  2005, and Respondent filed an Answer on December 20, 2005 [doc. nos. 52, 53]. Bustamante filed a

19  Traverse on April 10, 2006, and a Supplemental Traverse on May 23, 2006 [doc. nos. 61, 64].

20  **IV.    DISCUSSION**

21         **A.    Scope of Review**

22         Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal

23  habeas corpus claims:

24          The Supreme Court, a Justice thereof, a circuit judge, or a district court shall
            entertain an application for a writ of habeas corpus in behalf of a person in custody
25          pursuant to the judgment of a State court only on the ground that he is in custody in
            violation of the Constitution or laws or treaties of the United States.

26

27  28 U.S.C.A. § 2254(a) (West 1994) (emphasis added).

28  / / /

The current Petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).   As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West 2006) (emphasis added).

To obtain federal habeas relief, Rivas must satisfy either § 2254(d)(1) or § 2254(d)(2).  *See Williams v. Taylor*, 529 U.S. 362, 403 (2000).  The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts

1 [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established

2 federal law. *Id.*

3     **B.    Analysis**

4     Bustamante raises nine basic issues in his petition:  (1) the trial court improperly denied his

5 motion to dismiss, (2) the trial court improperly instructed the jury, (3) the trial court failed to rule on

6 an objection during closing argument, (4) the trial court improperly denied his severance motion, (5)

7 the trial court was biased against him, (6) the prosecutor committed misconduct, (7) his trial counsel

8 rendered ineffective assistance, (8) his appellate counsel rendered ineffective assistance, and (9)

9 there was insufficient evidence introduced to support his conviction.  (*See* Pet'rs Ex. A at 71-188.)

10 Respondent argues that all but Bustamante's claims regarding the denial of his severance motion and

11 the ineffectiveness of his appellate counsel are procedurally defaulted.  (*See* Mem. of P. & A. in

12 Supp. of Answer at 7-9.)  In the alternative, Respondent argues that the state courts' denial of the

13 claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court

14 law.  (*Id.* at 10-46.)

15     1.   <u>Procedural Default</u>

16     The Ninth Circuit has held that because procedural default is an affirmative defense,

17 Respondent must first have "adequately pled the existence of an independent and adequate state

18 procedural ground . . . ."  *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).  In order to place the

19 defense at issue, Bustamante must then "assert[] specific factual allegations that demonstrate the

20 inadequacy of the state procedure . . . ."  *Id.*  The "ultimate burden" of proving procedural default,

21 however, belongs to the state.  *Id.*  If the state meets its burden under *Bennett*, federal review of the

22 claim is foreclosed unless Bustamante can "demonstrate cause for the default and actual prejudice as

23 a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will

24 result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

25     Respondent argues that all of Bustamante's claims, except for his claims regarding the denial

26 of the severance motion and ineffective assistance of appellate counsel, are procedurally defaulted.

27 (Mem. of P. & A. in Supp. of Answer at 7-9.)  Bustamante exhausted his federal claims by

28 presenting them in a habeas corpus petition to the California Supreme Court, which denied the

1    petition without citation of authority. (*See* Lodgment Nos. 12, 13.) It is presumed the court rejected

2    the claims on the same grounds as the lower court. *Ylst*, 501 U.S. at 803. The lower court, in this

3    case the California Appellate Court, rejected Bustamante's claims, citing *Ex parte Dixon*, 41 Cal. 3d

4    756 (1953), which Respondent argues is an independent and adequate state procedural bar. (*See*

5    Lodgment No. 11.) As Respondent notes, *Dixon* stands for the proposition that "habeas corpus may

6    not serve as a substitute for the normal appeal process and, absent unusual circumstances, claims that

7    were or could have been raised on direct appal may not be raised on habeas corpus." (Mem. of P. &

8    A. in Supp. of Answer at 8.)

9        The Ninth Circuit has held that the adequacy of a state procedural bar must be determined at

10   the time the default occurred. The Court has defined the trigger date as "the time the claim should

11   have been raised." *Fields v. Calderon*, 125 F.3d 757, 760 (9th Cir. 1887) (citing *Calderon v. Bean*,

12   96 F.3d 1126, 1130 (9th Cir. 1996).) "With respect to the *Dixon* rule, . . . the relevant point of

13   reference for assessing its application is the time at which the petitioner 'had an opportunity to raise

14   the claims on direct appeal.'" *Id*. at 760-61. Thus, any procedural default occurred at the time

15   Bustamante failed to raise his claims on direct appeal in March of 1995.

16       In *In re Robbins*, 18 Cal. 4th 770 (1998), the California Supreme Court acknowledged that in

17   applying the *Dixon* rule, California courts had been considering federal constitutional law in

18   determining whether a claim was viable. *Robbins* stated that, henceforth, California courts would

19   not apply federal law when determining whether a claim is procedurally defaulted. *Robbins*, 18 Cal.

20   4th at 338-39. As a result, the Ninth Circuit concluded in *Park v. California*, 202 F.3d 1146, 1152-

21   53 (9th Cir. 2000) that the *Dixon* rule was not "independent" before *Robbins* clarified its application

22   in 1998. *See also Washington v. Cambra*, 208 F.3d 832, 834 (9th Cir. 2000). Because Bustamante's

23   default occurred in 1995, before the *Dixon* rule was independent, Respondent has not met his burden

24   under *Bennet*. The Court will address the merits of Bustamante's claims. And, because the last state

25   court decision to address Bustamante's claims denied them on procedural grounds and not on the

26   merits, there is no state court decision to which this Court can defer. Accordingly, this Court must

27   conduct a *de novo* review of his claims. *See Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2003).

28   / / /

2.      Denial of the Motion to Dismiss

Bustamante claims that the state trial court "abused its discretion" when it denied his motion to dismiss the case against him which counsel made pursuant to California Penal Code section 1118.1 at the close the prosecution's case.  Penal Code 1118.1 states:

> In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal.  If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right.

(Cal. Penal Code § 1118.1) (West 2007.)

Bustamante provides no federal constitutional basis with regard to this claim.  (*See* Pet'rs Ex. A at 71-73.)  Federal habeas corpus relief is not available for an alleged error in the interpretation or application of state law.  *See* 28 U.S.C. § 2254(a) (West Supp. 2000); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Bustamante's claim relates exclusively to the state court's application of its own law, and he is therefore not entitled to relief.

3.      Jury Instructions

Bustamante claims that the trial court gave several incorrect jury instructions.  Respondent contends that none of the jury instructions were incorrect.

a.      *Felony Murder Instruction*

Although not entirely clear, Bustamante appears to argue that the jury was instructed, contrary to California law, they could find him guilty of first degree felony murder despite the fact that the target crime was assault with a deadly weapon.  (Pet'rs Ex. A at 73-75.)  Respondent notes that the jury was not instructed on first degree felony murder, nor did they convict Bustamante of first degree felony murder.  (Mem. of P. & A. in Supp. of Answer at 13-15.)  Rather, the jury was instructed on two theories of murder:  first degree murder and second degree murder committed while aiding and abetting an assault, the natural and probable consequences of which were Schaum's murder.  Bustamante was convicted of the latter.  (Lodgment No. 1, Vol. 2 of 2 at 0286-90, 0294-98, 0426.)

/ / /

1    "Instructional error will not support a petition for federal writ of habeas relief unless it is

2    shown 'not merely that the instruction is undesirable, erroneous, or even "universally

3    condemned,"'[citation omitted], but that 'the ailing instruction by itself so infected the entire trial

4    that the resulting conviction violates due process.' [citation omitted]." *Murtishaw v. Woodford*, 255

5    F.3d 926, 971 (9th Cir. 2001) (citing *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)); *see also*

6    *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). Moreover, the allegedly erroneous jury instruction

7    cannot be judged in isolation. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). Rather, it must be

8    considered in the context of the entire trial record and the instructions as a whole. *Id.*; *see also*

9    *Gilmore v. Taylor*, 508 U.S. 333, 343-44 (1993) (finding that the right to present a complete defense

10   does not entitle a defendant to a particular set of jury instructions).

11       Because he was not convicted of first degree felony murder, Bustamante has not established

12   that any jury instruction error occurred nor that any error "so infected the entire trial that the resulting

13   conviction violates due process." *Murtishaw*, 255 F.3d at 971 (internal citations omitted).[1]  He is not

14   entitled to relief as to this claim.

15       b.    *Failure to Give a Pinpoint Instruction on Aiding and Abetting*

16       One of the theories upon which Bustamante was prosecuted was that he aided and abetted an

17   assault on Schaum, the natural and probable consequences of which was Schaum's murder. In

18   California, "[a] person who encourages or facilitates the commission of a crime [i.e., aids and abets]

19   is criminally liable not only for that crime, but also for any other crime that is a natural and probable

20   consequence of the target crime." *People v. Hoang*, 145 Cal. App. 4th 264, 269 (2006) (citing

21   *People v. Prettyman*, 14 Cal. 4th 248, 260 (1996).)  "There must be a close connection between the

22   target crime a defendant aids and abets and the offense actually committed." *Id*. at 269. "On the

23   issue of foreseeability, the 'question is not whether the aider and abettor actually foresaw the . . .

24   crime, but whether, judged objectively, it was *reasonably* foreseeable.'" *People v. Karapetyan*, 140

25   Cal. App. 4th 1172, 1177 (2006) (quoting *People v. Mendoza*, 18 Cal.4th 1114, 1133 (1998) (italics

26   in original).)  California courts have upheld murder convictions in which the "target crime," i.e., the

27

28       _____

         [1]  Indeed, even Bustamante concedes that second degree murder was the "maximum exposure and
         ultimate criminal liability" to which he could be subjected.  (Pet'rs Ex. A at 73.)

1  crime which defendant is accused of aiding and abetting, is assault, and the natural and probable

2  consequences of the assault was a murder. *See id.*; *People v. Culuko*, 78 Cal. App. 4th 307 (2000);

3  *People v. Luparello*, 187 Cal. App. 3d 410 (1986).

4     California does not permit a defendant to be convicted of felony murder based upon a "target

5  crime" of assault, however. *People v. Ireland*, 70 Cal. 2d 522, 539-40 (1969). *Ireland* held that

6  "felony murder instructions [are] improper when they [are] based upon a felony that was an integral

7  part of the homicide." *Karapetyan*, 140 Cal. App. 4th at 1177-78 (citing *Ireland*, 70 Cal. 2d at 539.)

8  "Because a homicide generally results from the commission of an assault, every felonious assault

9  ending in death would be elevated to murder, relieving the burden of the prosecutor to prove malice

10  in most cases." *Id.* at 1178 (citing *People v. Hansen*, 9 Cal. 4th 300, 311-12 (1994). Bustamante's

11  attorney argued for a pinpoint instruction which would have extended California's *Ireland* rule to

12  Bustamante's case, and Bustamante faults the trial court for refusing to give the instruction. (Pet'rs

13  Ex. A at 76-79.) In arguing for this extension, Bustamante's counsel stated:

14     MR. CANNON: As to the issue that was mostly our discussion yesterday, I am
15  objecting to the court's giving of an instruction as currently phrased, specifically the one
    on aiding and abetting, because that instruction identifies the target offense as being that
16  of assault, the target offense being the offense that Mr. Bustamante allegedly aided and
    abetted. Because of the way the evidence in this particular case has evolved, in essence
    Mr. Bustamante is being charged with a de facto felony murder theory here, and, that is,
17  his involvement in a violent assault that resulted in a homicide should expose him to a
    homicide conviction. *Ireland* teaches that we cannot do that.

18
19     The reason we are in this posture, however, is [the prosecutor] has elected to
    charge this case in a particular way. He has elected to proceed on a particular theory, that
20  of aiding and abetting rather than the felony murder. But however it's characterized,
    your Honor, the fact of the matter is, it is involvement in a transaction, the result of
    which ultimately proved to be a homicide.

21
22     Now, once – I recognize where the problem is. When we look at the instruction
    on aiding and abetting, the last part of it talks about natural and probable consequences.
23  But that phrase does not delineate when a person is an aider and abettor, it merely
    delineates the scope of consequences that may be attached to that person once he is found
24  to be an aider and abettor, under the balance of that instruction, that when he has
    knowledge that someone else is about to do something and the defendant or the accused
25  doesn't act or does an act or gives advice and encouragement which he intends to further
    or facilitate the target offense.

26                                    . . . .

27     What the court is going to do, however, if it gives the instruction is it's going to
28  give this jury a piece of paper in which they can trace it down and they are going to find
    an assault, if they find him guilty of aiding and abetting an assault, that's what that
    instruction will lead them to, then they are going to find him guilty of a murder because

1    that's what the instruction says.  So in essence if they follow the instruction down and

2    believe that he aided and abetted an assault, this jury is going to find Jesus Bustamante
     guilty of a murder.

3

4    (Lodgment No. 2, Vol. X at 1562-65.)

5        Although the specific instruction defense counsel proposed is not in the record, counsel

6    apparently requested that the jury be instructed that Bustamante could not be convicted of murder if

7    they found he was aiding and abetting only an assault.  (*Id.*)  Counsel also asked that the jury make

8    "special findings" as to who they found Bustamante was aiding and abetting, what the target offense

9    was and what act, advice or encouragement Bustamante gave.  The trial court denied Bustamante's

10   requests:

11           I'm not going to instruct on felony murder.  But I think that the district attorney
             should be allowed to argue that if the jury believes that Mr. Bustamante, in charging out,
12           came charging out of that house, the first one out of the house, that he went to Mr.
             Schaum's car, that he leaned in with a beer bottle and/or a stick, that by doing so he
13           attacked Mr. Schaum, preventing him from leaving or escaping, and I think there is
             evidence that he attempted to start his car, he was told to leave, he was in the process of
14           leaving when the group attacked him, he was prevented.  And I think the jury could find
             that your client participated in that prevention by the attack upon him and that he aided
15           the others in the attack, and that the natural and probable consequences of the attack was
             the death of Mr. Schaum.
16

17   (Lodgment No. 2, Vol. X at 1568-69.)

18       Federal courts are "bound by a state court's construction of its own penal statutes."  *See*

19   *Aponte v. Gomez*, 993 F.2d 705, 707 (9th Cir. 1993).  Given California's interpretation of the *Ireland*

20   rule, the jury in Bustamante's case was properly instructed under California's aiding and abetting

21   law.  California Jury Instruction ("CALJIC") No. 3.00 told the jury that an individual is a principal,

22   and therefore equally guilty of the crime, if a person either "directly and actively [committed] the act

23   constituting the crime," or "aid[ed] and abet[ted] the commission of the crime."  (Lodgment No. 1,

24   Vol. 2 of 2 at 0286; CALJIC 3.00.)  Further, the jury was given a correct definition of aiding and

25   abetting, and was cautioned, contrary to Bustamante's contention, that mere presence at the scene of

26   a crime did not constitute aiding and abetting:

27   / / /

28   / / /

-13-

A person aids and abets the commission of a crime when he or she,

(1) with knowledge of the unlawful purpose of the perpetrator and

(2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice, aids, promotes, encourages or instigates the commission of the crime.

Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.

Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.

(Lodgment No. 1, Vol. 2 of 2 at 0287; CALJIC No. 3.01.)

Finally, the jury was instructed on California's natural and probable consequences doctrine, which holds a defendant liable for the reasonably foreseeable consequences of the target crime:

One who aids and abets another in the commission of a crime or crimes is not only guilty of that crime those crimes [sic], but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted.

In order to find the defendant Jesus Bustamante guilty of the crime of murder as charged in count one, you must be satisfied beyond a reasonable doubt that:

(1) The crime or crimes of assault with a firearm and/or assault with a deadly weapon were committed,

(2) The defendant aided and abetted such crime[s],

(3) A co-principal in such crime committed the crime of murder and

(4) The crime of murder was a natural and probable consequence of the commission of the crimes of assault with a deadly weapon.

(Lodgment No. 1, Vol. 2 of 2; CALJIC No. 3.02)

As noted above, in order to warrant federal habeas relief for jury instruction error, "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' [citation omitted]." *Murtishaw*, 255 F.3d at 971. Bustamante's quest to expand California's *Ireland* rule has been rejected by California courts, and thus the pinpoint instruction he requested was a misstatement of California law. Accordingly, Bustamante has not established that there was any error in the jury instructions relating to aiding and abetting liability, much less that any error "'by itself so infected the entire trial that the resulting conviction violates due process.'" *See Murtishaw*, 255 F.3d at 971 (internal citations omitted). Bustamante is not entitled to relief as to this claim.

-14-

1        c.      *Failure to Properly Instruct on the Elements of Attempted Assault/Assault*

2                *With a Deadly Weapon*

3        Bustamante contends the trial court did not properly instruct the jury on all the essential

4   elements of the crime of attempted assault/assault with a deadly weapon.  (Pet'rs Ex. A at 80-81.)

5   Specifically, he claims that the instruction did not require the jury to find that he had the intent to

6   commit battery.  (*Id.*)  Respondent counters that intent to commit a battery is not an element of the

7   crimes of assault or assault with a deadly weapon in California and that the jury instructions were

8   proper.  (Mem. of P. & A. in Supp. of Answer at 15-16.)

9        As previously stated, federal courts are "bound by a state court's construction of its own

10  penal statutes."  *See Aponte*, 993 F.2d at 707.  As Respondent correctly notes, in California, the

11  crimes of assault and assault with a deadly weapon are general intent crimes and do not require a

12  specific intent to commit a battery or injure the victim.  *People v. Williams*, 26 Cal. 4th 779, 788

13  (2001); *People v. Sargent*, 19 Cal. 4th 1206, 1220 (1999).  The California Supreme Court has stated

14  that in order to be found guilty of assault, "mere recklessness or criminal negligence is. . . not enough

15  [citations omitted] because a jury cannot find a defendant guilty of assault based on facts he should

16  have known but did not know [citations omitted]."  *Williams*, 26 Cal. 4th at 788.  Rather, "a

17  defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize

18  that a battery would directly, naturally and probably result from his conduct."  *Id.*  However, "an

19  assault does not require a specific intent to cause injury or a subjective awareness of the risk that an

20  injury might occur."  *Id.* at 790.  "Rather, assault only requires an intentional act and actual

21  knowledge of those facts sufficient to establish that the act by its nature will probably and directly

22  result in the application of physical force against another."  *Id.*

23       The jury in Bustamante's case was instructed on both assault and assault with a deadly

24  weapon.   As to assault, the jury was instructed as follows :

25              Every person who with general criminal intent makes an unlawful attempt
            coupled with the present ability to apply physical force upon the person of another, is
26          guilty of the crime of assault.

27              In order to prove such crime, each of the following elements must be proved:

28  / / /

-15-

1.  An unlawful attempt was made to apply physical force upon the person of another,

2.  At the time of such attempt the person who made the attempt had the present ability to apply such physical force, and

3.  The person making the attempt had a general criminal intent, which, in this case, means that such person intended to commit an act, the direct natural and probable consequences of which if successfully completed would be the application of physical force upon the person of another.

To constitute an assault, it is not necessary that any actual injury be inflicted. However, if an injury is inflicted it may be considered in connection with other evidence in determining whether an assault was committed and, if so, the nature of the assault.

(Lodgment No. 1, Vol. 2 of 2 at 0290; CALJIC No. 9.00.)

As to the crime of assault with a deadly weapon or by means of force likely to produce great bodily injury, the jury was instructed as follows:

Every person who commits an assault upon the person of another with a deadly weapon or instrument or by means of force likely to produce great bodily injury is guilty of the crime of violation of Section 245(a)(1) or with a firearm is guilty of a violation of Section 245 (a)(2) of the Penal Code.

In order to prove such crime, each of the following elements must be proved:

1.  A person was assaulted, and

2.  The assault was committed with a deadly weapon or instrument or by means of force likely to produce great bodily injury [or] with a firearm.

A deadly weapon is any object, instrument, or weapon which is used in such a manner as to be capable of producing, and likely to produce, death or great bodily injury.

Great bodily injury refers to significant or substantial bodily injury or damage; it does not refer to trivial or insignificant injury or moderate harm.

A firearm includes a revolver.

Actual bodily injury is not a necessary element of the crime. If such bodily injury is inflicted, its nature and extent are to be considered in connection with all the evidence in determining whether the means used and the manner in which it was used were such that they were likely to produce great bodily injury.

(Lodgment No. 1, Vol. 2 of 2 at 0289; CALJIC No. 9.01.)

Given California's definition of assault as delineated by *Williams*, the jury was properly instructed as to the elements of assault and assault with a deadly weapon. Indeed, much of the instructions related to those crimes closely tracked the language of *Williams*. Accordingly,

03cv0276

1   Bustamante has not established that the jury instructions in his case were erroneous, or that any error

2   in the assault instructions "'by itself so infected the entire trial that the resulting conviction violates

3   due process.'"  *See Murtishaw*, 255 F.3d at 971 (internal citations omitted).  He is not entitled to

4   relief as to this claim.

5           d.      *Failure to Instruct on Manslaughter*

6           Bustamante contends the trial court had a *sua sponte* duty to instruct the jury on the lesser

7   included crime of manslaughter.  (Pet'rs Ex. A at 82-83.)  Voluntary manslaughter is defined in

8   California as "the unlawful killing of a human being without malice [and] upon a sudden quarrel or

9   heat of passion."  (Cal. Penal Code § 192 (a).)  Involuntary manslaughter is defined as "the unlawful

10  killing of a human being without malice [and] in the commission of an unlawful act, not amounting

11  to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner,

12  or without due caution and circumspection."  (Cal. Penal Code § 192(b).)  Respondent argues that

13  Bustamante was not entitled to manslaughter instructions under California law.  (Mem. of P. & A. in

14  Supp. of Answer at 15-16.)  Respondent also notes that there is no clearly established Supreme Court

15  law which requires a trial court to instruct on a lesser included offense in non-capital cases.  (*Id.*)

16          In the context of a trial court's failure to give an instruction on a theory of the defense, the

17  Ninth Circuit has noted that "[u]nder the Due Process Clause of the Fourteenth Amendment,

18  criminal prosecutions must comport with prevailing notions of fundamental fairness . . . [which]

19  require that criminal defendants be afforded a meaningful opportunity to present a complete

20  defense." *Bradley v. Duncan*, 315 F.3d 1091, 1098-99 (9th Cir. 2002) citing *Mathews v. United*

21  *States*, 485 U.S. 58, 63 (1988) and *California v. Trombetta*, 467 U.S. 479, 485 (1984).  Thus, a

22  "'[f]ailure to instruct on the defense theory of the case is reversible error if the theory is legally sound

23  and evidence in the case makes it applicable.'" *Clark v. Brown*, 450 F.3d 898, 904-05 (9th Cir. 2006)

24  (quoting *Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004)); *Solis v. Garcia,* 219 F.3d 922,

25  929 (9th Cir. 2000); *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984) (quoting *James v. Reese*,

26  546 F.2d 325, 327 (9th Cir. 1976).)  However, the Supreme Court has recognized "that due process

27  requires that a lesser included offense instruction be given *only* when the evidence warrants such an

28

-17-

instruction." *Hopper v. Evans*, 456 U.S. 605, 611 (1982) (emphasis in original).[2]

Bustamante's theory at trial was that Nathan Truehitt, not he, was the real killer of Schaum. He presented no evidence that he killed Schaum either "without malice [and] upon a sudden quarrel or heat of passion" or that he killed Schaum "without malice [and] in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Cal. Penal Code § 192 (a), (b).) The entire thrust of his defense was to expose the motive and opportunity for Truehitt to commit the murder, Bustamante's corresponding lack of motive and opportunity for participating in Schaum's murder and the inconsistencies in the prosecution witness' versions of events. (Lodgment No. 2, Vol. X at 1690-1706). Accordingly, because the evidence did not support a manslaughter conviction, nor was that the theory of Bustamante's defense, his federal due process rights were not violated by the trial court's failure to give manslaughter instructions. *See Hopper*, 456 U.S. at 611; *Clark*, 450 F.3d at 904-05.

e.     *Failure to Give Accomplice Instructions*

Bustamante claims that the trial court should have instructed the jury with instructions regarding the testimony of accomplices. (Pet'rs Ex. A at 85.) He argues that Truehitt and Sergio Jacobo were accomplices to Schaum's murder, and that the jury should have been instructed to view their testimony with caution pursuant to CALJIC Nos. 3.10 – 3.14 and 3.18.[3]  Respondent contends

_____

[2] California law is consistent with *Hopper*. In California, a trial judge must instruct the jury on lesser included offenses if they are supported by substantial evidence, including defenses that are not inconsistent with defendant's theory of the case. *People v. Breverman*, 19 Cal. 4th 142, 148-49 (1998); *People v. Montoya*, 7 Cal. 4th 1027, 1047 (1994).

[3] CALJIC No. 3.11 states:

   You cannot find a defendant guilty based upon [the testimony of an accomplice] [or] [the testimony by a codefendant that incriminates the defendant] unless that testimony is corroborated by other evidence which tends to connect [the] [that] defendant with the commission of the offense.
   [Testimony [of an accomplice] [or] [by a codefendant] includes any out-of-court statement purportedly made by [an accomplice] [or] [a codefendant] received for the purpose of proving that what the [accomplice] [or] [the codefendant] stated out-of-court was true.]

   CALJIC No. 3.12 states:

   To corroborate the testimony of an accomplice there must be evidence of some act or fact related to the crime which, if believed, by itself and without any aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the

-18-                                                                                                   03cv0276

1   that the accomplice instructions were not warranted because Truehitt and Jacobo did not fit the

2   definition of "accomplice."  Moreover, Respondent argues, any error in the failure to give the

3   instructions was harmless because other witnesses corroborated the facts supporting Bustamante's

4   convictions, Truehitt's testimony was "strongly challenged" by the defense and other jury

5   instructions informed the jury that they must view Jacobo's contradictory testimony with care.

6   (Mem. of P. & A. in Supp. of Answer at 17-19.)

7        Under California law, an accomplice is defined as "a person who is subject to prosecution for

8   the identical offense charged . . . against the defendant on trial by reason of aiding and abetting or

9   being a member of a criminal conspiracy."  (CALJIC No. 3.10.)   The defendant has the burden of

10  proof, by a preponderance of the evidence, to establish that an individual is an accomplice.  (CALJIC

11  No. 3.19.)

12  _____

13       commission of the crime charged.
             However, it is not necessary that the evidence of corroboration be sufficient in itself to

14   establish every element of the crime charged, or that it corroborate every fact to which the
     accomplice testifies.
             In determining whether an accomplice has been corroborated, you must first assume the

15   testimony of the accomplice has been removed from the case. You must then determine whether
     there is any remaining evidence which tends to connect the defendant with the commission of

16   the crime.
             If there is no independent evidence which tends to connect defendant with the

17   commission of the crime, the testimony of the accomplice is not corroborated.
             If there is independent evidence which you believe, then the testimony of the accomplice

18   is corroborated.

19       CALJIC No. 3.13 states:

20           The required corroboration of the testimony of an accomplice may not be supplied by

21   the testimony of any or all of [his] [her] accomplices, but must come from other evidence.

22       CALJIC No. 3.14 states:

23           Merely assenting to or aiding or assisting in the commission of a crime without
     knowledge of the unlawful purpose of the perpetrator and without the intent or purpose of

24   committing, encouraging or facilitating the commission of the crime is not criminal. Thus a
     person who assents to, or aids, or assists in, the commission of a crime without that knowledge

25   and without that intent or purpose is not an accomplice in the commission of the crime.

26       CALJIC No. 3.18 states:

27           To the extent that [an accomplice] [or] [a codefendant] gives testimony that tends to
     incriminate [the] [a] [another] defendant, it should be viewed with caution. This does not mean,

28   however, that you may arbitrarily disregard that testimony. You should give that testimony the
     weight you think it deserves after examining it with care and caution and in the light of all the
     evidence in this case.

1    An accessory to a crime is not an accomplice under California law. *See People v. Snyder*, 112 Cal.

2    App. 4th 1200, 1220-21 (2003).

3         The prosecution's theory of the case was that Gonzalez, Bustamante and Flores killed

4    Schaum "as a pack" and as a show of bravado or machismo. (Lodgment No. 2, Vol. X at 1578-

5    1624.) Truehitt testified on direct examination that when Schaum arrived at the Wardlow house, he

6    and Carranza went outside. (Lodgment No. 2, Vol. V at 452-53.) Carranza began yelling at Schaum

7    and Truehitt told Schaum to leave. (*Id.* at 454.) Truehitt then saw people rushing at Schaum's car

8    with Bustamante at the passenger side window and Gonzalez at the driver's side. (*Id.* at 455-56,

9    457.) Schaum was being bounced around inside the car and it looked like he was being hit by the

10   individuals, although he could not specifically tell who was hitting. (*Id.* at 456.) He saw someone

11   wielding a bottle. (*Id.*) Truehitt saw Gonzalez standing over Schaum, a flash and a gun in

12   Gonzalez's hand. (*Id.* at 457.) Gonzalez ran into the street and Truehitt called 911. (*Id.* at 457-58.)

13        On cross-examination, defense counsel sought to establish a motive for Truehitt to kill

14   Schaum by portraying him as a jealous lover involved in a love triangle with Schaum and Carranza.

15   (*Id.* at 468-515; Vol. VI at 695-97.) Defense counsel also sought to impeach Truehitt by pointing out

16   inconsistencies in his accounts of the event, his location in relation to the car, and his relationship

17   with Carranza, and posit him as the possible real killer by trying to establish him as a violent

18   methamphetamine user who owned a gun. (Lodgment No. 2, Vol. VI at 704-822.) In closing

19   argument, the prosecutor pointed to the three defendants as the killers, arguing they worked in

20   concert with each other to bring about the murder of Schaum. (Lodgment No. 2, Vol. X at 1578-

21   1624.) Defense counsel argued that Truehitt was the individual who had the strongest motive for

22   killing Schaum and was likely the actual killer. (*Id*. at 1690-1706.)

23        Jacobo was offered immunity for his testimony. (Lodgment No. 2, Vol. VII at 837.) His

24   testimony on direct examination was contradictory and inconsistent. He denied seeing Gonzalez

25   with a gun before Schaum's murder, although he was confronted with his testimony at the

26   preliminary hearing, at which he admitted seeing Gonzalez with a gun. (*Id.* at 837-45.) He

27   acknowledged that he testified at the preliminary hearing that Gonzalez showed him the gun, told

28   him it was a .44 caliber weapon and that Bustamante was present. (*Id.* at 849.) He acknowledged

1   that he told police in an interview that Gonzalez was showing off the gun and some hollow-point

2   bullets he had gotten for it.  (*Id.* at 858-59.)  He saw all three defendants walk out of the Wardlow

3   house after Schaum arrived.  (*Id.* at 868-69.)  He heard a shot.  (*Id.* 869070.)  Later, he heard

4   Bustamante say that he hit Schaum in the face with a bottle.  (*Id.* at 906.)

5          On cross-examination, Jacobo testified that he was providing Truehitt with drugs, knew that

6   he did not like Schaum and had threatened Schaum in the past.  (*Id.* at 950, 959.)  He also knew that

7   Truehitt had a revolver.  (*Id.*)  Jacobo also testified he was intimidated by police into telling a version

8   of the events which comported with their theory that Gonzalez, Flores and Bustamante killed

9   Schaum, and that they called him a liar when he tried to tell them something different.  (*Id.* at 954-

10  58.)  He also admitted that he had some blood on his pants after the murder and that he was worried

11  the police would charge him with Schaum's murder so he made up much of the story he told police

12  which implicated Gonzalez, Flores and Bustamante.  (*Id.* at 958, 960, 970.)

13         During closing argument, the prosecutor discussed Jacobo's testimony, but acknowledged it

14  was weak and that the jury would have to "test" his credibility because his testimony was so

15  contradictory.  (Lodgment No. 2, Vol. X at 1590-91, 1595-96, 1597, 1603, 1611-12.)  He argued that

16  Jacobo's statement about Bustamante's admitting to hitting Schaum with a bottle was corroborated

17  by testimony by Truehitt, who said he saw someone hitting Schaum with a bottle, and Bustamante's

18  own statement.  (*Id.* at 1601-02.)

19         As the Supreme Court has noted, in evaluating jury instruction error,"the . . . burden is

20  especially heavy [when] no erroneous instruction was given," and "[a]n omission, or an incomplete

21  instruction, is less likely to be prejudicial than a misstatement of the law."  *Kibbe*, 431 U.S. at 154.

22  Here, Bustamante claimed at trial that Truehitt was the true killer and he had nothing to do with the

23  assault on Schaum.  Accordingly, Bustamante has not established that the failure to give accomplice

24  instructions "so infected the entire trial that the resulting conviction violates due process.' [citation

25  omitted]."  *Murtishaw*, 255 F.3d at 971.  He is not entitled to relief as to this claim.

26         4.    Failure to Rule on a Defense Objection During Closing Argument

27         Next, Bustamante claims that the trial court committed prejudicial error when it failed to rule

28  on defense counsel's objection during closing argument.  (Pet'rs Ex. A at 84.)  Specifically,

-21-                                                       03cv0276

1  Bustamante points to the prosecutor's statement that "Bustamante lead [the codefendants] out" of the

2  house and that "[Bustamante] said he was the first one out." (Lodgment No. 2, Vol. X at 1607.)

3  Defense counsel objected, the trial judge did not rule, and the prosecutor then corrected his

4  statement, saying "He was one of the first people out." (*Id.*)  Respondent argues that any error

5  committed by the trial court did not deprive Bustamante of a fair trial or due process. (Mem. of P. &

6  A. in Supp. of Answer at 19.)

7       It appears from the record that the prosecutor corrected his erroneous statement about

8  Bustamante before the trial court could rule on defense counsel's objection.  But, even assuming the

9  trial court's failure to rule on the defense objection was error, on federal habeas corpus review

10 Bustamante must establish that the error had a substantial and injurious effect on the verdict in order

11 to obtain relief.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  He has not done so.  The

12 statement was a very small portion of the entire argument and trial and the prosecutor corrected his

13 error immediately after the objection.  Under these circumstances, Bustamante has not shown he is

14 entitled to relief as a result of this error.

15       5.       Denial of the Severance Motion

16       Bustamante next claims the state court erred by denying his motion for severance which

17 denied him a fair trial as a result of being tried with Gonzalez and Flores.  (*Id.*)  Respondent counters

18 that the state court's denial of this claim was neither contrary to, nor an unreasonable application of,

19 clearly established Supreme Court law. (Mem. of P. & A. in Supp. of Answer at 19-20.)[4]

20       The Supreme Court has addressed the question of misjoinder of defendants in the context of

21 Rule 8 of the Federal Rules of Criminal Procedure in *United States v. Lane*, 474 U.S. 438 (1986) and

22 *Zafiro v. United States*, 506 U.S. 534 (1993).  In deciding those cases, the Court applied federal

23 constitutional principles in their discussion of misjoinder and severance under Rule 8.  In *Lane*, the

24 _____

25       [4]  Because the *last* court to render a decision on this claim, the California Supreme Court on habeas corpus review, denied it without citation of authority, this Court must look through to the *last* reasoned state court opinion as the basis for its analysis.  *Ylst*, 501 U.S. at 801-06. As with Bustamante's other claims, that court did

26 not reach the merits of his claims but instead imposed a state procedural rule, which this Court has concluded does not preclude federal habeas review.  (*See* Lodgment No. 11; Section IV(B)(1) of this Report and

27 Recommendation.)  Accordingly, contrary to Respondent's argument, as with Bustamante's other claims, the Court must conduct a *de novo* review of the claim.  *Pirtle*, 313 F.3d at 1167.  This is true even though Bustamante

28 raised this claim on direct appeal and the state appellate court denied it in a written opinion because that opinion was not the *last* reasoned opinion rendered on the claim by the state courts.

1   Supreme Court noted that "the specific joinder standards of Rule 8 are not themselves of

2   constitutional magnitude." *Id.* at 446 and n.8.  However, the Court also stated that "misjoinder

3   would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a

4   defendant his Fifth Amendment right to a fair trial." *Id.*  The Court explained that "an error

5   involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in

6   actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's

7   verdict.'" *Id.* at 449 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).  Further, in

8   *Zafiro*, the Court explained that the relationship between the Federal Rules of Criminal Procedure

9   and general fair trial principles:

10         [I]t is well settled that defendants are not entitled to severance merely because
           they may have a better chance of acquittal in separate trials.  *See e.g., United States v.*
11         *Martinez*, 922 F.2d 914, 922 (1st Cir. 1991); *United States v. Manner*, 887 F.2d 317, 324
           (D.C. Cir. 1989), *cert. denied*, 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990).
12         Rules 8(b) and 14 are designed "to promote economy and efficiency and to avoid a
           multiplicity of trials, [so long as] these objectives can be achieved without substantial
13         prejudice to the right of the defendants to a fair trial."  *Bruton*, 391 U.S., at 131, n.6
           (internal quotation marks omitted).

14

15   *Zafiro*, 506 U.S. at 540.

16         *Zafiro* identified two possible ways in which a denial of severance could affect a defendant's

17   substantial rights and violate his right to a fair trial: (1) if the denial would "compromise a specific

18   trial right of one of the defendants," or (2) if the denial would "prevent the jury from making a

19   reliable judgment about guilt or innocence" of the defendant, for example, when "evidence that the

20   jury should not consider against a defendant and that would not be admissible if a defendant were

21   tried alone is admitted against a codefendant." *Id.* at 539.

22         Bustamante does not specifically state why he was entitled to severance, other than to claim

23   that "the [prosecution] was founded upon petitioner's association with codefendants, not his actual

24   criminal conduct" and that he suffered "prejudicial association with codefendants."  (Pet'rs Ex. A at

25   86.)  As noted by *Zafiro*, "defendants are not entitled to severance merely because they may have a

26   better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540.  Bustamante has not shown that

27   the denial of his severance motion denied him a specific trial right, nor that it "prevent[ed] the jury

28   from making a reliable judgment about guilt or innocence." *Id.* at 539.  He is not entitled to relief as

1    this claim.

2          6.    Trial Court Bias

3          Bustamante contends the state trial court judge became biased against him after Truehitt

4    testified that he was allegedly dealing drugs.  (Pet'rs Ex. A at 87, 134.)  Bustamante claims that the

5    trial judge's rulings became "more biased" after this revelation, rendering his trial unfair.  (*Id.*)

6    Respondent correctly states that Bustamante has provided no evidence, beyond vague and conclusory

7    allegations, that the trial judge was biased against him.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir.

8    1994).  As such, he has not established that he was denied a fair trial or an impartial judge.

9          7.    Prosecutorial Misconduct

10         Bustamante next alleges that the prosecutor was improperly obsessed with obtaining a

11   conviction and committed misconduct throughout the trial by improper questioning, making threats

12   to defense counsel, withholding material information about a prosecution witness, presenting coerced

13   and false testimony, improper argument, and vindictively increasing the charges against him.  (Pet'rs

14   Ex. A at 87-96, 137-155.)  Respondent states that although the record may reflect mistakes

15   committed by the prosecutor and an unfriendly relationship between the prosecutor and defense

16   counsel, there was no evidence of actual, prejudicial misconduct.  (Mem. of P. & A. in Supp. of

17   Answer at 21-31.)

18         "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

19   fairness of the trial, not the culpability of the prosecutor.  *Smith v. Phillips*, 455 U.S. 209, 219

20   (1982).  As Respondent points out, "it 'is not enough that the prosecutors' remarks were undesirable

21   or even universally condemned.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Rather, a

22   prosecutor commits misconduct when his or her comments "'so infect. . . the trial with unfairness as

23   to make the resulting conviction a denial of due process.'"  *Id*. (quoting *Donnelly v. DeChristoforo*,

24   416 U.S. 637 (1974).)  "Moreover, the appropriate standard of review for such a claim on writ of

25   habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'"

26   *Id.* (citing *Donnelly*, 416 U.S. at 642).

27   / / /

28   / / /

03cv0276

1          a.      *Obsession to Convict/Questioning of Jacobo*

2          Bustamante cites the questioning of prosecution witness Sergio Jacobo as support for his

3   contention that the prosecutor's obsession with convicting resulted in prosecutorial misconduct. (*See*

4   Pet'rs Ex. A at 88.)  Respondent dismisses these instances as merely the product of a "hard fought

5   trial with active litigants."  (Mem. of P. & A. in Supp. of Answer at 21-22.)

6          In support of this claim, Bustamante cites to the prosecutor's direct examination of Sergio

7   Jacobo, a recalcitrant witness.  The first instance referred to by Bustamante occurred when the

8   prosecutor asked Jacobo about his statement to police that the day of the murder, Gonzalez showed

9   him a gun.  At trial, Jacobo testified that he did not recall seeing Gonzalez with a gun.  The

10  prosecutor, Mr. Bowman, then attempted to impeach him with his prior statements to police:

11  BY MR. BOWMAN:

12          Q.  You don't recall?

13          A.  No, I don't

14          Q.  And do you recall him telling you that he had just gotten a gun?

15          A.  No, I don't.

16          Q.  And it was a revolver, wasn't it?

17          MR. PFEFFER: Objection; assumes facts not in evidence.  He is cross-examining
    his witness.
18
            THE WITNESS: I don't recall.
19
            THE COURT: He has answered the question.  He doesn't recall.
20
    BY MR. BOWMAN:
21
            Q.  You don't recall?
22
            A.  No, I don't.
23
            MR. BRAHMS: Excuse me, Mr. Bowman.  Could he maybe pull the microphone
24  closer, get closer to the microphone?  He is starting to fade out.

25  BY MR. BOWMAN:

26          Q.  You actually held the revolver in your hands, the revolver Mr. Gonzalez gave
    to you, right?
27
            MR. PFEFFER: Objection, your Honor.  This is in the form of impeachment.  It
28  assumes facts not in evidence.  The man has denied that he saw the gun.  He is now

cross-examining him.  I believe that's improper without some additional steps being taken.

THE COURT: Reask the question, please.

BY MR. BOWMAN:

Q.  Did you hold a gun that Mr. Gonzalez gave you in your hands?

A.  No, I didn't.

Q.  Were Sherry Jacobson and Jesse Bustamante present when you held that gun in your hands?

MR. PFEFFER: Objection, your Honor.  Assumes fact not in evidence; an attempt to trick this witness.

THE COURT: No.  Overruled.  You may answer the question.

THE WITNESS: What was that?

BY MR. BOWMAN:

Q.  You can answer.  Were Sherry Jacobson and Jesse Bustamante present when you held a gun in your hands?

MR. CANNON:  Your Honor, that assumes fact not in evidence.

THE COURT: One at a time, please.

MR. CANNON: Your Honor, this witness has testified he did not hold a gun in his hand, so there is no time at which he held the gun in his hand so he cannot answer the question.

THE COURT: Let me see counsel.

(Lodgment No. 2, Vol. VII at 837-39.)

At this point, there was a bench conference during which the trial judge told the prosecutor that, in order to avoid posing questions which assumed facts not in evidence, he must "go back to the very foundation."  To do so, he should ask Jacobo a question and, if Jacobo answers in contradiction to what he told police in his statement or states he does not remember, then he may confront him with his prior inconsistent statement.  (*Id.* at 839-40.)  The prosecutor agreed to do so.  (*Id.* at 840.)  The prosecutor also indicated that if Jacobo continued to answer questions in this manner, he would be seeking an official ruling from the court that Jacobo was being evasive in his answers, enabling him to bring in Jacobo's statement to police as impeachment via the officers' testimony.  (*Id.* at 840-41.)

Following further questioning by the prosecutor during which defense counsel objected to the prosecutor's method of impeaching Jacobo, another bench conference was held during which the trial judge admonished the prosecutor to employ the proper methods to impeach Jacobo:

> THE COURT: Yes. I don't think that's a proper question and answer. You can go to the next one where there is a question answered. And that's why it's very important, counsel, that you make a record and you have some verbal response, particularly when you get to the area of impeachment. I would suggest to you, however, that if you plan to impeach him from his transcript at the preliminary hearing that you get him to tell you that that's what the transcript says.

> You have to read the question, answer, was that your testimony at the preliminary hearing. So that last part is stricken, on page 99 lines 5 and 6 are stricken.

> MR. CANNON: Thank you, your Honor.

> (The following proceedings were had in open court and in front of the jury:)

> THE COURT: The question and answer given by Mr. Bowman is stricken, and it's specifically this question, I'm going to admonish the jury to disregard it:

> "Question: You gave it back to the defendant?"

> "Answer: (Witness nods head affirmatively.)"

> That is stricken. You are admonished to disregard it.

(*Id.* at 847-48.)

The prosecutor continued questioning Jacobo, who testified he didn't remember much of what he told police about what occurred that day before the murder. (*Id.* at 848-52.) He then asked, in front of the jury, whether the judge found Jacobo's answers to be evasive, and defense counsel objected. (*Id.* at 852.) A bench conference occurred, during which defense counsel complained about the prosecutor's actions and asked the court to deny the prosecutor's motion on the record. The court denied the request because any comment on the motion would have endorsed either the credibility or non-credibility of Jacobo. (*Id.* at 852-55.) He again admonished the prosecutor to "do it the way it's supposed to be done." (*Id.* at 856.)

The prosecutor then questioned Jacobo about his statement to police that Gonzalez showed him hollow-point bullets at the same time Gonzalez showed him his .44 caliber revolver. (*Id.* at 858-60.) Defense counsel objected and the trial judge again expressed frustration with the prosecutor

1   about his incorrect method of questioning Jacobo.  (*Id.* at 860-65.)  Bustamante's counsel accused

2   the prosecutor of misconduct, but the court did not make a formal finding of misconduct.  (*Id.* at

3   865-67.)

4        The next incident occurred when the prosecutor asked Jacobo whether he heard Flores say

5   something as Flores got into the car after the murder.  Jacobo testified he did not remember Flores

6   saying anything, and the prosecutor read his testimony from the preliminary hearing during which

7   Jacobo said that "[Flores] had mentioned that he stuck him [Schaum].  I don't know if it was with a

8   stick, a bottle, a gun, or a knife."  (*Id.* at 875.)  Defense counsel objected that the material being

9   elicited violated the rule of *Bruton v. United States*, 391 U.S. 123 (1968), and the California version

10  of this rule, *People v. Aranda*, 63 Cal. 2d 518 (1965).  *Bruton* and *Aranda* hold that the admission of

11  a non-testifying co-defendant's confession which inculpates a defendant at a joint trial violates the

12  defendant's Sixth Amendment confrontation rights.  *Bruton*, 391 U.S. at 126; *Aranda*, 63 Cal. 3d at

13  523.  Following a bench conference  and a hearing outside the presence of the jury, the court

14  concluded that there was no violation of the *Bruton/Aranda* rule and again instructed the prosecutor

15  on how to properly impeach Jacobo.  (Lodgment No. 2, Vol. VII at 875-93.)  In response to defense

16  counsel's expressed concern, the prosecutor also assured the court and counsel that he would not

17  elicit the specifics of a conversation allegedly had between Gonzalez and Bustamante which Jacobo

18  overheard.  (*Id.* at 893.)

19       The prosecutor then continued questioning Jacobo, asking him whether he remembered

20  Bustamante telling him that he hit Schaum in the face with a bottle.  Counsel vehemently objected

21  that the prosecutor was again creating a *Aranda/Bruton* problem by not being specific enough in his

22  questioning and permitting Jacobo to testify as to statements made by codefendants about other

23  codefendants.  Defense counsel accused the prosecutor of misconduct, and the trial judge chastised

24  the prosecutor:

25       THE COURT: But here's the problem.  And I understand what [defense counsel]
         Mr. Cannon is talking about.  There is more than one conversation.  Every question that
26       you pose, you should place the time, the location, the persons present, personal
         knowledge, all of these things, because as I look at that transcript, this man talking to the
27       police is all over the place.  He is talking about conversations at the hotel, he is talking
         about potential *Aranda/Bruton* problems.  So it's encumbent upon you to specify and ask
28       him whether or not he heard at the house such and such, say whatever the statement is.

1

2          You are getting yourself boxed in where you are going to be faced with
          *Aranda/Bruton*.  And a couple years down the line, if there is a conviction in this case,
          you are going to be redoing it, Mr. Bowman, and the Court of Appeal is not going to
3          appreciate what you did.

4          So you have got to lay the foundation.  Even though I overruled the objection, I
          wasn't aware of that transcript.  And you should have done your homework and you
          should be aware of the transcript that on the very next page he is talking about something
5          happening at the hotel, which is a totally different conversation.

6          So the question has to be the house with these people present.  And every
          question should be posed if you are going to ask him about conversations at the house
7          with that preliminary information and that he personally heard it from the speaker that
          you are referring to, that is, Jesse.  That's it.

8

9   (Lodgment No. 2, Vol. VII at 902-03.)

10          Defense counsel continued to argue that the testimony the prosecutor had already elicited

11   presented an *Aranda/Bruton* problem and accused the prosecutor of asking his questions without a

12   good faith belief about the context of the conversations.  (*Id.* at 903-04.)  The prosecutor disagreed,

13   and the court again explained the problem to the prosecutor:

14          THE COURT: I understand that.  But there are multiple conversations, multiple
          subject matters, and you have to specify and make sure he understands.  With very simple
15          questions you have to make sure this man understands what you are asking him, and that
          is that he heard himself out of the mouth of Jesse a statement as follows, and where was
16          the conversation, who was present.  I mean, that's what you've got to do, otherwise, you
          are going to get – you are going to put these guys in a position where they can't cross-
17          examine it may have been hotel conversation and they are going to be
          questioning him about one of the co-defendants.  That's the problem.

18
          MR. CANNON: We are in that position, your Honor.
19
          THE COURT: Let's find out, otherwise I will strike it.
20
          MR. CANNON: I ask the court to strike it now and admonish the jury.  Your
21   Honor –

22          THE COURT: Let me see if he can correct it.

23          MR. CANNON: Your Honor, I want to point out for the record.  I brought the
          issue up.  I discussed it in good faith as an officer of the court.  I brought it up.  And Mr.
24          Bowman, all he has done now is say, "No, it didn't happen.  I'm not going to talk about
          what happened at the hotel."
25
          This is terrible.  This is terrible.  He can't be getting away with this.  He has
26          infected this jury again by playing silly little word games.  I have not misled this court,
          yet this gentleman has misled the court repeatedly on his intentions.  I ask for proffers;
27          I'm not getting the proffers.  He says, "I'm not going to talk about the hotel."

28          I again ask the court for one citation to the discovery, to the transcript where it

-29-

1   says this statement was made at Sergio Bustamante's house.  In fact, this witness said
2   that at Sergio Bustamante's house they didn't talk about details.  That was under
    pressure.  There is no place in the discovery, in potential evidence in the transcript where
3   this conversation could conceivably have come from the house of Sergio Butamante.

4           MR. BOWMAN: Your Honor, I disagree.

5           MR. CANNON: Cite it.

6           THE COURT: Lay the foundation.  If it's not, I'm going to strike that testimony.

7           MR. BOWMAN: Your Honor, I just have on objection.  Mr. Cannon is engaged
    in a personal attack.  I don't want to get involved in that, but I'm getting tired of hearing
    it.  I wish the court would tell him to let's make it professional and keep it clean.

8           MR. CANNON: Listen to this.

9           THE COURT: Okay.  Let's go.

10

11  (*Id*. at 904-06.)

12          A few pages later, the prosecutor was again called to task for asking questions which elicited

13  improper evidence.  This time, he asked Jacobo whether any of the defendants burned their clothes

14  after the murder.  Jacobo replied that no, they did not, but then began volunteering that the had heard

15  something about it.  (*Id*. at 907.)  Defense counsel objected that the prosecutor could not have had a

16  good faith belief that Jacobo had seen people burn their clothes because the discovery suggested that

17  Jacobo had heard from other people that the defendants had burned their clothes.  (*Id*. at 908-09.)

18  Upon being questioned by the court, the prosecutor admitted that he did not have any proof that

19  Jacobo actually saw people burning their clothes, and the court admonished him for it:

20          THE COURT: You know you can't do that, Mr. Bowman.  That's hearsay.  I
    mean, you can't do that.  The problem it, you put that before a jury, and even if he says
21  no, even though your question is not evidence, you know –

22          MR. BOWMAN: I had a good faith belief people did burn their clothes on the
    basis of what was said by him.
23
            THE COURT: That's not the issue.  The issue is do you have a good faith belief
24  that he saw it, not that you believe that they did it.  Find somebody, get somebody up
    here that says, "I saw them do it."  That's the problem.  I'm not testing your good faith
25  belief, but it has to be based on substance.  And if you have a witness that says, "I saw
    them burn the clothes," bring them up here.  The fact that this man heard it, that's
26  improper.  You can't do that.  Now you have planted in the jury's mind that these guys,
    after committing a terrible crime, burned their clothes, but there is nobody going to say
27  it.

28          MR. CANNON: Now what do we do?  Now what do we do?

1    THE COURT: Well, I will think about it.  Let's go on to something else.

2  (*Id.* at 909-10.)

3    The Court then held a discussion with the attorneys about how to correct the problem caused

4  by the prosecutor's question.  (*Id.* at 911-12.)  Following a discussion regarding the proper remedy,

5  defense counsel again pointed out that there was no basis upon which the prosecutor could have

6  believed in good faith that Jacobo had personal knowledge of the defendants burning their clothes.

7  (*Id.* at 912-16.)  The court told the prosecutor:

8    THE COURT: Well, but you see Mr. Bowman, when – that's why I told you,
     each question has to be prefaced with who is present.  I agree with you, that if Sergio
9    Bustamante, moments after a murder, talks to these three defendants at the same time,
     same location, everything the same, and makes that statement, that's one thing.  You
10   never established that.  I don't know that one of these may have left the room when that
     particular statement was made.  That's why I tell you, every time you are talking about
11   at Sergio Bustamante's house you have to lay the foundation that these three are there

12   together at the same time, not bits and pieces.  And we can't – nobody can figure out who
     is there.  Each question must be prefaced: who is there, who is the speaker, who is
13   talking.

14     To be admissible against each one of them, all three of them have to be there.
     You can't have just two of them listening to Sergio Bustamante and one of them going
15   to the bathroom, or wiping off blood, or doing whatever they are doing.  That's why I
     told you each question must be prefaced with: who's there, who is present, is Mr.
16   Gonzalez there, Mr. Flores, Mr. Bustamante, all three of them when the statement is
     made.

17
       But then you turned around and you asked him whether or not they burned their
18   clothes.  It's a far cry from what Mr. Sergio Bustamante said, if I understand your offer
     of proof: "You better burn your clothes, get rid of these clothes."
19

20  (*Id.* at 916-17.)

21    Counsel then asked the court to strike all of Jacobo's testimony due to the impropriety of the

22  prosecutor's question and the restrictions on cross-examination created by it.  (*Id.* at 917-22.)

23  Following the noon recess, the court heard further argument on the defense request to strike Jacobo's

24  testimony.  The court said:

25     THE COURT: Well here's how I analyze the situation.  I agree that the asking of
     the question poses some problems for the defense, as I now understand the anticipated
26   cross-examination.

27       My concern is whether or not Mr. Bowman knew from this witness that he had
     personal knowledge that somebody, namely, one of these three defendants, burned their
28   clothes.  And I'm not going to inquire of Mr. Bowman whether or not he asked that

-31-                                                                          03cv0276

question in any type of an interview or communication with Sergio Jacobo. And he may – he may think that he asked the question in good faith; but I really question that that could be the case unless he knew from Mr. Jacobo that the answer to the question was "yes." Then that, of course, is a different situation. But asking a question such as that where you don't know the answer to the question doesn't indicate to me that it was asked in good faith because there's no assurance that he as personal knowledge of this.

And that subject matter is I think pretty powerful evidence. If this jury were to somehow conclude that each of these defendants burned their clothes immediately after a murder, the inference is severe. One of them is: they did it. They got blood on their clothing. They didn't want to have their clothing identified as being the clothing that they wore, that is, the shooter and/or stabber or stabbers, as the case may be. And so I think the inference is pretty – it's a pretty strong inference that a jury could draw from the evidence.

So my concern, Mr. Bowman, is when you say you had a good faith belief in it, just saying is doesn't make it so. That's the problem. You may have thought in your own mind that you had a good faith belief that somebody burned their clothes and I may think it and the jury may think it. The problem is there is no evidence of it. And that's I think where the problem is, unless Jacobo told you that the answer to the question is "yes."

So the question that I have is: What remedy do I fashion for this jury? I'm not going to strike the testimony of Jacobo.

. . . .

For whatever it's worth, I think – I think Mr. Bowman asked the question knowing full well the question he was going to ask, but I don't think he knew what the witness was going to respond, how he was going to respond. Now that may be because he did not talk to the witness beforehand. It's his witness. The witness is in custody. From everything I know, the witness was available, accessible, could be interviewed with or without his attorney and the whole business gone into beforehand.

. . . .

So I think that Mr. Bowman asked the question intentionally. I mean I don't think it's like cross-examination where you ask a question, you don't know the answer. And everybody tells you: Don't ask the question unless you know the answer to the question. So this isn't a case of cross-examination. This is his witness. And I don't know if he expected a "yes" or "no" answer from Sergio Jacobo, I'm not sure. But I think he intentionally asked the question. I don't think he knew what the answer was going to be, but that's his fault for not knowing it before you broach the subject with one of your own witnesses.

So I think doing it's harmful to the defense. I think so. But I'm just wondering whether or not you gentlemen are a little less trusting of the jury than I am. I don't know but what this jury can totally put that out of their head and not even consider it under a proper admonishment, and not discuss it back in the jury room. If it hadn't come up, for all I know they could think it. I could never find out whether or not they would think it in their deliberations, whether they would even talk about it in their deliberations, even though there has been no evidence of it.

So I think it was a bad question. I've already found that. I don't think it was done in good faith because he didn't know the answer to the question. He was just kind

-32-

1    of shopping.  The problem is that he broached an area.

2            And this is the problem, Mr. Bowman, that you as the prosecutor are in a very
     unique, powerful position vis-a-vis these defendants.  You have the resources, you have
3    the investigative tools, you have the ability to make certain calls during the trial, such as
     granting of immunity, that only the prosecutor can do.  But with that also goes the public
4    responsibility to make sure that you do noting that would jeopardize these gentlemen
     receiving a fair trial.  I know you think they are guilty.  I know the defense counsel think
5    they are not guilty.  That's why this is called an adversary proceeding.  It's up to the jury
     to decide whether or not they are guilty or not guilty.  But your responsibility is to make
6    sure that you do nothing that would jeopardize their receiving a fair trial.

7            And asking a question that you don't know the answer to of your witness is a real
     no-no because you should have prepared your witness.  And you could have very easily
8    asked Mr. Jacobo back in the hallway this morning, wherever you were with him: "Did
     either of these three ever burn their clothes in your presence?"  or "Did they ever tell you
9    they burned their clothes?"  And it would have been done.  You would have had the
     answer.  And if he would have told you "No," then I would have taken different steps.

10
             But I think that what I'm going to do is I'm going to admonish the jury.  I'm
11   going to tell them that it was an improper question.  I'm going to tell them that they are
     to totally disregard it, they are not to discuss it during their deliberations, it's not to enter
12
     into their deliberations in any way, and inquire of them whether or not they could follow
13   that admonishment.  If they can't, the I will do something else, unless you object to my
     doing that, and leaving it the way it is.
14

15   (*Id*. at 940-42.)

16           Bustamante's defense counsel then accused the prosecutor of intentional prosecutorial

17   misconduct and asked the court to declare a mistrial and dismiss the case.  (*Id.* at 943.)  The court

18   declined and admonished the jury as follows:

19           THE COURT: Again, I have to apologize to you, ladies and gentlemen.  At the
     beginning of this trial in describing the process to you, I tried to explain to you as clearly
20   as I could that what counsel say during the course of this trial is not evidence.  I think
     now that you have been with us for awhile you start to see that it's the evidence – the
21   answer is the evidence given by the witness to a particular question.

22           This witness was asked a question this morning that I find to have been improper,
     and that's the question about the burning of clothes.  That was not a proper question.  I
23   am striking the question and the answer from the record.  And I'm admonishing you, and
     I'm going to ask each of you whether or not you can totally put that out of your head.
24   Don't consider it.  You are not to discuss it.  It's not to enter into any of your
     deliberations in any way, the subject matter of that question.
25

26   (*Id*. at 947-48.)

27           The court then asked each juror whether they would be able to comply with the court's

28   admonition, and each one replied that they could.  (*Id.* at 948-49.)  The prosecutor then concluded his

03cv0276

1  direct examination and defense counsel conducted their cross-examination of Jacobo.  (*Id.* at 949-

2  74.)

3          Contrary to Respondent's characterization of the prosecutor's conduct during Jacobo's

4  examination, the prosecutor was not simply aggressively questioning Jacobo, nor did the court

5  decline to find misconduct.  Rather, the record reflects a prosecutor who either could not or would

6  not properly impeach Jacobo with his prior testimony and who, as a result, placed some inadmissible

7  and potentially prejudicial information before the jury by assuming facts not in evidence in the

8  questions he posed, (Lodgment No. 2, Vol. VII at 839-41, 846-48), asking the court to comment on

9  Jacobo's credibility in front of the jury and reading testimony from the preliminary hearing, (*id.* at

10  852-56), improperly characterizing prior testimony, (*id.* at 860-66), improperly eliciting testimony

11  about co-defendants' statements, (*id*. at 875-93, 900-906), and improperly posing a question which

12  he knew would elicit prejudicial hearsay regarding whether the defendants burned their clothes, (*id*.

13  at 907-24, 930-49.)  In every instance, the judge reprimanded the prosecutor.  Two of these instances

14  were serious enough that the court struck the testimony and admonished the jury to disregard the

15  testimony.  (*Id.* 848, 947-48.)  With regard to the question regarding the burning of clothes, the court

16  concluded that the question was not asked in good faith, an implicit finding of misconduct.  (*Id.* at

17  940-42.)

18          Nevertheless, as noted above, "the touchstone of due process analysis in cases of alleged

19  prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.  *Smith*, 455

20  U.S. at 219.  After carefully reviewing the record, the Court concludes that although the prosecutor's

21  actions were inappropriate at best, Bustamante was not denied a fair trial as a result of the

22  prosecutor's actions.  Because Jacobo's testimony was so contradictory and confusing, and because

23  he denied having much memory of the incidents in question, the jury likely did not place much

24  emphasis on it in reaching their conclusion.  Nor was Jacobo's testimony a major portion of the case

25  against Bustamante.  Rather, the prosecution's case rested mainly on the testimony of Jacobson and

26  Truehitt.  Jacobson testified that Gonzalez showed her and Bustamante a large revolver on the

27  afternoon of the murder, and that she saw Bustamante, Gonzalez and Flores come out of the house

28  and attack Schaum in his car.  (Lodgment No. 2, Vol. IV at 129-33.)  She then heard a gunshot and

-34-

saw a flash and ran into the house.  (*Id.* at 133.)  Truehitt testified that he saw Bustamante on the passenger side of the car and Gonzalez on the driver's side.  (Lodgement No. 2, Vol. V. at 456-57.)  He saw the individuals surrounding the car hitting Schaum, saw a flash and saw Gonzalez with a gun in his hand.  (*Id.* at 457.)

Finally, most of the inappropriate actions by the prosecutor resulted in prior sworn testimony being put before the jury in a technically improper manner.  Most, if not all, of this evidence could have been placed before the jury under proper evidentiary procedures.  And, following the two most egregious instances of impropriety – the prosecutor's representation that Jacobo answered "yes" at the preliminary hearing when asked whether he gave the gun back to Gonzalez after looking at it when the transcript indicates the court reporter's characterization of his response as nodding his head, and his question to Jacobo about whether the defendants burned their clothes after the murder – the court admonished the jury to disregard the question and answer.  (Lodgment No. 2, Vol. VII at 847-48, 947-48.)  In the case of the latter impropriety, the court polled the jury as to whether they would be able to put the information out of their mind; all members assured the judge they could.  (*Id.* at 948-949.)

Accordingly, upon consideration of the entirety of the trial record and considering the prosecutor's impropriety in the context of the trial as a whole, the Court concludes that the prosecutor's actions did not "so infect. . . the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at 181 (internal citation marks omitted.)  He is not entitled to relief as to this claim.

b.   *Threats to Defense Counsel*

Bustamante claims the prosecutor committed misconduct when he made an implied threat to defense counsel after counsel brought and lost a motion to dismiss the complaint based upon vindictive prosecution.  (Pet'rs Ex. A at 88, 139.)  Bustamante argues that, as a result of this threat, "it is a fair assumption that defense counsel no longer felt that he could effectively defend his clients after having the prosecutor's office labeled[] him with a jacket."  (Pet'rs Ex. A at 139.)  Respondent does not specifically address this claim.

/ / /

1    A Sixth Amendment violation may occur when the prosecution interferes with the

2  relationship between a defendant and his attorney.  *Weatherford v. Bursey*, 429 U.S. 545, 554 (1977).

3  However, in order to establish a violation, a defendant must show some prejudice from the

4  interference.  *Id*. at 558; *United States v. Danielson*, 325 F.3d 1054, 1069 (9th Cir. 2003) (citing

5  *United States v. Irwin*, 612 F.2d 1182, 1186-87 (9th Cir. 1980).)  Here, even assuming that the

6  prosecutor's threat constituted an improper interference with Bustamante's relationship with his

7  attorney under *Weatherford*, he has not established he was prejudiced by any such interference but

8  merely states that "[i]t is a fair assumption" defense counsel's representation suffered as a result of

9  the prosecutor's comments.  The record belies this assumption, as counsel vigorously represented

10  Bustamante throughout the trial, challenging the prosecutor on numerous occasions, arguing many

11  legal and evidentiary points with the judge, strenuously cross-examining prosecution witnesses, and

12  passionately arguing his closing argument.

13    For the foregoing reasons, Bustamante has not established that he is entitled to relief as to

14  this claim.

15    c.    *Withholding Material Information Regarding a Prosecution Witness*

16    Bustamante next contends that the prosecution withheld material, exculpatory evidence from

17  the defense, specifically the fact that one of  the prosecution's main witnesses, Truehitt, was an

18  informant.  (Pet'rs Ex. A at 88, 139-40.)  Respondent contends that although there was a delay in

19  disclosure of the facts surrounding Truehitt's status as an informant, the information was ultimately

20  provided to the defense sometime during the beginning of the first trial.  Moreover, the defense

21  ultimately agreed, for tactical reasons, not to question Truehitt about his status as an informant.

22  Thus, Bustamante suffered no deprivation of his constitutional rights.  (Mem. in Supp of Answer at

23  24-26.)

24    The facts surrounding this claim are as follows.  On the third day of the first trial, the

25  prosecutor informed defense counsel and the court that Truehitt had told him two new pieces of

26  information that morning.  First, Truehitt told him that, contrary to his testimony at the preliminary

27  hearing, he consumed two "lines" of methamphetamine the afternoon of Schaum's murder.  Second,

28  Truehitt told him that the reason he consumed the drugs and lied about it at the preliminary hearing,

was that he was acting as a confidential informant ("CI") for the Drug Enforcement Agency ("DEA")
at the time attempting to set up the defendants for arrest and was concerned the defendants suspected
he was a CI. (Lodgment No. 2, Vol. 2 of 2 [transcript of August 5, 1993] at 284-88.)  Defense
counsel asked that Truehitt not be permitted to testify until he had a chance to investigate and think
about how to deal with the issue.  (*Id.* at 288.)  A mistrial was declared before Truehitt could testify
and the matter was not resolved. (Lodgment No. 2, Vol. 1 of 11 [transcript of August 9, 1993] at
18.)

Before Truehitt testified at the second trial, the prosecutor sought a ruling on the admissibility
of the CI information. (Lodgment No. 2, Vol. V at 418.)  The court held a hearing  pursuant to
Evidence Code section 402[5] during which Truehitt testified that he began working as an informant
right after he got out of jail, about two weeks before Schaum's murder.  (Lodgment No. 2, Vol. V at
517.)  He was trying to set up Bustamante and Jacobo because he knew they were going to go to
Mexico and bring back a large amount of marijuana.  (*Id.* at 517-18.)  Jacobo suspected Truehitt was
a CI and told Bustamante his suspicion.  (*Id.* at 519.)  Bustamante questioned him repeatedly about
whether he was a CI.  (*Id.*)  Truehitt was promised no deals in relation to the Schaum case, but was
hoping that his drug case would be dismissed.  (*Id.* at 522-24.) He also testified that he did not tell
the prosecutor when he was interviewed that he was an informant.  (*Id.* at 530-31.)  He did, however,
reveal his status as a CI to one of the investigating officers, Ronald Thill, during the portion of his
taped interview when he asked for the tape recorder to be turned off.  (*Id.* at 533, 588.)  Following
argument, the court directed the prosecutor to bring the detectives assigned to the case in for
testimony to clarify exactly what had happened and when.  (*Id.* 569.)

---

[5]  Evidence Code section 402 states:

(a) When the existence of a preliminary fact is disputed, its existence or nonexistence
shall be determined as provided in this article.

(b) The court may hear and determine the question of the admissibility of evidence out
of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine
the question of the admissibility of a confession or admission of the defendant out of the
presence and hearing of the jury if any party so requests.

(c) A ruling on the admissibility of evidence implies whatever finding of fact is
prerequisite thereto; a separate or formal finding is unnecessary unless required by statute.

1    The following day, Thill testified that during his taped interview, Truehitt asked for the tape

2  recorder to be turned off, then revealed to Thill that he was currently working as a CI for the

3  Narcotics Task Force ("NTF").  (*Id.* at 588.)  Thill learned who Truehitt's contact agent was but did

4  not have a conversation with him regarding Truehitt.  (*Id.* 589.)  Truehitt also may have said that he

5  was trying to set up Bustamante and Gonzalez.  (*Id.*)  Thill testified that he did not write any of this

6  information down in his reports because: (1) he did not believe that Truehitt's status as a CI was

7  relevant to the Schaum murder case, and (2) as a matter of routine, he does not include the fact that a

8  witness is a CI in police reports in order not to jeopardize narcotics investigations.  (*Id.* at 589-90.)

9  Thill also said that he did not know whether he told the prosecutor at any time prior to the

10  preliminary hearing that Truehitt was an informant, although it was possible that he had.  (*Id.* at 601-

11  04, 616.)

12    At the conclusion of the hearing, the judge stated he did not think the prosecutor knew about

13  Truehitt's CI status, but should have known because "the asking of even stupid questions in an office

14  where you are not in front of a jury would have brought out the information of Nathan Truehitt and

15  his alleged plot to set up these two defendants."  (*Id*. at 635.)  He also said he believed that the

16  defense bore some responsibility for not asking questions regarding the portion of the tape during

17  which Truehitt asked for the tape recorder to be turned off, which was when he revealed his

18  informant status.  (*Id.* at 640-41.)

19    The following day, the judge conducted an in camera hearing with the agent who handled

20  Truehitt, Mr. Bojorquez, and reviewed the files generated by Truehitt's cooperation.  (*Id*. at 665-74;

21  Lodgement No. 2, Vol. VI at 689-90.)  The judge disclosed the following information to defense

22  which was gleaned from that hearing: (1) Bojorquez had never heard the name "Kevin Schaum," (2)

23  Truehitt made references to Jacobo, Bustamante and Gonzalez, (3) Gonzalez was the individual who

24  shot Schaum in the head, (4) Sergio Bustamante worked in the City Attorney's Office, and (5)

25  Bustamante and Gonzalez were possibly "on the lam" in Mexico evading a murder investigation.

26  (Lodgment No. 2, Vol. VI at 740-41.)  All parties concluded they did not want the CI information

27  admitted.  (*Id.* at 690-91.)

28  / / /

1          i.        Clearly Established Supreme Court Law

2          In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that a prosecutor must

3    disclose all material evidence, including impeachment evidence, to the defendant.  *Brady*, 373 U.S.

4    at 87.  In order to establish a *Brady* violation, Bustamante must prove three elements:  (1) the

5    evidence was suppressed by the prosecution, either willfully or inadvertently, (2)  the withheld

6    evidence was either exculpatory or impeachment material, and (3) the evidence was material to the

7    defense.  *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Benn v. Lambert*, 283 F.3d 1040,

8    1052-53 (9th Cir. 2002) (citing *United States v. Bagley*, 473 U.S. 667, 676, 678 (1985) and *United*

9    *States v. Agurs*, 427 U.S. 97, 110 (1976).)

10         ii.        Whether the CI evidence should have been disclosed.

11         In *Kyles v. Whitley*, 514 U.S. 419, 438 (1995), the Supreme Court concluded that in addition

12   to exculpatory or impeaching evidence they are actually aware of, prosecutors "'[have] a duty to

13   learn of any favorable evidence known to the others acting on the government's behalf in [the] case,

14   including the police.'"  *Strickler*, 527 U.S. at 280-81 (quoting *Kyles*, 514 U.S. at 437-38.)  However,

15   "*Brady* does not necessarily require that the prosecution turn over exculpatory material *before* trial."

16   *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) (emphasis in original).  Rather, the

17   material must be disclosed "'at a time when disclosure would be of value to the accused.'"  *Id*.

18   (quoting *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985).)

19         Thus, although it appears the prosecutor was not aware of Truehitt's CI status until a few

20   days into the first trial and he disclosed the information as soon as he was aware of it, he cannot

21   escape *Brady* liability simply because he did not know about Truehitt's CI status.  Moreover,

22   although the prosecutor did disclose the information about Truehitt to the defense as soon as he

23   became aware of it, it is unclear whether the information was disclosed in sufficient time for defense

24   counsel to decide whether to use it in his defense strategy.   By the time the information was

25   disclosed, defense counsel had already given his opening statement and had committed to a theory of

26   the case which did not take into account Truehitt's CI status.  Accordingly, the Court concludes

27

28

-39-                                                    03cv0276

1   Bustamante has satisfied the first prong of the *Brady* test.[6]  *See Strickler*, 527 U.S. at 281-82.

2          iii.     <u>Whether the information was exculpatory or impeaching</u>

3         Evidence that Truehitt was working as a CI who was trying to set up Gonzalez and

4   Bustamante at the time he allegedly witnessed them kill Schaum was both exculpatory and

5   impeaching.  As the trial court pointed out, the evidence provided a motive for the defense

6   contention that Truehitt was the actual killer (to prove he was not a CI) and it provided additional

7   information with which to contest Truehitt's truthfulness.  Accordingly, the second prong of *Brady* is

8   satisfied.  *See Strickler*, 527 U.S. at 281-82.

9          iv.     <u>Whether the information was material</u>

10         "Evidence is deemed prejudicial, or material, only if it undermines confidence in the outcome

11   of the trial."  *Benn*, 283 F.3d at 1053 (citing *Bagley*, 473 U.S. at 676, *Agurs*, 427 U.S. at 111-12).

12   "Moreover, we analyze all of the suppressed evidence together, using the same type of analysis that

13   we employ to determine prejudice in ineffective assistance of counsel cases."  *Id.* (citing *Bagley*, 473

14   U.S. at 682 and *United States v. Shaffer*, 789 F.2d 682, 688-89 (9th Cir. 1986).)  "The question is not

15   whether the defendant would more likely than not have received a different verdict with the

16   evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict

17   worthy of confidence."  *Kyles*, 514 U.S. at 434.

18         Following the revelation of Truehitt's CI status, there were extensive discussions regarding

19   how the admission of the CI information would affect Bustamante and the other defendants' defense.

20   (Lodgment No. 2, Vol. V at 621-32.)  The judge stated that he would admit the CI information

21   because it established a possible motive for Truehitt to murder Schaum (to prove he was not a CI as

22   Bustamante suspected) and that if the CI information was admitted, he would instruct the jury that

23   Truehitt may be an accomplice to the murder of Schaum.  (*Id.* at 632.)  If the CI information were to

24   come in, however, the judge stated that he would admit all of the information Truehitt testified to,

25   including that he knew Bustamante and Gonzalez were drug dealers, that he was trying to set them

---

26   [6]  There is some suggestion in the record that defense counsel knew Truehitt was acting as a CI because
27   one of their witnesses, Dean Pagel, was to testify that he knew that Truehitt was a CI and that Truehitt was acting
     as a CI and selling drugs at the same time.  (Lodgment No. 2, Vol. V at 428-29.)  However, this does absolve the
28   prosecution from it's duty to disclose such information.  *See Strickler*, 527 U.S. at 281-82.

03cv0276

1    up for a bust and that they were planning on going to Mexico to bring a large amount of marijuana

2    into the United States.  (*Id.* at 423-24, 635-36, 641.)  The judge noted that if defense counsel did not

3    want the CI information admitted, he would not do so, but that the defense would be sacrificing

4    some things, namely a motive for Truehitt to kill Schaum and a jury instruction that Truehitt was an

5    accomplice, which would have required some corroboration of Truehitt's claim that he saw Gonzalez

6    shoot Schaum in the head.  (*See* CALJIC No. 3.11.)  Bustamante's counsel, as well as other defense

7    counsel, decided against questioning Truehitt about his CI status.  (*Id*. at 633.)

8           Leaving aside whether counsels' decision to oppose admission of the CI information waives

9    any claim of error, the fact that Truehitt was a CI at the time of Schaum's murder, and specifically

10   that he was trying to set up Bustamante and Gonzalez, was certainly relevant to Bustamante's

11   defense.  Truehitt was the only witness to testify that he saw Gonzalez shoot Schaum in the head.  As

12   the trial court noted, the CI information provided a possible motive for Truehitt to murder Schaum

13   and/or made him an accomplice to the murder and thus require corroboration for his testimony.

14   However, while the decision not to admit the CI information took away a strong motive for Truehitt

15   to kill Schaum, defense counsel, together with cocounsel, was able to put before the jury an equally

16   strong motive for killing Schaum, his jealousy regarding Carranza's relationship with Schaum, his

17   belief that Schaum had stolen from him, combined with his use of methamphetamine which made

18   him violent.  (Lodgment No. 2, Vol. V at 471-96, 503-15 Vol. VI at 695-97, 764-75, 780-86.)

19          Moreover, even if the CI information had been admitted and accomplice instructions given,

20   the jury still could have credited Truehitt's testimony.  While California law requires that the

21   testimony of an accomplice be corroborated in order for the jury to consider it, the corroboration

22   "may be slight and entitled to little consideration when standing alone."  *People v. Sanders*, 11 Cal.

23   4th 475, 535 (1995) (quoting *People v. Miranda*, 44 Cal. 3d 57, 100 (1957)) (internal quotation

24   marks omitted.)  All that is required is that "the evidence tends to connect the defendant with the

25   commission of the crime in such a way as may reasonably satisfy the jury that the [accomplice] is

26   telling the truth."  *Id*. (internal quotation marks omitted, brackets in original.)  Jacobson testified that

27   Bustamante told her Gonzalez and Flores were "like brothers" to him.  (Lodgment No. 2, Vol. III at

28   96-97, 99.)  She saw Bustamante give Flores a knife as a present a few days before the murder and

-41-                                                          03cv0276

1   Gonzalez showed her and Bustamante a gun the afternoon of the murder.  (*Id.* at 98, 105.)  After

2   Schaum showed up at the Wardlow residence and Carranza and Truehitt went out to argue with him,

3   she saw Bustamante, Gonzalez and Flores walk out of the house with angry looks on their faces.  (*Id.*

4   at 129-30.)  She saw them walk up to Schaum's car, then saw Bustamante and Flores leaning into the

5   car; Flores appeared to be hitting Schaum.  (*Id.* at 132-33.)  She then heard a shot and everyone ran

6   away.  (*Id.* at 133-34.)  This was sufficient evidence to corroborate Truehitt's testimony.

7        For the foregoing reasons, the Court concludes that the CI evidence was not "material" to

8   Bustamante's defense as defined by *Brady* because it does not "undermine[ the Court's] confidence

9   in the outcome of the trial."  *See Benn*, 283 F.3d at 1053.  Accordingly, Bustamante is not entitled to

10  relief as to this claim.

11        d.    *Presentation of Coerced Testimony*

12        Bustamante contends the prosecutor presented coerced testimony, namely the testimony of

13  Sergio Jacobo and Sergio Bustamante.  (Pet'rs Ex. A at 88-91, 140-44.)[7]  He argues that Jacobo and

14  Sergio Bustamante were coerced into implicating him during police interrogations and preliminary

15  hearing and that their testimony at the trial, during which they recanted much of their police

16  statements and preliminary hearing statements, was truthful.  (*Id.*)  Respondent argues that although

17  there were numerous inconsistencies between Jacobo's statements to police, his testimony at the

18  preliminary hearing and his testimony at the trial, there is no evidence establishing Jacobo's

19  statements were coerced.  Respondent also points out that, with respect to Sergio Bustamante, the

20  trial judge held a hearing to determine the voluntariness of his statements, concluding that they were.

21  (Mem. of P. & A. in Supp. of Answer at 26-29.)

22        Bustamante does not have standing to complain about violations of Jacobo's or Sergio

23  Bustamante's constitutional rights.  *See Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978).  However,

24  Bustamante "is entitled to habeas relief if the trial court's admission of [Jacobo and Sergio

26        [7]  Bustamante also complains that the testimony of Gabriel Lozano was coerced.  (Pet'rs Ex. A at 88-89.)
27  However, Lozano only testified at Bustamante's first trial, which was halted after three days of testimony and
    a mistrial declared.  (Lodgment No. 2, Vol. 2 of 2 (Aug. 5, 6, 1993) and Vol. 1 of IX (Aug. 9, 1993).  He did not
28  testify at the second trial which resulted in Bustamante's conviction.  Lozano's testimony at the first trial does
    not have any bearing on this claim.

03cv0276

1  Bustamante's] testimony rendered the trial so fundamentally unfair as to violate due process."

2  *Williams v. Woodford*, 384 F.3d 567, 593 (9th Cir. 2004) (citing *Karis v. Calderon*, 283 F.3d 1117,

3  1129 n. 5 (9th Cir. 2002) and *Jeffries v. Blodgett*, 988 F.2d 923, 934-35 (9th Cir.1993).)

4        i.      Testimony of Sergio Jacobo

5        After being counseled by his attorney and in front of the jury, Jacobo asserted his Fifth

6  Amendment right not to incriminate himself and was granted transactional immunity in return for his

7  testimony.  (Lodgment No. 2, Vol. VII at 837.)  During his direct testimony he denied many of the

8  statements police attributed to him which implicated Gonzalez and Bustamante in the murder or

9  stated he did not recall.  These statements included seeing Gonzalez with a gun on the day of the

10 murder, stating that Gonzalez had hollow point bullets, seeing Gonzalez, Bustamante and Flores

11 walk out of the house after Schaum arrived and hearing a shot.  (*Id*. at 833-924, 949-75.)  He also

12 denied testifying consistently with those statements at the preliminary hearing.  (*Id*.)  On cross-

13 examination, Jacobo claimed that he only told detectives that Gonzalez had a gun because they were

14 threatening to arrest him for the murder as well and he did not want to go to jail.  (*Id.* at 954.)  He

15 said the detectives were "slamming their hand on tables, screaming and stuff," and telling him he

16 was lying whenever he said something that did not implicate the defendants.  (*Id.* at 957, 960.)

17 However, on redirect examination, Jacobo admitted that he was not threatened at the preliminary

18 hearing when he testified he saw Gonzalez with a revolver the afternoon of the murder and that he

19 saw Gonzalez put a gun in his waistband as he left the scene of the murder.  (*Id.* at 961-62.)

20       "An interrogating agent's suggestion that a suspect's cooperation with the government will

21 have a positive effect on the suspect's possible sentence is not an improper inducement that causes

22 the suspect's later testimony for the government to be involuntary."  *Williams*, 384 F.3d at 594

23 (citing  *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir.1988) and *United States v.*

24 *Moody*, 778 F.2d 1380, 1384-85 (9th Cir.1985).)  "However, a promise of leniency accompanied by

25 threats or other coercive practices constitutes improper influence and makes a subsequent inculpatory

26 statement involuntary." *Id*. at 595 (citing *United States v. Tingle*, 658 F.2d 1332, 1336 (9th

27 Cir.1981).)

28 / / /

-43-

03cv0276

1    Bustamante has provided no evidence that Jacobo's testimony at the preliminary hearing

2  during which he implicated the defendants in Schaum's murder was coerced.  There is no evidence

3  that any coercive acts were visited upon Jacobo other than the threat of possible liability for

4  Schaum's murder, which in not an "improper inducement."  *Id.* at 594.  Moreover, the only

5  "coercive" acts the detectives allegedly committed during Jacobo's interrogation were threatening to

6  arrest him for Schaum's murder,  "slamming their hand on tables, screaming and stuff," and telling

7  him he was lying whenever he said something that did not implicate the defendants.  (*Id.* at 954, 957,

8  960.)  None of these acts rise to the level of "coercion" sufficient to establish that Jacobo's

9  statements to police were involuntary.  *See e.g.*, *Williams*, 384 F.3d at 593-94 (coercion found where

10  witness testified police beat him, interrogated him and accused him of committing the murder);

11  *Douglas v. Woodford*, 316 F.3d 1079, 1092 (2003) (coercion found were witness testified he was

12  beaten by Mexican authorities prior to giving information about defendant).

13         ii.    Testimony of Sergio Bustamante

14    Sergio Bustamante was also granted immunity in exchange for his testimony.  (Lodgment No.

15  2, Vol. VII at 1026.)  Before Sergio Bustamante was scheduled to testify, defense counsel made a

16  motion to exclude his testimony on the ground that his statements to police were involuntary.  (*Id.* at

17  1007.)  In preparation for a hearing on the motion, the court and counsel listened to the tape of the

18  interrogation, then heard testimony from the Detective Torgersen, who interviewed Sergio

19  Bustamante and Sergio Bustamante himself.  (*Id.* at 1034-35; Lodgment No. 2, Vol. VIII at 1037-

20  94.)

21    Torgersen testified that Sergio did not ask for an attorney at any time during the interview,

22  that he did not advise Sergio of his rights and he did not threaten Sergio.  (Lodgment No. 2, Vol. VIII

23  at 1041-42.)  Torgersen did not believe Sergio was telling the truth with regard to what he knew

24  about the Schaum murder, and he told Sergio the he "could end up getting charged as an accessory

25  to murder."  (*Id.* at 1043.)  Torgersen admitted he was "leaning" on Sergio in an attempt to get him

26  to speak truthfully about the murder and repeatedly told Sergio he thought he was lying.  (*Id.* at

27  1043-44, 1051-52.)  Torgersen also testified that Detective Thill "raised his voice" at one point

28  during the questioning and used profanity.  (*Id.* at 1055, 1058-60.)

1    Sergio Bustamante testified that he asked to have an attorney present at the beginning of the

2    interrogation; Thill told him he did not need one. (*Id.* at 1080, 1082.) He was asked whether he

3    would like to have the interview tape recorded, to which he replied "no." (*Id.* at 1082-83.) During

4    the interview, Sergio began to think that he was going to be arrested unless he told the detectives

5    what they wanted to hear. (*Id.* at 1084.) He said that the officer threatened him with arrest and the

6    loss of his job if he did not tell them what they wanted to hear. (*Id.* at 1085086.) On cross-

7    examination, Sergio admitted that he had been working for the city attorney's office at the time he

8    was questioned and had frequent contact with prosecutors and police. (*Id.* at 1090-91.) He also

9    admitted that he had previously enrolled in the police academy and was not afraid of police. (*Id.* at

10   1092-94.)

11    At the conclusion of the hearing, the judge concluded Sergio Bustamante's statement was not

12   coerced:

13           [THE COURT: . . . .] I've listened to the statement, the tape, spent a couple of
        hours yesterday with counsel listening to the entire tape recording, and I don't think
14      that's an involuntary statement at all. I don't think its involuntary. I don't think any will
        was overborne. I don't think the police did anything that was illegal.

15
             As I recall from the interview with Sergio Bustamante, he begins by telling them
16      he wasn't even there at the time of the murder and he had left, gone to his girlfriend's
        house. Thill and Torgersen know full well, if I listen to the tape correctly, that that's a
17      lie, that in fact they heard from a number of other people that Sergio Bustamante was in
        fact there at the time, that he left the scene after the shooting. And they view him as a
18      liar. In fact, I think Thill even commented that he really can't distinguish a truth from
        a lie.

19
             And I don't think the raising of a voice or good guy/bad guy is in this instance
20      something that would cause a statement to be either coerced, that he was forced to say
        it, if his statements to the police are incredulous I think. I think Thill and Torgersen did
21      everything they could, other than throw up their hands and just leave the interview room
        after hearing some of the lies from Mr. Bustamante.

22
             But I don't think anything he said to them was involuntary. I think it was a
23      voluntary statement. He tried to weasel his way out, that he wasn't there. Then it's
        obvious to me that he tried to protect his brother. He even asked early on: "Is anybody
24      going to hear this tape or anybody going to see what I am telling you?" And he is even
        told: "Sure they are going to see it. We arrest everybody that we think is involved in the
25      homicide. We have to go to court. They are going to see exactly what we think you said
        or what exactly you say," and then he finally says, "Oh, well," kind of what the heck, I
26      might as well go ahead and talk to you anyway.

27           I don't find it involuntary. I don't find it coerced. I think it's a product of his
        own will, albeit that I think that he lied consistently throughout this entire tape any time
28      he had an opportunity. And I just don't believe anything Sergio Bustamante says, quite

-45-

1    frankly.

2                                                    . . . .

3         [Sergio Bustamante's credibility is] for the jury to decide.  I'm just saying, for
     this hearing and what he has testified to before me as to even his state of mind or what
4    occurred, I accept Detective Torgersen's – and I think I am required to assess credibility,
     I think Detective Torgersen is credible.  I find that Mr. Sergio Bustamante is incredible.
5

6    (Lodgment No. 2, Vol. VIII at 1104-06.)

7         Although the Court is dealing here with a statement made by a third party witness rather than

8    a confession, the same legal principles for determining voluntariness should apply.  "[A] confession

9    is involuntary only if the police use coercive means to undermine the suspect's ability to exercise his

10   free will."  *Henry v. Kernan*, 197 F.3d 1021, 1026 (9th Cir. 1999) (citing *Colorado v. Connelly*, 479

11   U.S. 157, 167 (1986)).  A court must consider the totality of the circumstances in determining

12   voluntariness, including factors such as "the surrounding circumstances and the combined effect of

13   the entire course of the officers' conduct upon the defendant."  *Id.* (citing *United States v. Polanco*,

14   93 F.3d 555, 560 (9th Cir. 1996)); *Schneckloth v. Bustamante*, 412 U.S. 218, 226 (1973).  The court

15   must determine whether the statement is the product of the free will or whether his will was

16   overborne.  *Henry*, 197 F.3d at 1026-27 (citing *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991)

17   (en banc)); *see also United States v. Guerrero*, 847 F.2d 1363, 1366 & n. 1 (9th Cir. 1988) (citing

18   *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (per curiam)).  The question  whether a statement is voluntary

19   is legal one, while the determination as to the underlying facts, that is, whether improper threats or

20   promises were made in order to obtain the statement, is a factual one entitled to a presumption of

21   correctness.  *See Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir. 1997); *Iaea v. Sunn*, 800 F.2d 861, 864

22   (9th Cir. 1986).

23        Here, the trial judge, after hearing both witnesses testify, made a factual finding that

24   Detective Torgersen was a more credible witness than Sergio Bustamante.  He also made a factual

25   finding that Sergio's will was not overborne and that the officer did not engage in illegal tactics.

26   This Court must defer to those factual findings.  *See Rupe*, 93 F.3d at 1444.  Accepting those facts as

27   found, there is no evidence that Sergio Bustamante's statement was involuntary.  Torgersen admitted

28   to accusing Sergio of lying, telling him he could be subject to criminal liability for Schaum's murder,

                                            -46-                                   03cv0276

1   yelling at him and using profanity. But these actions did not rise to the level of coercion because

2   nothing in Sergio's testimony indicates his free will was overborne. Accordingly, Bustamante is not

3   entitled to relief as to this claim.

4         e.    *Presentation of False Testimony*

5         Bustamante alleges the prosecutor presented false testimony in the form of testimony by

6   Detective Ronald Thill. Specifically, Bustamante contends that Thill lied when he testified that he

7   did not threaten Sergio Bustamante during his interview. Bustamante claims the prosecutor knew

8   this to be false because the prosecutor had listened to the tape of the interview and thus allegedly

9   heard Thill threatening Sergio and because Torgersen had testified at the hearing on the voluntariness

10  of Sergio's statement that Thill did not raise his voice or threaten Sergio. (Pet'rs Ex. A at 91, 144-

11  47.) Respondent counters that Bustamante mischaracterizes Thill and Torgersen's testimony.

12  (Mem. of P. & A. in Supp. of Answer at 29-30.)

13        Clearly established Supreme Court law holds that "[t]he knowing use of perjured testimony

14  by a prosecutor generally requires that the conviction be set aside." *Killian v. Poole*, 282 F.3d 1204,

15  1208 (9th Cir. 2002) (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976).) "The same result

16  obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it

17  appears." *Napue v. People of the State of Illinois*, 360 U.S. 264, 269 (1959). However, the

18  presentation of conflicting versions of events, without more, does not constitute knowing

19  presentation of false evidence. *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) (citing

20  *United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir. 1989).) Rather, "[i]t [i]s within the

21  province of the jury to resolve the disputed testimony." *Id*.

22        Torgersen testified at the voluntariness hearing that Thill accused Sergio of trying to cover up

23  for his brother, and that Thill raised his voice at Sergio and used profanity. (Lodgment No. 2, Vol.

24  VIII at 1046, 1055-56, 1058.) Torgersen also admitted that Thill was "leaning on" Sergio in an

25  attempt to get him to tell them the truth and that he repeatedly accused Sergio of lying. (*Id*. at 1058-

26  60.) At trial, Thill testified that he did not threaten or raise his voice to Sergio during the interview.

27  (Lodgment No. 2, Vol. IX at 1311-12.) At most, this is merely "the presentation of conflicting

28  versions of events" which the jury is entitled to resolve. *See Geston*, 299 F.3d at 1135.

-47-

1    Moreover, once the trial court determined that Sergio's statement was voluntary, Torgersen's

2    and Thill's testimony regarding the circumstances surrounding Sergio's statement bore entirely on

3    the reliability of the statement. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (holding that a

4    defendant has a federal constitutional right to present evidence bearing upon the reliability and

5    credibility of a confession and that "evidence about the manner in which a confession was secured

6    will often be germane to its probative weight, a matter that is exclusively for the jury to assess.")

7    The jury was properly instructed to consider the credibility of Sergio, Torgersen and Thill and there

8    is no evidence in the record which indicates they did not. (*See* Lodgment No. 1, Vol. 2 of 2 at 268-

9    73 [CALJIC Nos., 2.13[8] ("Prior Consistent or Inconsistent Statements as Evidence"), 2.20[9]

10

11

12

13

14

15

---

16       [8]   Evidence that on some former occasion, a witness made a statement or statements that were
17   inconsistent or consistent with his or her testimony in this trial, may be considered by you not only for the
     purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the
18   witness on such former occasion.
          If you disbelieve a witness' testimony that he [or] she no longer remembers a certain event, such
19   testimony is inconsistent with a prior statement or statements by him [or] or her describing that event.

20       [9]   Every person who testifies under oath is a witness. You are the sole judges of the believability of a
     witness and the weight to be given the testimony of each witness.
21        In determining the believability of a witness you may consider anything that has a tendency in reason
     to prove or disprove the truthfulness of the testimony of the witness, including but not limited to any of the
22   following:
          The extent of the opportunity or ability of the witness to see or hear or otherwise become aware of any
23   matter about which the witness has testified;
          The ability of the witness to remember or to communicate any matter about which the witness has
24   testified;
          The character and quality of that testimony;
25        The demeanor and manner of the witness while testifying;
          The existence or nonexistence of a bias, interest or other motive;
26        Evidence of the existence or nonexistence of any fact testified to by the witness;
          The attitude of the witness toward this action or toward the giving of testimony;
27        A statement previously made by the witness that is consistent or inconsistent with the testimony of the
     witness;
28        An admission by the witness of untruthfulness;
          The witness' prior conviction of a felony.

("Credibility of Witnesses"), 2.21.1[10] ("Discrepancies in Testimony"), 2.21.2[11] ("Witness Willfully False"), and 2.22[12] ("Weighing Conflicting Testimony")].)

For the foregoing reasons, the Court concludes the prosecutor did not present false evidence at trial.  Accordingly, Bustamante is not entitled to relief as to this claim.

>    f.    *Improper Argument*

Bustamante claims the prosecutor committed misconduct during closing argument by (1) improperly telling the jury to credit Sergio Jacobo's and Sergio Bustamante's statements to police and disregard their trial testimony, (2) improperly stating that Bustamante led the defendants out of the residence toward Schaum, was armed and intended to kill Schaum, (3) mischaracterizing Jacobson's and Carranza's testimony, (4) telling the jury there was no evidence that Truehitt was selling drugs out of the Wardlow house, and (5) telling the jury that Bustamante admitted to having a stick and hitting Schaum in the face with a beer bottle.  (Pet'rs Ex. A at 92-95, 147-49.)  Respondent contends that none of the incidents Bustamante  complains of constitute misconduct.  (Mem. of P. & A. in Supp. Answer at 30-31.)

A prosecutor commits misconduct during closing argument when he or she manipulates or misstates the evidence presented during the trial.  *Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986). However, a prosecutor is permitted to argue reasonable inferences based on the evidence and is afforded wide latitude in presenting closing argument.  *Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996);  *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991).

---

[10]  Discrepancies in witness's testimony or between his or her testimony and that of others, if there were any, do not necessarily mean that the witness should be discredited.  Failure of recollection is a common experience; and innocent misrecollection is not uncommon.  It is a fact, also, that two persons witnessing an incident or a transaction often will see or hear it differently.  Whether a discrepancy pertains to a fact of importance or only to a trivial detail should be considered in weighing its significance.

[11]  A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others.  You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars.

[12]  You are not bound to decide an issue of fact in accordance with the testimony of a number of witnesses, which does not convince you, as against the testimony of a lesser number or other evidence, which appeals to your mind with more convincing force.  You may not disregard the testimony of the greater number of witnesses merely from caprice, whim or prejudice, or from a desire to favor one side as against the other.  You must not decide an issue by the simple process of counting the number of witnesses.  The final test is not in the number of witnesses, but in the convincing force of the evidence.

1          i.       Comments on Sergio Jacobo's and Sergio Bustamante's Credibility

2          During closing argument as the prosecutor began summing up the evidence establishing the

3   defendants were guilty of murdering Schaum, he referred to the testimony of Sergio Jacobo and

4   Sergio Bustamante as follows:

5                  Let me stop here and point something out.  I don't need Sergio Jacobo to prove
            my case beyond a reasonable doubt, I don't need Sergio Bustamante to prove it.  *You
6           could knock their testimony out and not listen to a single word they had to say* and you
            would still know that these men committed the murder.  I don't need that.
7
                   But you can't just knock out their prior statements.  You can't do that and I will
8           tell you why later.  You can't do that.  You've got to consider them.  They want [you to]
            do that.  They want you not to consider what they said, that was clear.  The defendants
9           want you to not consider what they told the police, that's clear.  But you can't do that.
            *You have to test what they said.  You have to test it and analyze it and look at it and look*
10          *at it carefully, absolutely, but you can't knock it out,* especially if in view of the fact that
            much of it, if not all of it, was corroborated by other independent witnesses.
11

12   (Lodgment No. 2, Vol. X at 1588-89) (emphasis added.)

13          Later, the prosecutor commented on the credibility of witnesses, in particular Sergio Jacobo

14   and Sergio Bustamante, noting that "[t]his is a case where almost every witness admitted that they

15   hadn't told the whole truth to police" and that "some of the witnesses got on the stand and recanted

16   things that they had said earlier," in particular Jacobo and Truehitt.  (*Id.* at 1603.)  He urged the jury

17   to "test the credibility of these people" by considering whether the witness was believable, whether

18   they had a motive to lie, and any corroboration of the testimony.  (*Id.* at 1603-04.)  Later still, he

19   commented on Sergio Jacobo's and Sergio Bustamante's credibility in particular:

20                 How about Jacobo and Bustamante?  *I told you earlier that you could throw*
            *everything that they had to say out and you could still find these people guilty of murder*.
21          And that's the truth.  But you can't throw what they had to say out.  That's what they
            wanted you to do, that was clear.  *That's what these guys want [you to] do is throw it*
22          *out.*  They don't want you to consider it.  You know what that was all about on the stand
            when those two took the stand.  You knew that what had happened was they ratted on
23          their friends to the police and now they regret it.  It's as simple as that.  They ratted on
            these guys and they regret it.
24
                   What motive did Jacobo have to get up there and recant all those things, all those
25          detailed facts, all those detailed corroborated facts when he took the stand?  Well, instead
            of at preliminary hearing, he had not one defendant here but three defendants to look at.
26          Another important reason was, if you recall, Jacobo admitted he was in jail at this point
            in time.  Back at the preliminary hearing he was free to come and go.  Now he is in jail.
27          He is in jail and he is ratting on his friends.  That's a pretty good motive to recant.  Rats
            are not treated well in jail.
28

                                                    -50-                                      03cv0276

1
2
3

> *Most importantly, in Jacobo's case you have to treat everything he had to say with skepticism. You can't throw it out because that would not allow you to get to the full truth. You can't do that. But you have to use corroborating evidence to test it, and you have that.*

4
5
6

> Bustamante, same thing. You saw that pretty clearly. He comes into the police officers. He is not arrested. He is not in any trouble himself. He comes in. He is friendly with them. And on page 6 he rats Gonzalez out. *Now he regrets it. You can't let him get away with that. You can't throw that out. You've got to test it. You've got to see if it's corroborated.* But there was no reasonable motive for him to tell the police that Gonzalez did it unless it were true. Gonzalez did do it. The evidence shows he did.

7   (*Id.* at 1613) (emphasis added.)

8   Contrary to Bustamante's claim, the prosecutor did not tell the jury to disregard Sergio

9   Jacobo's and Sergio Bustamante's trial testimony in favor of their prior statements or testimony.

10  Rather, he noted that the jury *could* disregard their trial testimony and still find the defendants guilty.

11  The prosecutor went on to state that the jury could not simply disregard Jacobo's and Sergio

12  Bustamante's prior statements in favor of their trial testimony, as the defendants wanted them to.

13  Rather, the jury had to "test it and analyze it and look at it . . . carefully," that they had to look at

14  Jacobo's and Sergio Bustamante's testimony with skepticism because of their recantations and

15  suggested that their recantations were a result of being scared of the defendants. (*Id.* a 1589, 1613.)

16  These comments merely reiterated the proper and appropriate instructions the jury was given

17  regarding prior consistent or inconsistent statements (CALJIC No. 2.13), credibility of witnesses

18  (CALJIC NO. 2.20), discrepancies in testimony (CALJIC No. 2.21.1), wilful falsity of witnesses

19  (CALJIC No. 2.21.2.) and weighing conflicting testimony (CALJIC No. 2.22),[13] and drew a

20  reasonable inference as to why Jacobo and Sergio Bustamante had changed their stories. *See Ceja*,

21  97 F.3d at 1253-54.

22  For the foregoing reasons, the Court concludes the prosecutor did not improperly argue the

23  credibility of Jacobo and Sergio Bustamante. Bustamante is not entitled to relief as to this claim.

24  / / /

25  / / /

26  / / /

27

28

---

[13] *See* footnotes 8-12.

1

    ii.    <u>Comments Alleging Bustamante Was the First One Who Exited the Wardlow</u>

2

              <u>Residence, Was Armed and Intended to Kill Schaum</u>

3          Bustamante next contends that the prosecutor improperly told the jury that Bustamante led

4    the other defendants out of the Wardlow residence in order to attack Schaum, that Bustamante was

5    armed and that Bustamante intended to kill Schaum.  (Pet'rs Ex. A at 92.)  While discussing

6    Bustamante's liability during closing argument, the prosecutor said that  "Bustamante led [the

7    defendants] out" of the Wardlow house to Schaum's car.  Defense counsel objected, whereupon the

8    prosecutor revised his statement to say "[h]e was one of the first people out."  (Lodgment No. 2, Vol.

9    X at 1607.)  Jacobson testified that Bustamante was in Melissa's room when she went in the house to

10   tell Carranza that Schaum had arrived and wanted to talk to her.  (Lodgment No. 2, Vol. III at 124,

11   Vol. IV at 278.)  After she had gone outside to talk to Schaum the second time, she saw Carranza and

12   Truehitt coming out of the house; Carranza was first. (Lodgment No. III at 128.)  After hearing

13   Carranza yell at Schaum for a while, she saw "a line of young men" come out of the house with

14   angry looks on their faces.  (*Id* at 129-30.)  Bustamante was the first one out of the house.  (*Id.*)

15   Detective Thill also testified that Bustamante admitted he was one of the first people to exit the

16   house towards Schaum's car.  (Lodgment No. 2, Vol. V at 437.)  Accordingly, the prosecutor's claim

17   that Bustamante was one of the first people out of the house toward Schaum's car was a reasonable

18   inference from Jacobson's testimony.  *See Ceja*, 97 F.3d at 1253-54.

19         Bustamante also claims the prosecutor improperly told the jury that, based on the evidence,

20   the jury could find Bustamante guilty of murder because he personally intended to kill Schaum

21   when, armed, he led the other defendants toward Schaum knowing that Gonzalez and Flores were

22   also armed. (*Id.* at 1621-22.)  Carranza testified she saw something dark in Bustamante's hand as he

23   exited the house toward Schaum's car but could not tell what it was.  (Lodgment No. 2, Vol. IV at

24   346.)  Detective Thill testified that Bustamante told him he had a beer bottle and a "pin" in his hand

25   when he approached Schaum's car.  (Lodgment No. 2, Vol. V at 437.)  Detective Torgersen testified

26   he found a beer bottle inside Schaum's car, and the pathologist, Dr. Super, testified that Schaum had

27   a tiny abrasion on the back of his right hand, the hand which he would have used to defend himself

28   against an attack from the passenger window.  (*Id.* at 1258.)  Jacobson testified she saw Bustamante

1   leaning into Schaum's car through the passenger side window during the attack.  (Lodgment No. 2,

2   Vol. III at 132.)  Finally, Jacobo admitted that Bustamante had told him he hit Schaum in the face

3   with a beer bottle, that he had left a stick at the scene of the murder and that he was worried his

4   fingerprints would be found on the bottle and stick.  (Lodgement No. 2, Vol. VII at 906.)  Given this

5   testimony, the prosecutor's argument was a reasonable inference which could be drawn from the

6   facts presented.  *Ceja*, 97 F.3d at 1253-54.

7          iii.     Comments on Jacobson's and Carranza's Testimony

8         Next, Bustamante argues that the prosecutor mischaracterized Carranza's testimony by

9   stating that she told the jury that Carranza saw two people leaning into Schaum's car during the

10  attack and that "both people appeared to be punching him or hitting him from the motions they were

11  making."  (Lodgment No. 2, Vol. X at 1597.)  The prosecutor then linked Carranza's testimony to

12  Jacobson's, stating that Carranza's testimony was corroborated by Jacobson who said the two people

13  she saw on the passenger side of the car were Bustamante and Flores and that Flores was swinging

14  his arm in what appeared to be a punching or slashing motion.  (*Id.*)

15        Carranza testified that she saw two people on the passenger side of the car, both of whom

16  were leaning into the car.  (Lodgment No. 2, Vol. IV at 344.)  She further testified that, as far as she

17  could remember, both people were making punching or striking motions.  (*Id.*)  Jacobson testified

18  that she saw Flores and Bustamante on the passenger side of Schaum's car, leaning into the car.  She

19  saw Flores swinging his arm as if he were punching Schaum.  (Lodgment No. 2, Vol. III at 132-33.)

20  The motion also appeared to be a slashing motion.  (*Id.*)

21        The prosecutor's statement was amply supported by this testimony and was a reasonable

22  inference to make.  *Ceja*, 97 F.3d at 1253-54.  Bustamante has not established any error by the

23  prosecutor.

24         iv.     Comments on the Lack of Evidence of Truehitt's Drug Dealing

25        Bustamante contends the prosecutor committed misconduct when he stated that there was no

26  evidence that Truehitt was selling drugs in huge quantities from the Wardlow house.  (Pet'rs Ex. A at

27  93-94.)  Gonzalez testified that while he was at the Wardlow house, Truehitt offered him some

28  methamphetamine.  (Lodgment No. 2, Vol. IX at 1432.)  Later, he saw people coming in and out of

1   the house who looked like they were buying drugs, but Gonzalez never saw a transaction take place.

2   (*Id.* at 1434.)  Jacobson testified she sold drugs for Truehitt two or three times and that Truehitt and

3   Jacobo were drug dealers.  (*Id.* at 173.)  Truehitt testified that after the murder, he took drugs from

4   the house, put them in a box, and gave them to Dean Pagel to take away before the police arrived.

5   (Lodgment No. 2, Vol. V at 460.)  The box contained several plastic sandwich bags of marijuana,

6   and a quarter ounce of methamphetamine.  (Lodgment No. 2, Vol. VI at 743-46.)   He admitted that

7   Jacobson and Carranza had sold drugs for him before the murder.  (Lodgment No. 2, Vol. V at 471,

8   477.)  He also admitted that he was in jail for attempting to sell a pound of methamphetamine about

9   a week before the murder.  (Lodgment No. 2, Vol. VI at 727-29.)

10        During co-counsel's closing argument, counsel for Flores argued that Truehitt and Jacobo

11   were selling drugs together and that Nathan was selling drugs out of the Wardlow house at the time

12   of the murder, stating that "there were drugs moving in that house, drugs being taken" and that "[w]e

13   are talking serious drug use, meaning serious quantities being passed, meaning lots of drugs being

14   sold."  (Lodgment No. 2, Vol. X at 1647-48.)  In rebuttal, the prosecutor stated that "There was a

15   claim that Nathan Truehitt was selling drugs out of the house in huge quantities," and asked "Where

16   is the evidence of that?  Zero."  (*Id.* at 1729.)

17        As detailed above, there certainly was evidence that Truehitt was a drug dealer.  However,

18   most of the testimony related to activity Truehitt participated in before Schaum's murder.  The only

19   evidence that Truehitt was selling drugs from the Wardlow house was Gonzalez's testimony in

20   which he indicated that he saw what appeared to be drug sales taking place, although he never

21   witnessed a transaction.  (Lodgment No. 2, Vol. IX at 1434.)[14]  But even Gonzalez's testimony does

22   not conclusively establish large amounts of drugs were being sold from the Wardlow house.  Given

23   the state of the evidence, it is not outside the "wide latitude" afforded prosecutors during closing

24   argument, particularly during rebuttal and in response to defense claims.  *Ceja*, 97 F.3d at 1253-54.

25   Accordingly, Bustamante has not shown he is entitled to relief as to this claim.

26   _____

27        [14]  The testimony related to the box of drugs Truehitt gave to Pagel to dispose of before the police arrived
is subject to two interpretations: it could have indicated current drug sales or could have been left over from
28   Truehitt's previous drug activity.

-54-

03cv0276

1    v.    Comments on Bustamante's Admissions Regarding the Stick and Hitting Schaum in

2          the Face with a Beer Bottle

3          Finally, Bustamante claims that the prosecutor committed misconduct when he told the jury

4    that Jacobo testified that Bustamante hit Schaum in the face with a beer bottle during the attack .

5    (Pet'rs Ex. A at 94, 148-49.)  Bustamante claims that Jacobo never testified to such a thing.  (*Id.*)

6          As noted above, Carranza testified she saw something dark in Bustamante's hand as he exited

7    the house toward Schaum's.  (Lodgment No. 2, Vol. IV at 346.)  Detective Thill testified that

8    Bustamante told him he had a beer bottle in his hand when he approached Schaum's car.  (Lodgment

9    No. 2, Vol. V at 437.)  A beer bottle was found inside Schaum's car, and Dr. Super testified that

10   Schaum had a tiny abrasion on the back of his right hand, the hand which he would have used to

11   defend himself against an attack from the passenger window, although he could not tell how the

12   injury was inflicted.  (*Id.* at 1258.)  Finally, contrary to Bustamante's claim, Jacobo testified on two

13   separate occasions that Bustamante told him he hit Schaum in the face with a beer bottle:

14   BY MR. BOWMAN:

15        Q.  Do you remember Jesse telling you that he hit – you or anyone else at the
     residence, that he hit Schaum in the face with a beer bottle?

16

17        A.  Yes, I do.

18                                    . . . . .

19   BY MR. BOWMAN:

20        Q. Mr. Jacobo, if you recall, I was asking you questions about conversations that
     took place at Sergio Bustamante's house that night, just a short time after the murder.
     Was that your understanding [of] what I was talking about?

21

22        A.  Correct.

23        Q.  And when you said that you overheard Jesse Bustamante say that he hit Kevin
     Schaum in the face with a bottle, that was a conversation you overheard at Sergio
     Bustamante's house, correct?

24

25        A. Correct.

26   (Lodgment No. 2, Vol. VII at 900, 906.)

27        Accordingly, Bustamante has not established that the prosecutor committed any error here.

28   Bustamante is not entitled to relief as to this claim.

g.     *Vindictive Prosecution*

Bustamante alleges that the prosecutor's amendment of the complaint to charge him with murder after his attempt to plead guilty to conspiracy to commit an assault with a deadly weapon amounts to vindictive prosecution.  (*See* Pet'rs Ex. A at 88, 95.)  Bustamante was originally arrested for murder.  He was then released and the charge dropped because of lack of evidence.  (Lodgment No. 8, Ex. C.)  Later, he was rearrested and charged with conspiracy to commit assault with a deadly weapon and battery with great bodily injury.  (Lodgment No. 1, Vol. 1 of 2 at 0001-03.)  When Bustamante attempted to plead guilty to those charges at the preliminary hearing, the prosecutor, who had incorrectly believed that the charges would make Bustamante liable for murder, sought and received permission to amend the information to charge Bustamante with murder.  (Lodgment No. 1, Vol. 1 at 0013-45.)  Defense counsel made a motion to dismiss the complaint for vindictive prosecution, which was denied.  (Lodgment No. 2, Vol. V at 559-60.)  Defense counsel stated in a memorandum to his supervisors that he believed the prosecutor had taken his decision to file the motion very personally.  He also alleged that a day after his motion was denied, he ran into the prosecutor in the hallway and the prosecutor told him that "People create their own jackets."  (*Id.*; Pet'rs Supp. Traverse, Ex. A at 9 [Memorandum to Loren Mandel and Dan Harrington from Greg Cannon, dated April 26, 1993].)  Respondent contends there is no evidence of vindictiveness and that the amendment occurred as a result of a charging error.  (Mem. of P. & A. in Supp. of Answer at 23-24.)

Courts and prosecutors are prohibited by the Due Process Clause of the Constitution from penalizing a defendant for exercising a protected right.  *See North Carolina v. Pearce*, 395 U.S. 711 (1969) (holding that imposition of a heavier sentence on a re-convicted defendant following a successful appeal violates the Due Process Clause and imposing a presumption of vindictiveness whenever it occurs); *Blackledge v. Perry*, 417 U.S. 21 (1974) (holding that where the circumstances surrounding an the imposition of a detriment upon a defendant following the exercise of a right leads to the likelihood of vindictiveness, a rebuttable presumption in favor of vindictiveness is present).  The Court has restricted this presumption, however, to events which occur after a trial.  Thus, in *Bordenkircher v. Hayes*, 434 U.S. 357 (1978), the Court held that a defendant's due process rights

were not violated when a prosecutor made good on a threat to increase the charges against a

defendant following that defendant's refusal to plead guilty to the offense with which he was

originally charged.  And, in *United States v. Goodwin*, 457 U.S. 368, 382 (1982) the Court declined

to extend the presumption of vindictiveness to the pretrial plea bargaining setting, instead concluding

that a defendant in such a situation must prove actual vindictiveness.

Here, the alleged prosecutorial vindictiveness occurred pretrial.  More than likely,

Bustamante realized that he could possibly be exposed to a murder charge and sought to take

advantage of the fact that he was facing lesser charges by pleading guilty to those lesser charges.

Thus, under *Goodwin*, no presumption of vindictiveness attaches.  *See id*.  Moreover, the prosecutor

submitted an affidavit to the state court in which he stated that the reason he charged Bustamante

with conspiracy originally was that he mistakenly believed the charge would make Bustamante liable

for murder.  When he realized his error, he sought and received permission to amend the complaint

with a murder charge.  (*See* Lodgment No. 1, Vol. 1 at 0045.)  Thus, Bustamante has not "objectively

proved" that the amendment was vindictive.  *See id*. at 384.  Finally, even if a presumption

vindictiveness did attach in this case, it has been rebutted by the prosecutor's statement that the

original charge of conspiracy was a mistake and that the amendment with the murder charge was

merely a correction of that mistake.  Bustamante's vindictive prosecution claim fails.

8.    *Ineffective Assistance of Trial Counsel*

Bustamante complains that his trial counsel was ineffective when he: (1)   failed to pursue a

Writ of Mandate/Prohibition on prosecutorial vindictiveness grounds; (2) failed to investigate a

voluntary intoxication defense; (3) failed to adequately argue the scope of Bustamante's liability for

the murder; (4) failed to object to the testimony of Sergio Bustamante and Sergio Jacobo as coerced;

(5) failed to object to Detective Thill's testimony as false; (6) failed to effectively present closing

argument; (7) failed to request favorable jury instructions; (8) failed to object to the prosecutor's

closing argument; (9) failed to object to the lesser included offense, natural and probable

consequences and assault jury instructions; (10) failed to competently argue the motion for new trial;

and (11) failed to adequately question Joaquin Guadiana.  (Pet'rs Ex. A. at 96-108,155-77.)

Respondent counters that Bustamante fails to establish, in each instance, either that counsel's

-57-

1    performance fell below an objective standard of reasonableness or that he was prejudiced by any

2    error.  (Mem. of P. & A. in Supp. of Answer at 32-42.)

3            To establish ineffective assistance of counsel, Bustamante must first show that his trial

4    counsel's performance fell below an objective standard of reasonableness.  *Strickland v. Washington*,

5    466 U.S. 668, 687 (1984).  "This requires a showing that counsel made errors so serious that counsel

6    was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*

7    Judicial scrutiny of counsel's performance must be "highly deferential."  *Id.* at 689.  Second, he must

8    show counsel's deficient performance prejudiced the defense.  *Id.* at 687.  This requires showing that

9    counsel's errors were so serious they deprived Petitioner "of a fair trial, a trial whose result is

10   reliable."  *Id.*  To satisfy the prejudice prong, Petitioner need only demonstrate a reasonable

11   probability that the result of the proceeding would have been different absent the error.  *Williams*,

12   529 U.S. at 406; *Strickland*, 466 U.S. at 694.  The prejudice inquiry is to be considered in light of the

13   strength of the prosecution's case.  *Luna v. Cambra*, 306 F.3d 954, 966 (9th Cir.), *amended*, 311

14   F.3d 928 (9th Cir. 2002).

15           a.       *Failure to Pursue a Writ of Mandate/Prohibition on Prosecutorial Vindictiveness*

16           Bustamante argues that his trial counsel was ineffective when he failed to file a Writ of

17   Mandate/Prohibition arguing prosecutorial vindictiveness.  Bustamante claims counsel violated his

18   duty of loyalty to him by acquiescing to his supervisor's direction not to file a writ.  (Pet'rs Ex. A at

19   97,  157-58.)

20           As previously discussed in this Report and Recommendation, Bustamante was originally

21   arrested for murder, then released and the charge dropped because of lack of evidence.  (Lodgment

22   No. 8, Ex. C.)  After he was rearrested and charged with conspiracy to commit assault with a deadly

23   weapon and battery with great bodily injury, Bustamante attempted to plead guilty to those charges at

24   the preliminary hearing.  (Lodgment No. 1, Vol. 1 of 2 at 0001-03.)  The prosecutor, who had

25   incorrectly believed that the charges would make Bustamante liable for murder, amended the

26   information to charge Bustamante with murder.   (Lodgment No. 1, Vol. 1 at 0013-45.)  Defense

27   counsel then moved to dismiss the complaint for vindictive prosecution, which the court denied.

28   (Lodgment No. 2, Vol. V at 559-60.)

In a memorandum defense counsel submitted to his supervisors requesting authorization to file a Petition for Writ of Mandate/Prohibition on vindictive prosecution grounds,  he stated he believed the prosecutor had taken his decision to file the motion very personally.  He alleged that a day after his motion was denied, he ran into the prosecutor in the hallway and the prosecutor told him that "People create their own jackets."  (*Id.*; Pet'rs Supp. Traverse, Ex. A at 9 [Memorandum to Loren Mandel and Dan Harrington from Greg Cannon, dated April 26, 1993].)  Counsel stated he wanted to pursue the writ for two reasons:

> First, I believe that I have a legitimate issue.  The authorities cited by the prosecution and apparently relied upon by Knoepp [the judge who denied the motion] do not stand for the proposition that a presumption of vindictiveness may not arise pretrial. Because of the procedural history of the case and the timing of the amendment I believe that we have a clean presentation of the issue.

> Second, I hope to use Bowman's [the prosecutor] emotional response to my motion to force Judge Preckel to assign the case to a judge for all purposes.  I plan to use the writ petition, and possibly a motion to dismiss per [Penal Code] section 1424, to turn the heat up a bit.  I can see that Bowman and I probably will not see eye to eye on many things from here on out, and it would be very beneficial to the client to avoid having future motions decided by either Knoepp or [Judge] Ehrenfruend.  I definitely would not want either to hear the vindictive prosecution motion should the Court of Appeal respond favorably.

> Our client has very real exposure in this case.  The facts are ugly and a jury could easily convict him.  I think it is very unlikely that Bowman will soon forgive me for making him declare his ignorance under penalty of perjury, and I think it equally unlikely that he will back off from the murder charge.  We have very little to lose by proceeding aggressively.

(Pet'rs Supp. Traverse, Ex. A at 9-10.)

As previously noted, the Supreme Court has declined to extend the presumption of vindictiveness to the pretrial plea bargaining setting.  Rather, such a defendant must prove actual vindictiveness.  *Goodwin*, 457 U.S. at 382.  California law is in accord with this rule.  *See People v. Michaels*, 28 Cal.4th 486, 515, 122 (2002).  To prove prosecutorial vindictiveness, a defendant "must 'prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something the law plainly allowed him to do.'" *People v. Jurado*, 38 Cal. 4th 72, 97-98 (2006) (quoting *Goodwin*, 457 U.S. at 384 and citing *Michaels*, 28 Cal. 4th at 515.)

Reviewing counsel's actions highly deferentially, as required by *Strickland*, Bustamante has not established that counsel's failure to pursue a writ of mandate/prohibition in the face of his

supervisor's direction not to do so was so unreasonable that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 689.  As previously discussed in this Report and Recommendation, Bustamante's attorney probably realized that Bustamante's criminal exposure was greater than the charges he was facing at the preliminary hearing and sought to avoid that exposure by advising him to plead guilty to the lesser charges.  In addition, the prosecutor stated in an affidavit that the reason he charged Bustamante with conspiracy originally was that he mistakenly believed the charge would make Bustamante liable for murder. When he realized his error, he sought and received permission to amend the complaint with a murder charge.  (*See* Lodgment No. 1, Vol. 1 at 0045.)  As counsel's supervisor apparently concluded, these facts cast significant doubt on counsel's ability to "objectively prove"that the amendment was vindictive in a writ petition.  *See Goodwin*, 457 U.S. at 384; *Jurado*, 38 Cal. 4th at 97-98.  And, because the facts make it very unlikely that a writ petition would have been successful, Bustamante has not shown that counsel's failure to pursue the writ was an error so serious the result of the proceeding would have been different absent the error.  *Williams*, 529 U.S. at 406; *Strickland*, 466 U.S. at 694.

   b.   *Failure to Investigate a Voluntary Intoxication Defense*

   Bustamante faults counsel for failing to investigate a voluntary intoxication defense to the charges.[15]  (Pet'rs Ex. A at 98-101, 158-66.)  Respondent argues the record reflects that counsel did investigate a voluntary intoxication defense but rejected it because Bustamante insisted that he did not have anything to do with the murder.  In addition, Respondent states that Bustamante has provided insufficient support for his contention that voluntary intoxication was a viable defense. (Mem. of P. & A. in Supp. of Answer at 33-35.)

   Documents provided by Bustamante contradict his claim.  Page eleven of Exhibit A to Bustamante's Supplemental Traverse contains a letter from defense counsel Cannon to Bustamante following Bustamante's conviction.  (Pet'rs Supp. Traverse, Ex. A at 11-12.)  It appears Bustamante

---

[15]  In California, "[i]ntoxication is . . . relevant only to the extent that it bears on the question of whether the defendant actually had the requisite specific mental state."  *People v. Saille*, 54 Cal. 3d 1103, 1119 (1991).

1    was communicating with Cannon during the pendency of his appeal in order to research appellate

2    issues.  In the letter, Cannon responds to Bustamante regarding the voluntary intoxication defense:

3            I'm afraid, however, that I'm not going to be much of a help to you in this regard.
         Not only did I consider the voluntary intoxication defense, you and I discussed it and
4        decided not to go that way.  Our conversation took place at the old East Mesa facility.
         You might recall that it was the day they shackled you rather uncomfortably to a bench
5        just outside the control booth.  I told you that it was possible that we might be able to get
         you convicted only of a lesser charge based on intoxication.  You insisted that you had
6        nothing at all to do with the crime.  I explained to you that we could argue (1) that you
         had nothing to do with the crime, (2) that you were too intoxicated to have formed the
7        specific intent, or (3) both that you did not have anything to do with the crime, and in the
         alternative, even if you did were too intoxicated to form the required specific intent.

8
         I also explained to you that the third choice, in my humble opinion, carried certain
9        risks.  In my experience jurors tend to look askance at defenses based on the third option.
         They tend to think we're talking out of both sides of our mouths and don't believe
10       anything we say.  You responded by again insisting you had nothing to do with the crime.
         You told me that you did not want to do any time for the crime and did not believe that
11       you should do any time.  That's how we played it at trial.  We tried to convince the jury
         that Truehitt was the killer and that you did not know anything about it.

12

13   (*Id.*)

14           As noted above, the Court must review counsel's performance deferentially.  *Strickland*, 466

15   U.S. at 689.  This is so because "it is all too tempting for a defendant to second-guess counsel's

16   assistance after conviction or adverse sentence. . . ."  *Id.*  That is precisely what is occurring here.

17   Bustamante considered and rejected the involuntary intoxication defense, insisting he had nothing to

18   do with Schaum's murder.  He now seeks to blame counsel's performance for the adverse outcome.

19   However, "[t]he reasonableness of counsel's actions may be determined or substantially influenced

20   by the defendant's own statements or actions."  *Id.* at 691.  Indeed, "when a defendant has given

21   counsel reason to believe that pursuing certain investigations would be fruitless or even harmful,

22   counsel's failure to pursue those investigations may not later be challenged as unreasonable."  *Id.*

23   Here, it is clear that counsel investigated and considered presenting a voluntary intoxication defense,

24   and that when Bustamante told counsel that he was not involved in Schaum's murder, counsel made

25   a strategic decision not to pursue any further investigation.  "[S]trategic choices made after thorough

26   investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."  *Id.* at

27   690.  Accordingly, Bustamante has failed to establish counsel's performance was unreasonable.  *Id.*

28   at 687.

1    Moreover, Bustamante has not established what, if anything, counsel would have discovered

2  had he further investigated a voluntary intoxication defense and how that information would have

3  assisted his defense.  He presents only conclusory allegations which cannot support habeas relief.

4  *See James*, 24 F.3d at 26.

5         c.    *Failure to Adequately Argue the Scope of Bustamante's Liability*

6    Bustamante argues that counsel did not appropriately argue that he could not be held liable

7  for first degree murder under Penal Code section 189, and that the scope of his liability for Schaum's

8  death only extended to second degree murder pursuant to that section.[16]  (Pet'rs Ex. A at 101, 166.)

9  Respondent counters that Bustamante's argument misconstrues his conviction as having occurred

10  under the felony murder rule rather than aiding and abetting and the natural and probable

11  consequences doctrine.  Further, Respondent argues that, in any event, Bustamante has not

12  established he was prejudiced by any error by counsel because he was convicted of second degree,

13  not first degree, murder.  (Mem. of P. & A. in Supp. of Answer at 35.)

14    Bustamante appears to incorrectly believe that his case was tried under a felony murder

15  theory, with assault as the target crime.  As previously discussed in the Report and Recommendation,

16  however, Bustamante was not tried pursuant to the felony murder rule contained in Penal Code

17  section 189; rather, he was tried on a theory of aiding and abetting an assault, the natural and

18  probable consequences of which were Schaum's death.  (Lodgment No. 1, Vol. 2 of 2 at 0286-90,

19  0294-98, 0426.)  The jury convicted him of second degree murder under this theory.  (*Id.*)  Thus, he

20  has not established that counsel's failure to argue that he was liable for, at most, second degree

21  murder under Penal Code section 189, was not unreasonable under *Strickland*.  *See Strickland*, 466

22  U.S. at 687-89.  Moreover, as Respondent points out, he has not established he was prejudiced by

23  any such error since the jury convicted him of second degree murder, a crime which he himself

24

25    _____

      [16]  Penal Code section 189, California's felony murder rule, states, in pertinent part:

26
            All murder which is . . . committed in the perpetration of, or attempt to perpetrate, arson,
27       rape, carjacking, robbery, burglary, mayhem, kidnaping, train wrecking, or any act punishable
         under section 206, 286, 288, 288a, or 289, . . . is of the first degree.
28          To prove the killing was "deliberate and premeditated," it shall not be necessary to
         prove the defendant maturely and meaningfully reflected upon the gravity of his or her act.

1    admits he could properly have been held liable.  *See id.* at 694.

2              d.     *Failure to Object to the Testimony of Sergio Jacobo and Sergio Bustamante as*

3                     *Coerced*

4         Bustamante claims counsel was ineffective because he joined in co-counsel's objection to the

5    admission of Sergio Jacobo's and Sergio Bustamante's testimony on the ground that their rights

6    under *Miranda v. Arizona*, 396 U.S. 868 (1969) were violated  instead of making his own, proper

7    objection on the ground that their statements to police were coerced.  (Pet'rs Ex. A at 101-02, 168-

8    89.)  Respondent points out that Bustamante's claim is not supported by the record, and that, in any

9    event, Bustamante suffered no prejudice as a result of counsel's actions.  (Mem. of P. & A. in Supp.

10   of Answer at 36.)

11        Contrary to Bustamante's claim, it does not appear from the record that any counsel made an

12   objection to the admission of Jacobo's statements to police on the ground that his *Miranda* rights

13   were violated.  Moreover, as Respondent has pointed out, Bustamante's counsel stated on the record

14   that it was a tactical call not to object to the admission of Jacobo's statements on the ground that they

15   were coerced because there were other parts of Jacobo's statements that were helpful to

16   Bustamante's defense.  (Lodgement No. 2, Vol. VIII at 1109.)  Specifically, consistent with

17   Bustamante's defense that Truehitt was Schaum's killer, Jacobo testified that he saw Truehitt at the

18   driver's side window of Schaum's car, that Truehitt appeared to be attempting to flee the scene after

19   Schaum was shot, and that Truehitt tried to suggest to him that Gonzalez, Flores and Bustamante had

20   killed Schaum,  (Lodgment No. 2, Vol. VII at 951, 954-55, 956.)  As noted above, "strategic choices

21   made after thorough investigation of law and facts relevant to plausible options are virtually

22   unchallengeable . . . ."  *Strickland*, 466 U.S. at 690.  Accordingly, Bustamante has failed to establish

23   counsel's performance was unreasonable.  *Id.* at 687, 697 (courts need not address both components

24   of a *Strickland* claim if a defendant fails to make a sufficient showing as to one).

25        As to Sergio Bustamante, counsel did attempt to exclude his statements on the ground that

26   they were coerced.  Indeed, the trial court held a hearing to determine whether they were coerced,

27   and counsel cross-examined witnesses and argued vigorously for the statements to be excluded.

28   (Lodgment No. 2, Vol. VIII at 1037-1103.)  Although the trial judge ultimately determined that the

                                          -63-                              03cv0276

1   statements were voluntary, this does not mean trial counsel's performance was unreasonable.  (*See*

2   *id.* at 1105.)  Rather, counsel must have made errors so significant that he did function as "counsel"

3   within the meaning of the Sixth Amendment.  *Strickland*, 466 U.S. at 687.  That did not occur here.

4           e.      *Failure to Object to the Admission of Detective Thill's Testimony as False*

5           Bustamante claims counsel was ineffective when he failed to object to the admission of

6   Detective Thill's testimony that he did not threaten Sergio Bustamante during his interrogation as

7   perjury.  (Pet'rs Ex. A at 102-03, 169-70.)[17]  As he did in his prosecutorial misconduct claim,

8   Bustamante notes that Torgersen testified at the voluntariness hearing that Thill accused Sergio

9   Bustamante of trying to cover up for his brother, and that Thill raised his voice at Sergio and used

10   profanity.  (Lodgment No. 2, Vol. VIII at 1046, 1055-56, 1058.)  Torgersen also admitted that Thill

11   was "leaning on" Sergio in an attempt to get him to tell them the truth and that he repeatedly accused

12   Sergio of lying.  (*Id.* at 1058-60.)  At trial, Thill testified that he did not threaten or raise his voice to

13   Sergio during the interview.  (Lodgment No. 2, Vol. IX at 1311-12.)

14           As previously discussed in this Report and Recommendation, while the presentation of

15   conflicting versions of events, without more, does not constitute knowing presentation of false

16   evidence.  *Killian*, 282 F.3d at 1208; *Geston*, 299 F.3d at 1135.  Rather, "[i]t [i]s within the province

17   of the jury to resolve the disputed testimony."  *Geston*, 299 F.3d at 1135.  At most, the differences

18   between Torgersen's and Thill testimony is merely "the presentation of conflicting versions of

19   events."  *See Geston*, 299 F.3d at 1135.  Accordingly, there was no basis upon which counsel could

20   have objected to Thill's testimony and counsel's performance was therefore not unreasonable under

21   *Strickland*.  *See* 466 U.S. at 687, 688.

22           f.      *Failure to Effectively Present Closing Argument*

23           Next, Bustamante argues that counsel did not present an effective closing argument.  (Pet'rs

24

25           [17] Respondent states that Bustamante claims that counsel should have objected to Detective Torgersen's
26   testimony as false.  (Mem of P. & A. in Supp. of Answer at 37.)  However, it appears to this Court that
    Bustamante's claim is based on the same facts as his prosecutorial misconduct claim, namely that Detective
27   Torgersen testified that Detective Thill accused Sergio Bustamante of lying, raised his voice, used profanity and
    "leaned on" Sergio in an attempt to get him to tell the truth about the murder during Sergio's interrogation and
28   that Thill testified falsely that he did not threaten Sergio Bustamante or raise his voice during his interrogation.
    (*See* Pet'rs Ex. A at 102-03, 169-70.)

1   Ex. A at 103-04, 170-71.)  Although not entirely clear, Bustamante appears to claim that counsel

2   should have argued that: (1) the fact that Bustamante went to the passenger side of Schaum's car

3   indicates he did not intend to assault Schaum; (2) Bustamante was not leading the others out the

4   front door because due to the construction of the Wardlow house, only one person could exited the

5   house at a time and he was simply exiting the house single file; (3) other people besides Bustamante

6   must have dropped beer bottles outside the residence because Truehitt cleaned up bottles outside the

7   residence before the police arrived; (4)  the picture of what appears to be a bat or thick stick was not

8   the stick, "pen" or "pin" he told police he had prior to the murder[18]; (5) Sergio Jacobo's testimony

9   was false; (6) Sergio Jacobo implicated Truehitt as the true killer; and (7) merely being present when

10  the murder took place was insufficient to convict Bustamante of murder.  (*Id.* at 103-04.)

11  Respondent argues that, contrary to Bustamante's contention,  counsel made many of these

12  arguments and, as to the arguments cited by Bustamante that he did not make, Bustamante suffered

13  no prejudice.  (Mem. of P. & A. in Supp. of Answer at 37-39.)

14          None of the arguments Bustamante claims his counsel should have made satisfy both

15  *Strickland* prongs.  *See Strickland*, 466 U.S. at 687 (courts need not address both components of a

16  *Strickland* claim if a defendant fails to make a sufficient showing as to one).  First, it was a

17  reasonable, tactical decision by counsel not to argue that Bustamante's passenger door approach

18  supported his contention that he did not intend to assault Schaum. Such an argument would have

19  merely highlighted Jacobson's and Truehitt's testimony that Bustamante was leaning far into the car

20  from the passenger side, and indeed would more likely have supported a prosecution contention that

21  this was a coordinated assault with the defendants splitting up and surrounding the victim on both

22  sides.  And, defense counsel did point to several facts which supported an inference that Bustamante

23  did not intend to assault Schaum.  He noted the absence of motive, the fact that no witness saw

24  Bustamante hit Schaum, and the lack of evidence that Bustamante knew of any intent on the part of

25  Gonzalez or Flores to assault Schaum.  (Lodgment No. 2, Vol. X at 1693-1706.)

26

27  [18]   The prosecutor stated in closing argument that Bustamante had a stick just prior to the murder. (Lodgment No. 2, Vol. X at 1601.) Bustamante's counsel stated in closing argument that Bustamante had a "pen" he was playing with prior to the murder.  (*Id*. at 1699.)  In his statement to police, Bustamante stated that he had

28  a "pin" he was playing with prior to the murder. (Lodgment No. 2, Vol. V at 437.)

1    Second, counsel did argue that Bustamante was not leading the defendants out of the house

2    by highlighting the fact that Carranza went out first, followed by Truehitt and either Gonzalez or

3    Bustamante. (*Id.* at 1698.)  Counsel also referred to pictures of the interior of the house which he

4    argued indicated Bustamante was headed to the kitchen to get a beer, heard Carranza screaming

5    outside and went out to investigate. (*Id.* at 1698-99.)  That he did not specifically refer to the

6    construction of the house as support for his argument that Bustamante did not lead the others out of

7    the house did not prejudice Bustamante. *See Strickland*, 466 U.S. 694.

8    Third, the pathologist testified that Schaum had a small abrasion on his left hand, but could

9    not say how the injury was inflicted. (Lodgment No. 2, Vol. VIII at 1256-59.)  Since there was no

10   definitive evidence presented that any of Schaum's injuries could have come from Bustamante

11   striking him with a beer bottle, it is not clear what, if any, advantage would have been gained had

12   counsel argued that there were many beer bottles outside the Wardlow house and that Truehitt

13   cleaned them up before police arrived.  Accordingly, Bustamante has not established prejudice with

14   respect to this argument. *Strickland*, 466 U.S. at 694.

15   Fourth, although counsel could have argued that the stick photographed by police was not the

16   "pin" or "pen" Bustamante told police he was playing with prior to the murder, he has not shown

17   how such an argument would have furthered his defense since he denied being involved in the attack

18   on Schaum in any way and attempted to show that Truehitt was the true killer.

19   As to Bustamante's complaints regarding counsel's arguments about the role Sergio Jacobo

20   played, he seeks to have it both ways.  First, he faults counsel for not arguing that Jacobo was a liar

21   who sought to minimize his own role in the murder.  Then he faults counsel for not arguing that

22   Jacobo was truthful when he implicated Truehitt in the murder. Moreover, contrary to Bustamante's

23   first contention, counsel did argue that Jacobo was lying about the events and that Truehitt had more

24   of a motive to kill than Bustamante:

25           It happened fast.  It was dark outside.  Everybody had been drinking.  And the
             only people who had a motive, they were out there, and one of them was Sergio Jacobo.
26           He had blood on his pants.  Where did that blood come from?  All of the damaging
             testimony in this case came out of the mouth of Sergio Jacobo or Nathan Truehitt or
27           Sherry Jacobson.

28   (Lodgment No. 2, Vol. X at 1705.)

-66-

1    In addition, both counsel for Gonzalez and counsel for Bustamante argued extensively that

2    Truehitt was the likely killer.  (*See* Lodgment No. 2, Vol. X at 1624-1706.)  There is no reasonable

3    probability that the result of the proceeding would have been different had Bustamante's counsel

4    argued that Jacobo was truthful when he implicated Truehitt.  *See Strickland*, 466 U.S. at 689-94.

5    Finally, contrary to Bustamante's claim, counsel did argue that merely being present at the

6    scene of the murder was insufficient to convict Bustamante:

7    And another thing you probably are going to learn and if you haven't picked up
     on it already, is what it takes to be guilty for what someone else has done.  Now,
8    everyone of you, when you were children were told by your mother: don't hang out with
     those boys, you could be in trouble just for being there.  *If you look over at this*
9    *instruction, it tells you: mere presence at the scene of a crime which does not itself assist*
     *the commission of the crime does not amount to aiding and abetting.*  None of you knew
10   that before you got involved in this case, not many.

11   And when that gunshot went off at Wardlow on August 15th, nobody there knew
     it.  They all heard the same thing when they were kids.  If you hang out there, if you are
12   just there, you're going to get in trouble.  Everybody splits.  I didn't know it till I became
     a lawyer, I'll bet you didn't know either, that *mere knowledge that a crime is being*
13   *committed and failure to prevent it, that's not a crime.*  But if you are at the scene of a
     party, everybody has been doing drugs, suddenly there's a large fight outside, a gun goes
14   off and a young man is killed, and you are standing out there at the time it happens, you

15   are going to get out of there.  Maybe now you wouldn't.  Maybe now you would stay.,
     you would say, well, *mere presence is not enough.*  But who at Wardlow knew that?
16   Why would you expect anyone at Wardlow to know that?  That's unrealistic.

17   (Lodgment No. 2, Vol. X at 1695-96.)

18   Accordingly, Bustamante has not established either that counsel acted unreasonably or that he

19   was prejudiced by any error allegedly made by counsel.  *Strickland*, 466 U.S. at 687, 689-94.

20   g.    *Failure to Request Favorable Jury Instructions*

21   Bustamante also claims that counsel was ineffective when he failed to request several jury

22   instructions which he claims were appropriate and favorable:  the defense of accident or misfortune,

23   defense of property, accomplices and coconspirators and manslaughter.  (Pet'rs Ex. A at 104-05,170-

24   74.)  Respondent contends that none of these instructions were appropriate given the defense posture

25   of the case.  (Mem. of P. & A. in Supp. of Answer at 39-40.)

26   i.    Accident or Misfortune Instructions

27   Bustamante claims counsel should have asked that the jury be instructed with CALJIC No.

28   4.45, which states that a defendant does not commit a crime if "a person commits an act . . . through

1  misfortune or by accident under circumstances that show neither criminal intent, criminal purpose

2  nor criminal negligence." (CALJIC No. 4.45.)  Respondent argues that because the instructions

3  required the jury to find that Bustamante had higher *mens rea* than CALJIC No. 4.45 requires, the

4  jury necessarily resolved this issue against Bustamante.  (Mem. of P. & A. in Supp. of Answer at 39.)

5          It is not clear what act Bustamante believes he committed through misfortune or accident

6  which would have made this instruction relevant, since he claimed to his attorney and at trial that he

7  merely spoke to Schaum, told him to leave and was not involved in the assault on Schaum in any

8  way.  In any event, Bustamante has not established he was prejudiced by the failure to request this

9  instruction.  *Strickland*, 466 U.S. at 689-94.  "The accident defense amounts to a claim that the

10  defendant acted without forming the mental state necessary to make his or her actions a crime."

11  *People v. Lara*, 44 Cal. App. 4th 102, 110 (1996) (citing *People v. Scott*, 146 Cal. App.3d 823, 832

12  fn. 5 (1983), *People v. Calban,* 65 Cal. App.3d 578, 584  (1976) and *People v. Gorgol*, 122 Cal.

13  App.2d 281, 308 (1953).)  As Respondent correctly notes, the jury's verdict indicates they found

14  criminal intent on the part of Bustamante.  In order to convict Bustamante of second degree murder,

15  the jury had to find that he aided and abetted an assault, the natural and probable consequences of

16  which were Schaum's murder.  (Lodgment No. 1, Vol. 2 of 2 at 0287-88 [CALJIC Nos. 3.01, 3.02].)

17  This required the jury to conclude that Bustamante had "knowledge of the unlawful purpose of the

18  perpetrator," and had "the intent or purpose of committing, encouraging, or facilitating the

19  commission of the crime."  (Lodgment No. 1, Vol. 2 of 2 [CALJIC No. 3.01].)  Had the jury believed

20  that Bustamante lacked the "mental state necessary to make his or her actions a crime," they would

21  not have so concluded.

22          ii.      Defense of Property Instructions

23          CALJIC No. 5.40 provides that a lawful owner or occupant of a residence may use reasonable

24  force to eject a trespasser.  (CALJIC No. 5.40.)  While California law does not permit the intentional

25  use of deadly force to protect property, "[a] few older cases suggest . . . that a homicide involving the

26  *unintentional* and accidental use of deadly force may be justified on the ground that it occurred while

27  the defendant was exercising the right of defense of habitation."  *People v. Curtis*, 30 Cal. App. 4th

28  1337, 1360 (1994) (citations omitted and emphasis in original).  "Like traditional self defense,

-68-                                                    03cv0276

1   however, defense of habitation applies only if the defendant's belief that a trespass is occurring or

2   about to occur is reasonable." *Id*. at 1361.

3       This instruction was not applicable to Bustamante's case for two reasons. First,

4   Bustamante's defense was that he only told Schaum to leave. He denied using any force, reasonable

5   or not, against Schaum. Second, given that it was uncontroverted that Schaum never left his car,

6   there was no evidence that he was trespassing into the Wardlow house or that he was about to

7   trespass. Accordingly, counsel was not ineffective for failing to request this instruction. *See*

8   *Strickland*, 466 U.S. at 687.

9           iii.    Accomplice Instructions

10      CALJIC Nos. 3.11-3.19 instruct the jury on how to consider the testimony of accomplices

11  and directs the jury that they may not convict solely on the testimony of an accomplice and that

12  accomplice testimony must be viewed with caution. (*See* CALJIC Nos. 3.11, 3.18.) It is not clear

13  what testimony Bustamante claims that accomplice instructions should have applied to, but it

14  appears it could only arguably have been applied to Truehitt's and Sergio Jacobo's testimony. (*See*

15  Pet'rs Ex. A at 105.)

16      Given Bustamante's defense that he had nothing to do with Schaum's murder, did not know

17  that Gonzalez and/or Flores were armed, and that Truehitt had the motive and opportunity to kill

18  Schaum, it would have been inconsistent with this defense to request accomplice instructions. The

19  decision not to request such instructions is a tactical decision which Bustamante's attorney clearly

20  based on Bustamante's assertion that he had nothing to do with the murder. (*See* Pet'rs Supp.

21  Traverse, Ex. A at 11-12.) Bustamante has not established that this decision was unreasonable

22  under *Strickland*. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough

23  investigation of law and facts relevant to plausible options are virtually unchallengeable . . . .")

24          iv.    Manslaughter Instructions

25      Bustamante next complains that counsel was ineffective for failing to request a

26  "manslaughter jury instruction, based on the accident or misfortune." (Pet'rs Ex. A at 105.) In

27  California, there are two types of manslaughter, voluntary and involuntary. Voluntary manslaughter

28  is a homicide committed "without malice [and] upon a sudden quarrel or heat of passion." (Cal.

1  Penal Code § 192(b).)  Involuntary manslaughter is a homicide committed "without malice [and] in

2  the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act

3  which might produce death, in an unlawful manner, or without due caution and circumspection."

4  (Cal. Penal Code § 192 (b).)  Since the entire thrust of Bustamante's defense was to expose the

5  motive and opportunity for Truehitt to commit the murder, Bustamante's corresponding lack of

6  motive and opportunity for participating in Schaum's murder and the inconsistencies in the

7  prosecution witness' versions of events, *see* Lodgment No. 2, Vol. X at 1690-1706, counsel made a

8  reasonable strategic decision to forgo an alternative theory of manslaughter.  *See Strickland*, 466

9  U.S. at 690.

10      h.    *Failure to Object to the Prosecutor's Closing Argument*

11      Bustamante argues that his trial attorney was ineffective because he failed to object to the

12  prosecutor's improper comments during argument.  (Pet'rs Ex. A at 105, 167-68.)  However, as the

13  Court has concluded above, the prosecutor did not make any improper arguments.  (*See* Report and

14  Recommendation at IV(B)(7)(f).)  Accordingly, Bustamante has shown neither that counsel's

15  performance was unreasonable, nor that he was prejudiced by any alleged error.  *See Strickland*, 466

16  U.S. at 688-89, 694.

17      i.    *Failure to Object to the Lesser Included Offense, Natural and Probable*

18          *Consequences and Assault Instructions*

19      Although not entirely clear, Bustamante appears to argue that counsel should have objected to

20  written instructions on the lesser related offense of assault with a deadly weapon because it was

21  confusing as written.  (Pet'rs Ex. A at 106-07, 173-75.)  Respondent does not address this argument

22  in the Answer.  Bustamante does not specify exactly how the instruction is confusing, and the Court,

23  having reviewed the written instruction, does not find the instruction to be confusing.  Accordingly,

24  Bustatmante has not established either that counsel was unreasonable for failing to object to the

25  instruction, or that he was prejudiced by counsel's failure to object.  *See Strickland*, 466 U.S. at 687,

26  689-94.

27      In the alternative, Bustamante may be arguing that counsel failed to object to the jury being

28  instructed that he could be found guilty of murder if he aided and abetted in the commission of an

1   assault  or assault with a deadly weapon manner, the natural and probable consequences of which

2   were Schaum's murder.  Or, he may be arguing that counsel should have objected to the assault

3   instruction as defective  because it did not contain as an element the Bustamante intended to commit

4   a battery.  However, as previously discussed in this Report and Recommendation, both of those

5   instructions correctly stated California law.  (*See* Report and Recommendation at IV(B)(3)(a), (b),

6   (c) and IV(B)(8)(g).)  Thus, Bustamante has not established that counsel was ineffective when he

7   failed to object to them or that he was prejudiced.  *Strickland*, 466 U.S. at 687, 689-94.

8              j.      *Failure to Competently Argue the Motion for a New Trial*

9          Bustamante next claims that counsel was ineffective for failing to argue at the motion for a

10   new trial that the assault instruction was confusing and that the natural and probable consequences

11   and assault instructions did not accurately state the law.  (Pet'rs Ex. A at 106-07, 174-75.)

12   Respondent does not address this claim in the Answer.  As the Court has just concluded, the written

13   assault instruction was not confusing and the natural and probable consequences and assault

14   instructions were proper.  Accordingly, Bustamante has not established counsel was ineffective when

15   he failed to raise these issues at the motion for a new trial.  *Strickland*, 466 U.S. at 687, 689-94.

16              k.      *Failure to Adequately Question Joaquin Guadiana*

17          Bustamante claims counsel should have questioned Guadiana about his testimony at the

18   preliminary hearing that he heard Bustamante say "Oh, why?  Why?  Why did they shoot" as he,

19   Bustamante and Flores left the scene of the murder.  (Pet'rs Ex. A at 107, 175; Lodgement No. 2,

20   Preliminary Hearing Transcript at 126.)  Respondent argues that Guadiana's testimony as a whole

21   was damaging to Bustamante and that counsel therefore must have made a tactical decision not to

22   link Bustamante with Guadiana any further.  (Mem. of P. & A. in Supp. of Answer at 41.)

23   Moreover, Respondent argues, the statement did not establish a defense for Bustamante because

24   Bustamante did not have to know Schaum was going to be shot in order to be found guilty, only that

25   he aided and abetting an assault, the natural and probable consequences of which were Schaum's

26   murder.  (*Id.*)

27          Guadiana's testimony about Bustamante's statement would have helped establish that

28   Bustamante was surprised by or felt remorse as a result of Schaum's shooting, and thus cast doubt on

1  whether the natural and probable consequences of Bustamante's aiding and abetting the assault was

2  Schaum's murder.  However, given Jacobson's testimony about Bustamante's knowledge of the gun

3  and her and Truehitt's testimony about his actions during the initial assault on Schaum, Bustamante

4  has not established he suffered any prejudice as a result of any actions by counsel.  (*See* Lodgment

5  No. 2, Vol. III at 105, 129-34; Lodgment No. 2, Vol. V at 455-58; *Strickland*, 466 U.S. at 689-94.)

6         9.   Sufficiency of the Evidence

7        Bustamante contends that there was insufficient evidence presented to convict him of second

8  degree murder.  (Pet'rs Ex. A at 108-10, 178-82.)  Respondent argues that, given the elements of the

9  crime as defined under state law, there was more than sufficient evidence presented to support

10  Bustamante's conviction.  (Mem. of P. & A. in Supp. of Answer at 42-44.)

11        In assessing a sufficiency of the evidence claim, the Supreme Court has stated that "'the

12  relevant question is whether, after viewing the evidence in the light most favorable to the

13  prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

14  reasonable doubt.'"  *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005), quoting *Jackson v.*

15  *Virginia*, 443 U.S. 307, 319 (1979).  In determining whether sufficient evidence has been presented,

16  the Court must accept the elements of the crime as defined by state law.  *See Jackson*, 443 U.S. at

17  324, n. 16.

18        In California, there are two types of aiding and abetting liability: (1) the aider and abettor

19  acted with knowledge of the criminal purpose of the perpetrator and with the intent of committing,

20  encouraging or aiding the target offense, or (2) the aider and abettor intended to encourage or aid a

21  target offense but is also liable for the natural and probable consequences of the target offense.

22  *Karapetyan*, 140 Cal. App. 4th at 1178.  As previously discussed, the prosecution in Bustamante's

23  case chose to proceed on the second theory, specifically that Bustamante intended to encourage or

24  aid an assault on Schaum, the natural and probable consequences of which were Schaum's murder.

25        At Bustamante's trial, Sherry Jacobson testified that she had told Bustamante that Schaum

26  had stolen from her and that Bustamante once confronted Schaum when Schaum was removing

27  items from Truehitt's Imperial Beach residence.  (Lodgment No. 2, Vol. III at 122-23.)  She testified

28  that on the afternoon of the murder, Gonzalez was at the Wardlow house and he showed her and

-72-

1    Jesse a large revolver.  (*Id.* at 102, 105-06.)  After Schaum arrived at the Wardlow house and

2    Truehitt and Carranza began yelling at him, she saw Bustamante, followed by Gonzalez and Flores,

3    come out of the house with angry looks on their faces.  (*Id.* at 129-30.)  She saw Bustamante walk up

4    to Schaum's car on the passenger side with Flores.  (*Id.* at 131-32.)  Bustamante was leaning part of

5    the way into Schaum's car up to a point a little below his shoulders, but Jacobson could not see what

6    Bustamante was doing.  (*Id.* at 132.)  She could see that Flores was swinging his arm as if he were

7    hitting Schaum.  (*Id.* at 133.)  She then heard a gunshot and saw a flash and ran into the house.  (*Id.*)

8    She also testified that after Schaum was shot, Truehitt told her that Gonzalez shot him.  (Lodgment

9    No. 2, Vol. IV at 318.)

10       Tina Carranza testified she was inside the Wardlow house when someone told her that

11   Schaum was outside waiting for her.  (*Id.* at 341-42.)  She went outside and began yelling at Schaum

12   because she was upset that he was there and had discovered where she lived.  (*Id.* at 342-43.)  She

13   saw "some people" rush up to the car.  They were Hispanic and she thought one of them was

14   Bustamante.  (*Id.* at 343.)  The people leaned into Schaum's car and it looked as though they were

15   hitting him.  (*Id*. at 343-44.)  She yelled at Jacobson to tell them to stop.  Then she heard a gunshot.

16   (*Id.* at 345.)  Truehitt said, "Oh my God, they shot him."  (*Id.*)

17       Nathan Truehitt testified that he was at the Wardlow house when Sherry came in and

18   announced that Schaum was there.  (Lodgment No. 2, Vol. V at 451.)  He and Carranza went outside

19   and Carranza began arguing with Schaum.  (*Id.* at 453.)  Truehitt told Schaum to leave.  Schaum

20   agreed to leave and put the car into gear.  (*Id.* at 454-55.)  Just then, "both windows got rushed" by

21   people.  He saw Bustamante on the passenger side of the car and Gonzalez on the driver's side.  (*Id*.

22   at 456-57.)  The individuals were hitting Schaum.  Then Truehitt saw a flash and saw Gonzalez with

23   a gun in his hand.  (*Id*. at 457.)  Gonzalez ran away and he ran to call 911.  (*Id.* at 457-58.)

24       Jacobo told police and testified at the preliminary hearing that he was present when Gonzalez

25   showed Bustamante the gun.  (Lodgment No. 2, Vol. VII at 837-45.)  He also testified that after the

26   murder, Bustamante said he had hit Schaum in the face with a bottle.  (*Id.* at 906.)

27       Given the above testimony, there was sufficient evidence for the jury to conclude that

28   Bustamante aided and abetted an assault, the natural and probable consequences of which were

-73-                                                     03cv0276

1    Schaum's murder.  *See Karapetyan*, 140 Cal. App. 4th at 1178.  Bustamante knew there was bad

2    blood between Jacobson, his girlfriend, and Schaum.  (Lodgment No. 2, Vol. III at 122-23.)  When

3    he exited the house with Gonzalez and Flores, he had an angry look on his face.  (*Id.* at 129-30.)  In

4    concert with Gonzalez and Flores, he surrounded Schaum's car and leaned into the car up to his

5    waist; Schaum appeared to be "bounced around" inside the car by the defendants.  (*Id.* at 131-33.)

6    This was sufficient to establish that Bustamante "intended to encourage or aid" an assault on

7    Schaum.  *See Karapetyan*, 140 Cal. App. 4th at 1178.  Bustamante also knew Gonzalez was armed

8    with a gun the day of the murder because Gonzalez showed it to him while they were at the Wardlow

9    house just prior to the murder.  (*Id.* at 102, 105-06.)  Thus, Bustamante knew that a "natural and

10   probable consequence" of the assault was Schaum's murder.

11            10.    Ineffective Assistance of Appellate Counsel

12            Bustamante contends his appellate counsel was ineffective for failing to raise on appeal

13   issues related to errors in the jury instructions, the introduction of false testimony, ineffective

14   assistance of trial counsel and the restitution order.  (Pet'rs Ex. A at 111-13, 182-85.)  "The proper

15   standard for evaluating [a] claim that appellate counsel was ineffective . . . is that enunciated in

16   *Strickland [v. Washington]*."  *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Smith v. Murray*,

17   477 U.S. 527, 535-36 (1986)).  A petitioner must first show that his appellate counsel's performance

18   fell below an objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 688

19   (1984).  He must then establish he was prejudiced by counsel's errors.  *Id.* at 694.  To establish

20   prejudice, a petitioner must demonstrate that he would have prevailed on appeal absent counsel's

21   errors.  *Smith*, 528 U.S. at 285.

22            a.    *Failure to Argue Instructional Error*

23            Bustamante argues appellate counsel should have argued that the jury instructions on assault

24   and the natural and probable consequences doctrine were incorrect.  (Pet'rs Ex. A at 110-13, 182-

25   84.)  He also argues that appellate counsel should have argued that accomplice and manslaughter

26   instructions should have been given.  (*Id.*)  As Respondent correctly states, and this Court has

27   already determined, none of the jury instructions Bustamante complains about were defective, and

28   that accomplice and manslaughter instructions were not appropriate.  Bustamante has not established

1   appellate counsel was ineffective for raising meritless claims.  *Smith*, 528 U.S. at 285.

2           b.      *Failure to Challenge the Denial of the Severance Motion*

3           Bustamante claims appellate counsel was ineffective when she failed to argue that the

4   numerous severance motions made by counsel were improperly denied.  (Petr's Ex. A at 110-13,

5   182-84.)  As Respondent notes, Bustamante is incorrect.  Appellate counsel joined in co-counsel's

6   argument regarding this issue.  (Lodgment No. 3 at 17.)  Thus, Bustamante has not satisfied either

7   prong of *Strickland/Smith.  See Smith*, 528 U.S. at 285.

8           c.      *Failure to Challenge the Introduction of False Testimony*

9           Bustamante argues appellate counsel should have argued that the prosecutor improperly

10  presented false testimony, presumably the testimony of Detective Thill.  (Pet'rs Ex. A at 110-13,

11  182-84.)  As this Court has already determined, Thill's testimony was not false, and appellate

12  counsel cannot be faulted for failing to raise this meritless claim.  *Smith*, 528 U.S. at 285.

13          d.      *Failure to Argue that Trial Counsel Was Ineffective*

14          Bustamante states that appellate counsel should have argued the same ineffective assistance

15  of counsel claims as he has raised in this Court on direct appeal.  (Pet'rs Ex. A at 110-13, 182-84.)

16  Again, as this Court has already determined, none of Bustamante's ineffective assistance of trial

17  counsel claims had merit, and thus appellate counsel reasonably decided not to raise them.  *Smith*,

18  528 U.S. at 285.

19          e.      *Failure to Challenge the Restitution Order*

20          Finally, Bustamante argues that appellate counsel should have challenged the $10,000

21  restitution order on the ground that he did not have the ability to pay.  (Pet'rs Ex. A at 112, 183-84.)

22  Respondent contends the claim was waived on appeal when trial counsel did not object to it.  (Mem.

23  of P. & A. in Supp. of Answer at 45.)

24          While this may be true, there are other problems with Bustamante's claim.  First, the trial

25  court adopted the probation report's recommendation of the $10,000 fine.  (Lodgment No. 1, Vol. 1

26  of 2 at 142.)  In California, a defendant has the burden of proving that the amount of restitution

27  proposed by probation officer is incorrect.  *People v. Foster*, 14 Cal. App. 4th 939, 947 (1993).

28  Bustamante has not provided this Court with any information which suggests the amount is incorrect.

Second, California Penal Code section 1202.4(g) states that a defendant's ability to pay restitution "shall not be considered a compelling and extraordinary reason not to impose a restitution order, nor . . . be a consideration in determining the amount of a restitution order." *See also People v. Draut*, 73 Cal. App. 4th 577, 582 (1999). Accordingly, appellate counsel had no duty to raise this meritless claim. *Smith*, 528 U.S. at 285.

## IV.   CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge M. James Lorenz under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California. For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **July 25, 2007,** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **10 days after being served with the objections**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  June 25, 2007

_____
**CATHY ANN BENCIVENGO**
United States Magistrate Judge

03cv0276