1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                       SOUTHERN DISTRICT OF CALIFORNIA

10

11  JESUS BUSTAMANTE,                    )    Civil No. 03-CV-276-L(CAB)
                                         )
12                    Petitioner,        )    **ORDER ADOPTING REPORT AND**
                                         )    **RECOMMENDATION;**
13  v.                                   )    **OVERRULING OBJECTIONS;**
                                         )    **DENYING PETITION FOR WRIT OF**
14  S. GARCIA,                           )    **HABEAS CORPUS and DIRECTING**
                                         )    **ENTRY OF JUDGMENT**
15                    Respondent.        )
                                         )
16  _____ )

17        Petitioner Jesus Bustamante filed a petition for writ of habeas corpus pursuant to 28

18  U.S.C. § 2254 that has been fully briefed.  The matter was referred to United States Magistrate

19  Judge Cathy Ann Bencivengo, for a Report and Recommendation ("Report") under 28 U.S.C. §

20  636(b)(1)(B) and Civil Local Rule 72.3.   The magistrate judge issued a Report recommending

21  the petition be denied in its entirety.  Petitioner timely filed objections.  Respondent did not file

22  an objection or a response to petitioner's objections.

23  **A.    Standard of Review**

24        A federal court may not grant an application for writ of habeas corpus on behalf of a

25  person in state custody with respect to any claim that was adjudicated on the merits in state court

26  proceedings unless the adjudication of the claim: (1) "resulted in a decision that was contrary to,

27  or involved an unreasonable application of, clearly established Federal law, as determined by the

28  Supreme Court of the United States"; or (2) "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

> Before a federal court may overturn a conviction resulting from a state trial . . . it must be established not merely that the [State's action] is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.

*Cupp v. Naughten*, 414 U.S. 141, 146 (1973)

Under 28 U.S.C. § 636(b)(1), in reviewing a magistrate judge's report and recommendation, the district court "shall make a *de novo* determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  Under this statute, "the district judge must review the magistrate judge's findings and recommendations *de novo if objection is made, but not otherwise*."  *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.) (*en banc*) (emphasis in original); *see Schmidt v. Johnstone*, 263 F. Supp. 2d 1219, 1225-26 & n.5 (D. Ariz. 2003) (applying *Reyna-Tapia* to habeas review).  As previously noted, petitioner filed objections ("Obj.") to the Report.

**B.    Discussion**

    **1.    Factual and Procedural Background**

Petitioner does not object to the factual and procedural background contained within the California Court of Appeals decision[1] (Lodgment 5) and as set forth in the Report.  The facts as found by the state appellate court are as follows:

---

[1]    The Court gives deference to state court findings of fact and presumes them to be correct.  Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28 U.S.C.A. § 2254(e)(1)(West 2007); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).

I.      Factual Background

        A.      The Witnesses' Relationships

        The principal prosecution witnesses were Tina Carranza (Tina), Nathan Truehitt (Nathan) and Sherry Jacobson (Sherry).  These three persons and the victim [Kevin Schaum] were involved in a web of relationships.

        In the late spring of 1992 Tina met Nathan.  At that time Tina had been dating [Kevin].  However, on meeting Nathan she broke up with [Kevin] and a week later began seeing Nathan.  Shortly thereafter, Tina began living with Nathan.  She lived with Nathan until approximately one week before the August 15, 1992 murder.  Nathan threw Tina out of the Wardlow house because he was jealous of her continued relationship with [Kevin] and because Tina was unable to get along with Sherry, who was to move into the Wardlow house. [footnote 2: Tina conceded she and [Kevin] had been intimate while Nathan was in jail during July 1992 and had also spent the night with [Kevin] the night prior to Nathan's throwing her out.  Sherry had reported her suspicions of Tina's infidelity to Nathan while Nathan was in jail, and Nathan and Tina had violent arguments over Tina's relationship to [Kevin].]

        Sherry was a friend of Nathan's daughter, became close to Nathan and viewed him as an uncle.  Sherry was a methamphetamine user.  Nathan provided her with a home, money and drugs; in return she sold drugs for Nathan.

        Sherry first met [Kevin] through Tina in June 1992 when Tina requested [Kevin] to repair Sherry's car.  Although Sherry at first liked [Kevin], she became antagonistic when convinced [Kevin] had stolen property belonging to Nathan and her. [footnote 3: During July 1992 Nathan was jailed for possession of methamphetamine.  While Nathan was in jail, Tina and [Kevin] packed and moved Nathan's belongings from his old house and stored them in a U-Haul truck at a friend's home.  Sherry believed [Kevin] had stolen some of the property while it was being stored.  Sherry enlisted the help of Bustamante and Mr. Jacobo to try to convince [Kevin] to return the property.  After [Kevin] refused, Bustamante used a small knife to puncture the tire of the U-Haul.]  Sherry also disliked [Kevin] because she suspected he was sleeping with Tina while Nathan was in jail.  Sherry reported her suspicions of the Tina-victim relationship to Nathan.

        B.      The Relationship of the Codefendants

        Sherry met Bustamante through a Mr. Jacobo and began dating Bustamante in the summer of 1992. [footnote 4: Mr. Jacobo and Nathan were business acquaintances in the drug business.]  Bustamante introduced [co-defendant] Gonzalez to Sherry about 10 days before the murder, stating Gonzalez was like a brother to him and that he (Bustamante) would die for Gonzalez.  Bustamante also introduced [co-defendant] Flores to Sherry about a week before the murder, stating Flores was like a brother to him.  Sherry saw Bustamante give Flores a knife as a gift.

        Sherry introduced Bustamante to Nathan sometime during the two weeks prior to the murder.  Bustamante was staying at the Wardlow house

3

(with Nathan and Sherry) for several days prior to the murder.  Nathan met the other codefendants at the Wardlow house when Nathan arrived home on the day of the murder and found them and many others at the house.

### C.    The Shooting

On the evening of August 15, 1992, Nathan, Tina, Sherry, Jacobo, a Ms. Morris, a Mr. Pagel, the three codefendants and others were at the Wardlow house.  During the day, Bustamante was drinking with his friends. Several people, including Gonzalez and Nathan, were ingesting drugs.

During the same day, Sherry saw Gonzalez in the living room of the Wardlow house showing off a large revolver and heard Gonzalez comment: "Imagine what this can do with a hollow point bullet."  Jacobo was present while Gonzalez and Bustamante examined the gun and Jacobo looked at it before returning it to Gonzalez.  Jacobo later told police he had seen some hollow point bullets Gonzalez had for the revolver and that the revolver was a .44 caliber special.  [footnote 5: Jacobo was testifying under a grant of immunity.  At trial, he denied seeing any hollow point ammunition in Gonzalez's possession and claimed that his statement to police about the ammunition was untruthful.  He claimed to have told police what they wanted to hear because he feared being charged in the murder.  However, police testified Jacobo told them of the hollow point ammunition before they had revealed to him the type of ammunition recovered at the scene. Sherry confirmed seeing Jacobo holding hollow point bullets prior to the shooting.]  Another person present, Mr. Guadiana, saw Gonzalez lift his shirt to display the gun tucked in Gonzalez's waistband.  Jacobo also told police he had seen Flores with a knife earlier that day and Flores would occasionally pull it from his pocket and play with it.  Jacobo told police the knife was "legal" because the blade was less than three inches long.

At approximately 8 p.m., [Kevin] unexpectedly arrived at the Wardlow house and pulled his car into the driveway.  Ms. Morris went outside to see what [Kevin] wanted and then returned to the house to tell Tina that [Kevin] wanted to see her.  When Tina did not go outside, Sherry went out, spoke with [Kevin] and then returned inside to tell Tina that [Kevin] was waiting for her.  Sherry then went back outside to tell [Kevin] that Tina would be right out.

Tina, accompanied by Nathan, went outside.  Tina went to the passenger side window, began screaming at [Kevin] and asked, "What are you doing here?  How did you know where I lived?"  While Tina was yelling, Nathan went to the driver's side and told [Kevin] to leave.  Sherry heard the yelling from inside and came back outside.

Sherry then saw Bustamante, followed by Flores and Gonzalez, emerge from the house and walk toward the car.  Sherry, seeing they had angry looks on their faces, told them not to do anything stupid or crazy, but Flores had a smirk on his face and rolled his eyes.  Sherry testified Flores and Bustamante went to the passenger side window, leaned through it and made striking motions at [Kevin].  Nathan testified that he saw Bustamante on the passenger side attacking [Kevin] and that Gonzalez was leaning in through the driver's side window.  Nathan saw someone inside the car wielding a bottle but could not tell who it was.

Tina screamed at Sherry to tell them to stop. Ten to twenty seconds after the codefendants began their attack a shot rang out. Sherry heard the gunshot, saw the flash and ran inside. Tina saw the car jerk as if the clutch pedal had been released. Nathan saw the flash of the shot, saw [Kevin]'s head go forward and immediately thereafter saw a gun in Gonzalez's hand.

When Tina heard the shot she turned and saw Nathan standing near the left front wheel of [Kevin]'s car holding his hands in the air and saying, "Oh, my god, they shot him." Sherry came back outside and saw Nathan holding his head and saying, "I can't believe they did this" and saw Tina crying hysterically and yelling, "Oh, my god, they shot him." Nathan almost immediately told Sherry that Gonzalez had been the shooter.

Jacobo, who was inside when the shot was fired, ran out and saw Nathan, Bustamante, Gonzalez and Flores standing around the car. Jacobo heard someone say, "Let's get out of here." Then Jacobo (along with Flores, Bustamante and Guadiana) got into Jacobo's car and left. As he and the others left the scene, Jacobo saw Gonzalez putting a gun into his waistband. Gonzalez left in his own car.

        D.      Post Shooting Events

Nathan remained at the Wardlow house waiting for police to arrive, cleaning up beer bottles and disposing of the drugs around the house. Nathan instructed Sherry and Tina not to go near the car because they might disturb the fingerprints.

Jacobo, accompanied by Flores and Bustamante, drove to a house owned by Bustamante's brother, Sergio Bustamante (Sergio). During the trip, Flores was laughing and bragging that Flores "stuck him." Flores also told Bustamante: "You're my family. I'd kill for you." While at Sergio's house, Flores told Gonzalez: "I got him." He also told Gonzalez: "If you want, I'll do time for it." Bustamante stated he had struck [Kevin] in the face with a beer bottle and had left a beer bottle at the scene, saying, "Damn, they got my fingerprints."

Sergio later told police Gonzalez said he had hit [Kevin] and the gun accidentally discharged. Sergio also told police Gonzalez said he had used a .44 or .45 caliber revolver.

Bustamante told police he was one of the first to come out of the Wardlow house and he had a beer bottle in his hands which may have dropped inside [Kevin]'s car. Bustamante also told police the shooter was pistol-whipping [Kevin] when the gun discharged by accident.

        E.      Physical Evidence

Police recovered beer bottles from around the car and inside the car. A palm print taken from the passenger side door of [Kevin]'s car matched Flores's prints.

The bullet retrieved from [Kevin] was a hollow point .44 caliber, which only one company manufactures. The bullet could only have been fired from a .44 caliber revolver and the criminalist explained that because of the design of the revolver it cannot fire by accident; firing requires that someone pull the trigger.

The pathologist found [Kevin] had suffered three stab wounds in the right chest area consistent with a single-edged folding knife of less than three inches in length. [Kevin] also had a gunshot wound to his head that indicted the gun had been fired at very close range. [Kevin] also had cuts on the right side of his face. The cause of death was the gunshot wound to the head and two of the three stab wounds which had punctured the lungs.

F.    The Defense Theory

Gonzalez denied owning a gun or showing a gun around the Wardlow house. He claimed he saw a gun at the house that day when Nathan opened a drawer to retrieve drugs for them to consume. Gonzalez's version was as follows:

Gonzalez came out of the bathroom and saw Nathan pacing back and forth. Gonzalez then went outside and saw Tina arguing with someone as she stood next to the driver's window of a car. Nathan then ran up to Tina, pulled her away and began yelling at [Kevin] and poking [Kevin] with his finger. As the fight escalated Bustamante pulled Tina away. Gonzalez saw Nathan lean into the car and then saw a flash and heard a gunshot. Bustamante jumped back from the car. Gonzalez heard someone say, "Let's get out of here." Gonzalez then left. Later the next morning Gonzalez learned, through Jacobo, that Nathan was accusing Gonzalez of the shooting.

The defense also relied on Tina's testimony that Nathan was a violent person and had a tendency to become angry after ingesting methamphetamine. Nathan was under the influence of methamphetamine that day and was behaving irrationally. Jacobo claimed Nathan had threatened violence against [Kevin] prior to the shooting. After the shooting, Nathan threatened Tina with "the same thing done to you that was done to Kevin."

(Lodgment No. 5 at 3-9; Report at 2-5.)

The procedural background provided in the Report is as follows:

On July 28, 1993, the San Diego County District Attorney's Office filed a second amended second consolidated information charging Ernesto Gonzalez, Philip Antonio Flores and Jesus (Jesse) Ramirez Bustamante with one count of murder, a violation of Penal Code section 187(a). (*See* Lodgment No. 1, Vol. 1 of 2 at 0093-95.) The information also alleged that Bustamante was armed with a firearm, within the meaning of Penal Code section 12022(b) and that Bustamante had suffered a prior felony conviction which made him ineligible for probation, within the meaning of Penal Code section 1203(e)(4). (*Id.*) A jury found Bustamante guilty of second degree murder and found the Penal Code section 12022(b) allegation to be true. (Lodgment No. 1, Vol. 1 at 0210.)

Bustamante filed a direct appeal challenging his conviction in the California Court of Appeal, Fourth Appellate District, Division One. (Lodgment Nos. 3, 4.) On January 30, 1996, the state appellate court affirmed Bustamante's conviction in an unpublished opinion. (Lodgment No. 5.) He did not file a Petition for Review in the California Supreme Court.

03cv276

Bustamante next filed a habeas corpus petition in the California Court of Appeal, Fourth Appellate District, Division One, which that court denied in a brief unpublished opinion on February 21, 2001.  (Lodgment Nos. 6, 7.)  He filed another habeas corpus petition, together with a Motion for Production of Documents, in the San Diego Superior Court, which was denied in an unpublished opinion on November 21, 2001.  (Lodgment Nos. 8, 9.)  Bustamante then filed a second habeas corpus petition in the state appellate court, which was denied in an unpublished opinion on April 4, 2002.  (Lodgment Nos. 10, 11.)  Finally, Bustamante filed a habeas corpus petition in the California Supreme Court, which that court denied without citation of authority on January 29, 2003.  (Lodgment Nos. 12, 13.)

Bustamante then filed a habeas corpus petition pursuant to 28 U.S.C. § 2254 (West 2007) in this Court on February 10, 2003 [doc. no. 1].  Respondent filed a motion to dismiss on May 28, 2003, which was granted on February 23, 2004 [doc. nos. 12, 13, 18, 24].  Bustamante appealed the dismissal to the Ninth Circuit Court of Appeals, which vacated the dismissal order and remanded the case to this Court for further proceedings [doc. nos. 26, 31, 36, 37].

An order setting a briefing schedule on the merits of the petition was filed on August 26, 2005, and Respondent filed an Answer on December 20, 2005 [doc. nos. 52, 53].  Bustamante filed a Traverse on April 10, 2006, and a Supplemental Traverse on May 23, 2006 [doc. nos. 61, 64].

(Report at 5-6.)

## 2.    Objections to Report

Petitioner brought nine claims in his petition all of which the magistrate judge addressed in her Report.  In response to the Report, petitioner objects to portions of the findings of the magistrate judge but has indicated that he has no objection to the disposition of certain claims.[2]

Petitioner objects to the Report with respect to his Claim 2 concerning three particular jury instructions; Claim 6 – prosecutorial misconduct; Claim 7 – ineffective assistance of trial counsel: and Claim 8 – ineffective assistance of appellate counsel.

---

[2]    Claims to which petitioner has no objection include:  Claim 1: the trial court improperly denied his motion to dismiss (see Objection at 1, n.1); Claim 2: the trial court improperly instructed the jury with respect to felony murder (see Obj. at 1 n.1, at 3, n.4) and the failure to give a pinpoint instruction on aiding and abetting (see Obj. at 3 n.4) but petitioner objects to the lack of a lesser included offense, accomplice and assault/aggravated assault instructions; Claim 3: the trial court failed to rule on an objection during closing argument (see Obj. at 3, n.4); Claim 4: the trial court improperly denied his severance motion (see Obj. at 3, n.4); Claim 5:  the trial court was biased against him (see Obj. at 3, n.4); Claim 7: ineffective assistance of trial counsel but only to the issue of the failure to pursue the writ of mandamus (see Obj. at 11); and Claim 9: insufficiency of the evidence (see Obj. at 7).  As to these claims, the Court adopts the Report and Recommendation without further review.

### a.    Jury Instructions

Bustamante contends that the trial court failed to properly instruct on the elements of assault and assault with a deadly weapon (aggravated assault); to *sua sponte* instruct the jury that they could consider manslaughter as a lesser included offense; and to instruct on accomplice testimony.

### 1.    Assault/Assault with a Deadly Weapon

Petitioner asserts that the jury instructions on assault and aggravated assault were improper because these crimes require the specific intent to commit a battery.  In other words, petitioner contends an element of each of the crimes was deleted from the instructions which is a violation of his due process rights.

Under the Fourteenth Amendment, due process requires that "every fact necessary to constitute the crime with which [the defendant] is charged" be proved beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358, 364 (1970).  If a trial court fails to properly instruct the jury regarding an element of the charged crime, the court commits a constitutional error that deprives the defendant of due process. *See, e.g., Conde v. Henry*, 198 F.3d 734, 740 (9th Cir. 1999).

Under California law, battery and assault are general intent crimes.  *See People v. Williams*, 26 Cal. 4th 779, 788 (2001);  *People v. Colantuono*, 7 Cal. 4th 206, 217 (1994).  Although petitioner contends otherwise, the intent to commit battery is not an element of the crimes of assault or aggravated assault.

The trial court instructed the jury on both aggravated assault, CALJIC No. 9.02; and assault, CALJIC No. 9.00.  The standard California instructions used in petitioner's case included all the elements of assault and aggravated assault.  Because the instructions given were not erroneous, *i.e.,* they contained all the elements of the crimes, the Court cannot find that the instructions violated petitioner's due process rights.

### 2.    Lesser Included Offense Instruction

Petitioner contends that the trial court failed to instruct, *sua sponte*, on the lesser included offense of manslaughter.  Voluntary manslaughter is "the unlawful killing of a human being without malice [and] upon a sudden quarrel or heat of passion" while involuntary manslaughter

03cv276

1   is "the unlawful killing of a human being without malice [and] in the commission of an unlawful

2   act, not amounting to a felony; or the commission of a lawful act which might produce death, in

3   an unlawful manner, or without due caution and circumspection."  (CAL. PENAL CODE § 192(a)

4   and (b).)

5         There is no clearly established federal law that requires a state trial court to give a lesser

6   included offense instruction.  *See* 28 U.S.C. § 2254(d) (1); *Beck v. Alabama*, 447 U.S. 625, 638

7   & n. 7 (1980) (holding that the failure to instruct on a lesser included offense in a capital case is

8   constitutional error if there was evidence to support the instruction but expressly reserving

9   "whether the Due Process Clause would require the giving of such instructions in a non-capital

10  case"); *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (*per curiam*) (in non-capital case,

11  failure of state court to instruct on lesser included offense does not alone present a federal

12  constitutional question cognizable in a federal habeas corpus proceeding), *cert. denied*, 534 U.S.

13  839 (2001); *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) (failure of state trial court

14  to instruct on lesser included offenses in non-capital case does not present federal constitutional

15  question), *cert. denied*, 541 U.S. 950 (2004)).

16        But "the defendant's right to adequate jury instructions on his or her theory of the case

17  might, in some cases, constitute an exception to the [foregoing] general rule [that the failure to

18  give a lesser included offense instruction constitutes only a state law issue]."  *Solis*, 219 F.3d at

19  929; *see Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (state court's jury instructions violate

20  due process if they deny the criminal defendant "a meaningful opportunity to present a complete

21  defense"), *cert. denied* by *Ayers v. Clark*, 549 U.S. 1027 (2006) (quoting *California v.

22  Trombetta*, 467 U.S. 479, 485 (1984)).

23        Notwithstanding petitioner's statement to the contrary, the record shows that petitioner

24  and his counsel made a strategic decision not to request a manslaughter instruction based upon

25  petitioner's insistence that he did not participate in the events giving rise to the charges.  Thus, a

26  manslaughter defense was inconsistent with petitioner's trial strategy and theory of the defense.

27  Further, petitioner was not constitutionally entitled to the lesser included offense instructions

28  because there was no substantial evidence supporting the giving of such an instruction either at

1   the request of counsel or by the court *sua sponte*.

2       Finally, even if petitioner could establish that the trial court constitutionally erred in

3   failing to *sua sponte* give the lesser included offense instruction, the error was harmless. *See*

4   *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993); *see also Clark*, 450 F.3d at 905 (habeas

5   petitioner must show that the alleged instructional error had substantial and injurious effect or

6   influence in determining jury's verdict).   The evidence adduced at trial against petitioner in

7   support of the second degree murder conviction was sufficient and therefore, the failure to give

8   the lesser included offense instruction, which had no factual basis, could not have had a

9   substantial or injurious effect on the jury's verdict.   Accordingly, there is no basis for habeas

10  relief on the claim of instructional error regarding a lesser included offense.

11                          **3.      Accomplice Instruction**

12      Because Jacobo was granted immunity and "Truehitt had the victim's blood on his pants,"

13  petitioner argues "they had to have been present next to the victim and/or shooting the victim"

14  thereby making them accomplices.  (Obj. at 3.)  Petitioner goes on to  argue that because

15  Truehitt and Sergio Jacobo were accomplices to the killing, the trial court should have instructed

16  the jury to view their testimony with caution or to require corroboration to support his

17  conviction.[3]

18      Under California law, an accomplice is defined as "a person who is subject to prosecution

19  for the identical offense charged . . . against the defendant on trial by reason of aiding and

20  abetting or being a member of a criminal conspiracy."  (CALJIC No. 3.10.)   To be liable as an

21  accomplice under California law, the individual must aid, promote, encourage or instigate a

22  crime, knowing of the unlawful purpose and intending to assist in the commission of a crime.

23  *See People v. Beeman*, 35 Cal.3d 547, 560 (1984).  An accessory to a crime is not an accomplice

24  under California law.  *See People v. Snyder*, 112 Cal. App. 4th 1200, 1220-21 (2003).

25  Defendant has the burden of proof to establish that an individual is an accomplice.  (CALJIC

26  3.19.)

27

28          [3]          Accomplice instructions are found in CALJIC 3.11-3.14 and 3.18.

1   As noted above, habeas relief based on an erroneous instruction is available when 'the

2   ailing instruction by itself so infect[s] the entire trial that the resulting conviction violates due

3   process," *Cupp*, 414 U.S at 147, not merely when "the instruction is undesirable, erroneous, or

4   even 'universally condemned." *Id.*, at 146.  Further, the lack of or an incomplete instruction is

5   less likely to be prejudicial than a misstatement of the law.  *Henderson v. Kibbe*, 431 U.S. 145,

6   154 (1977).

7   "The Fourteenth Amendment does not forbid a state court to construe and apply its laws

8   with respect to the evidence of an accomplice."  *Lisenba v. California*, 314 U.S. 219, 227

9   (1941); *see also Harrington v. Nix*, 983 F.2d 872, 874 (8th Cir. 1993) ("state laws requiring

10  corroboration do not implicate constitutional concerns that can be addressed on habeas review");

11  *Brown v. Collins*, 937 F.2d 175, 182 n. 12 (5th Cir. 1991) ("the prosecution's failure to satisfy

12  the requirements of the accomplice-witness sufficiency rule, and a state court's failure to enforce

13  that purely state rule, simply would not warrant constitutional attention"); *Takacs v. Engle*, 768

14  F.2d 122, 127 (6th Cir. 1985) ("If uncorroborated accomplice testimony is sufficient to support a

15  conviction under the Constitution, there can be no constitutional right to instruct the jury that it

16  must find corroboration for an accomplice's testimony.").

17  Even if Truehitt and Jacobo were accomplices as petitioner contends, other witnesses

18  corroborated the facts supporting Bustamante's conviction, Truehitt's and Jacobo's testimony

19  was strongly challenged by the defense, the prosecutor acknowledged during his closing

20  argument that Jacobo's testimony was inconsistent, and other jury instructions informed the jury

21  that they must view contradictory testimony with care.

22  Petitioner has not shown that the jury's determination would have been different had the

23  jury been instructed that it could not rely on Truehitt's and Jacobo's testimony in the absence of

24  corroboration.  Additionally, petitioner fails to explain how an instruction to view their

25  testimony with caution because they were accomplices would have had a greater impact than the

26  general credibility instructions that told the jury that in assessing a witness's credibility, it must

27  consider the existence of a bias, interest or other motive.

28  The lack of an accomplice instructions did not so infect petitioner's trial as to result in a

1  violation of due process.  The state courts' denial of petitioner's instructional error claim was not

2  contrary to, nor an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. §

3  2254(d).

4  **b.    Prosecutorial Misconduct**

5        A defendant's due process rights are violated when a prosecutor's misconduct renders a

6  trial "fundamentally unfair."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Under *Darden*,

7  the court first determines whether the prosecutor's remarks or acts were improper; if so, the next

8  consideration is whether the conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d

9  1101, 1112 (9th Cir. 2005).  A prosecutorial misconduct claim is decided "on the merits,

10 examining the entire proceedings to determine whether the prosecutor's remarks so infected the

11 trial with unfairness as to make the resulting conviction a denial of due process."  *Johnson v.*

12 *Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted).

13       As the Supreme Court has noted: "Past decisions of this Court demonstrate that the

14 touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of

15 the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

16 Prosecutorial misconduct alone does not require a new trial.  *Id.* at 220.   Instead, the effect on

17 the trial is of paramount importance.

18 **1.    Threat to defense counsel**

19       Petitioner contends that he suffered severe prejudice based upon a threat to his counsel

20 made by the prosecutor.  Prior to the trial, the prosecutor and defense counsel had a verbal

21 exchange concerning defendants' motion to dismiss based upon vindictive prosecution that the

22 court denied.  The prosecutor said to defense counsel:  "People create their own jacket."

23 Although petitioner contends that "it is a fair assumption" that defense counsel no longer felt

24 that he could effectively defend his client after hearing the remark, there is no evidence

25 whatsoever to support this assertion.  The entire record in this case demonstrates that counsel

26 actively and appropriately offered petitioner a reasonable defense based upon petitioner's

27 unequivocal position that he was not involved in the killing and evidence introduced at trial.

28 Further, petitioner has not demonstrated that the statement had any impact on the relationship

1  between defense counsel and petitioner.  Thus, there is no showing of unfairness constituting a

2  denial of due process.

### 2.    Questioning of Witness Jacobo

4      According to petitioner, during the questioning of prosecution witness, Sergio Jacobo, the

5  prosecutor mischaracterized the evidence, argued facts not in evidence, and used improper

6  arguments and comments to the jury which demonstrates prosecutorial misconduct.  At a bench

7  conference, the trial judge advised the prosecutor to lay a proper foundation and to confront the

8  witness with prior inconsistent statements if Jacobo contradicted what he had told police in his

9  statements.  Even after this admonishment, the prosecutor continued to try to impeach Jacobo

10  with improper methods.  The trial court consistently warned the prosecutor of his use of

11  improper questioning.

12      Defense counsel sought to have stricken all of Jacobo's testimony based on the

13  impropriety of the questions the prosecutor asked.  Recognizing that the prosecutor had placed

14  some inadmissible and potentially prejudical information before the jury by assuming facts not

15  in evidence, improperly characterizing prior testimony, improperly eliciting testimony about co-

16  defendants' statements and improperly posing a question that the prosecutor knew would elicit

17  prejudicial hearsay, the trial judge  sought to determine a remedy other than striking Jacobo's

18  testimony or declaring a mistrial for the prosecutor's errors.  The jury was admonished to

19  disregard certain testimony and asked if they could do so.   They responded that they could.

20      Having reviewed Jacobo's testimony, it is clear that his testimony was anything but clear.

21  For example, Jacobo failed to recall much of what happened the day of the killing, he gave

22  conflicting testimony about seeing Gonzalez with a gun and hearing Flores making a statement

23  about striking the victim.  The jury would be unlikely to come to any decision about petitioner's

24  guilt or innocence based upon Jacobo's testimony.  Further, Jacobo was merely one of several

25  prosecution witnesses that the state relied upon.  Other witnesses provided material testimony

26  pointing to petitioner's guilt.

27      Notwithstanding the prosecutor's misconduct and placing that misconduct within the

28  context of the entire trial, his actions did not impair the jury's ability to render a fair and

1  impartial verdict.   Petitioner's due process rights were not violated by prosecutorial misconduct
2  in the questioning of Sergio Jacobo.

### 3.        Failure to Provide Information Prior to Trial

4        Petitioner contends that the prosecution withheld material, exculpatory evidence by
5  failing to disclose that Nathan Truehitt, a prosecution witness, was a confidential informant.
6  Delay in disclosure does not deprive an accused of due process where disclosure is made at
7  pretrial conference, *see Reiger v. Christensen*, 789 F.2d 1425, 1432 (9th Cir. 1986), or during
8  trial where the disclosure, though tardy, is still of value to the accused, *see U.S. v. Vgeri*, 51 F.3d
9  876, 880 (9th Cir. 1995).  Due process requires only that the disclosure of exculpatory material
10  is made in sufficient time to permit defendant to make effective use of the material.  *See LaMere*
11  *v. Risley*, 827 F.2d 622, 625 (9th Cir. 1987).

12        Here, the information concerning Truehitt's confidential informant status was disclosed to
13  the defense, at the latest, during the beginning of petitioner's first trial.  Because of the mistrial,[4]
14  it is undisputed that defense counsel had knowledge of Truehitt's confidential informant status
15  prior to the second trial and had sufficient time to prepare to challenge Truehitt's testimony.  The
16  record demonstrates that defense counsel decided not to question Truehitt about his confidential
17  informant status at trial for strategic reasons.

18        Petitioner has not made any showing that the delayed disclosure of Truehitt's status
19  violated petitioner's constitutional due process rights.  There was sufficient time after the
20  disclosure of the information at the commencement of the first trial for defense counsel to
21  consider the implications of Truehitt's confidential informant status and to decide whether they
22  did or did not want that information admitted during the second trial.  The Court concludes that
23  petitioner has not shown that the delayed disclosure violated his due process rights.

### 4.        Vindictive prosecution

25        Initially petitioner was arrested on a murder charge.  He was released but later rearrested
26  and charged with conspiracy to commit assault.  Petitioner was prepared to enter a guilty plea to

27  _____

28        [4]    The mistrial occurred because a prosecution witness failed to appear for a second
day of examination at trial.

that offense at the preliminary hearing; however, the prosecutor sought permission from the court to amend the charges by adding a count of murder.  The court granted the motion and consequently, petitioner was not permitted to enter a plea to the conspiracy to commit assault charge.

Thereafter, petitioner filed a motion to dismiss the amended murder count on the basis of prosecutorial vindictiveness.  The trial court denied petitioner's motion finding that the decision to amend the charges was made in good faith because, *inter alia,* the prosecutor believed petitioner was responsible for the murder.  Petitioner contends in his habeas petition that the prosecutor demonstrated vindictive prosecution by amending the charge.

"In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).  The *Bordenkircher* Court continued:

> Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation" so long as "the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification."

*Id.* (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962).

Here, petitioner has neither alleged or made a showing that the amended charges were based upon any impermissible ground and petitioner therefore is not entitled to habeas relief on this claim.

### 5.    Testimony of Sergio Jacobo & Sergio Bustamante

At trial, Sergio Jacobo ("Jacobo") and petitioner's brother, Sergio Bustamante ("Sergio") testified under grants of immunity.  During the investigation of the killing, Jacobo spoke to detectives and told them that he had seen Gonzalez, one of petitioner's co-defendants, with a gun earlier in the day of the incident.  Jacobo also testified at a preliminary hearing and identified defendants and their involvement in the killing.  However, at trial, Jacobo recanted his earlier statements and made inconsistent statements.  Under examination by defense counsel, Jacobo explained his earlier statements.  He stated that during his interview with the detectives, they

1  told him he could be liable for the victim's murder and the detectives slammed their hands on

2  table and screamed at him which caused him to say whatever the detectives wanted to hear.

3      Petitioner argues that Jacobo's testimony was coerced, and the trial court violated his due

4  process rights by permitting the testimony.  Although petitioner lacks standing to complain about

5  infringements of Jacobo's constitutional rights, he may be entitled to habeas relief if the trial

6  court's admission of Jacobo's testimony rendered petitioner's trial so fundamentally unfair as to

7  violate due process. *Williams v. Woodford*, 384 F.3d 567, 593 (9th Cir. 2004) (citations

8  omitted).

9      The acts or statements petitioner contends were coercive are insufficient to show that

10  Jacobo's trial testimony was involuntary.  The threat of potential liability for the killing is not an

11  improper inducement and raised voices do not suggest coercion.  Further, petitioner did not lack

12  the opportunity at trial to test the voluntariness and veracity of Jacobo's testimony through

13  cross-examination as shown during defense counsel's questioning,  Nor did defense counsel seek

14  to exclude Jacobo's testimony as involuntarily made as was their prerogative to do.

15      Petitioner has not made a factual showing to demonstrate that Jacobo's testimony was

16  involuntary and that its admission rendered the trial so fundamentally unfair as to violate due

17  process.

18      With respect to Sergio, defense counsel sought to exclude Sergio's testimony as

19  involuntarily made.  The trial court conducted an evidentiary hearing on the issue of

20  voluntariness.  The court and counsel listened to the tape of the detectives' interview with Sergio

21  and heard the testimony of both Detective Torgersen and Sergio Bustamante.  Torgersen testified

22  that he did not advise Sergio of his rights and told Sergio that he thought Sergio was lying and

23  could be charged as an accessory to murder.  Sergio testified that he asked to have counsel but

24  Detective Thill said he did not need one.  He further testified that he thought he was a suspect

25  and was afraid he would lose his job in the city attorney's office.

26      After listening to the interview tape and hearing Torgensen's and Sergio's testimony, the

27  trial judge found Sergio's statements voluntarily made: "I don't find it involuntary.  I don't find

28  it coerced.  I think it's a product of his own will, albeit that I think that he lied consistently

1    throughout this entire tape any time he had an opportunity." (Lodgment 2, Vol.VII at 1105.)

2         "The question of the voluntariness of a confession is a legal issue that requires an

3    independent federal determination." *Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir. 1997)(citing

4    *Miller v. Fenton*, 474 U.S. 104, 110 (1985)).  But a factual conclusion  is entitled to a

5    presumption of correctness under 28 U.S.C. § 2254(d).  *See Miller*, 474 U.S. at 117 (subsidiary

6    questions, such as the length of the interrogation or defendant's prior experience with the legal

7    system, are factual matters on which we defer to the state court).

8         After examining the statements in context, reviewing the tape of the interview and finding

9    that there were no threats or promises, the trial court made its determination that Sergio's

10   statements were not coerced.   The Court accords this factual finding presumptively correct.

11   Further the record is devoid of any suggestion that the detectives resorted to physical or

12   psychological pressure to elicit Sergio's  statements.  Petitioner is not entitled to habeas relief on

13   the ground that Sergio's statements were coerced.

14                          **6.    False Evidence**

15        Petitioner contends that the prosecutor knowingly permitted Detective Ronald Thill to lie

16   when he testified at trial that he did not threaten Sergio Bustamante during his interview with

17   him.

18        "A criminal defendant is denied due process of law when a prosecutor either knowingly

19   presents false evidence or fails to correct the record to reflect the true facts when unsolicited

20   false evidence is introduced at trial."  *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005).

21   In order to establish a claim for prosecutorial misconduct based on false testimony, petitioner

22   must show that the testimony was actually false, that the prosecutor knew the testimony was

23   actually false, and that the false testimony was material.  *United States v. Zuno-Arce*, 339 F.3d

24   886, 889 (9th Cir. 2003), citing *Napue v. Illinois*, 360 U.S. 264, 269-71 (1959); *see also Hayes v.*

25   *Brown*, 399 F.3d 972, 984 (9th Cir. 2005).

26        At trial detective Thill's testified that he did not threaten Sergio during the interview.

27   Petitioner contends this testimony was false because the prosecutor heard the tape of the

28   interview between Sergio and the detectives wherein Thill threatened Sergio, and Detective

1  Torgersen testified at the evidentiary hearing that Thill raised his voice to Sergio during the

2  interview.   Petitioner's contention does not establish that Thill's statement was false.  At most,

3  the jury heard conflicting versions of the incident and it is for the jury to resolve the disputed

4  testimony.  *See United States v.Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002).  Further, Thill's

5  statement cannot be considered material to petitioner's conviction.  There was ample evidence to

6  convict petitioner even if the jury found that Thill's testimony was false.  Finally, the trial court

7  found that Sergio's testimony was not coerced but instead was voluntary.

8      Based on the above, the prosecutor did not present false testimony and consequently,

9  petitioner was not denied due process based on alleged false testimony presented by the

10  prosecutor.

11                   **7.      Improper Closing Argument**

12      Petitioner complains that the prosecutor made a variety of improper remarks in closing

13  argument including telling the jury to credit some statements made to police but not trial

14  testimony, mischaracterizing certain testimony, and pointing out petitioner's prior statements.

15      As discussed above, federal habeas review of prosecutorial misconduct claims is limited

16  to the narrow issue of whether the alleged misconduct violated due process.  *See Donnelly v.*

17  *DeChristoforo*, 416 U.S. 637, 642-43 (1974).  "It is not enough that the prosecutors' remarks

18  were undesirable or even universally condemned."  *Allen v. Woodford*, 395 F.3d 979, 997 (9th

19  Cir.2004) (as amended) (internal quotations and citations omitted).  Misconduct is reviewed in

20  light of the entire trial record, and relief will be granted only if the misconduct infected the trial

21  with unfairness.  *See Donnelly*, 416 U.S. at 639-43; *see also Darden*, 477 U.S. at 181; *Greer v.*

22  *Miller*, 483 U.S. 756, 765-66 (1987).

23      In determining whether due process was violated, the Court considers: (1) whether the

24  prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a

25  curative instruction; and (3) the weight of the evidence against the accused.  *See Darden*, 477

26  U.S. at 181-82.  Here, even assuming that the prosecutor committed misconduct during his

27  closing argument, a review of the record establishes that this misconduct did not violate due

28  process.  *See Drayden*, 232 F.3d at 713 (prosecutor engaged in misconduct by delivering closing

1   argument in voice of the victim, but it did not so infect trial with unfairness as to violate due

2   process).

3        The court of appeal's finding that the prosecutor's argument did not violate due process is

4   objectively reasonable and supported by the record.  In each of petitioner's contentions of

5   misconduct, the prosecutor did not manipulate or misstate the evidence, the prosecutor's

6   statements were supported by the evidence and reasonable inferences that could be drawn from

7   the evidence, and the court provided proper and appropriate jury instructions concerning prior

8   consistent or inconsistent statements, discrepancies in testimony, credibility of witness, and

9   weighing conflicting testimony.  Therefore, the court of appeal's finding that the prosecutor's

10  closing argument did not violate due process is objectively reasonable and supported by the

11  record.  Habeas relief is unavailable because there is no showing that the closing argument

12  infected the trial with unfairness.

13                  **c.     Ineffective Assistance of Trial Counsel**

14       As applied to the states through the Fourteenth Amendment, the Sixth Amendment of the

15  United States Constitution guarantees a state criminal defendant the right to effective assistance

16  of counsel at trial.  *Evitts v. Lucey*, 469 U.S. 387 (1985).  To warrant habeas relief based upon

17  ineffective assistance of trial counsel, petitioner must show both that counsel's representation fell

18  below an objective standard of reasonableness and that counsel's deficient performance

19  prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  A court may

20  reject an ineffective assistance claim upon finding either that counsel's performance was

21  reasonable or that the alleged error was not prejudicial.  *Strickland*, 466 U.S. at 687, 697; *United*

22  *States v. Thomas*, 417 F.3d 1053, 1056 (9th Cir. 2005), *cert. denied*, 546 U.S. 1121 (2006).

23  Failure to satisfy either prong of the Strickland test obviates the need to consider the other. *Rios*

24  *v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002).

25       Review of counsel's performance is "highly deferential" and there is a "strong

26  presumption" that counsel rendered adequate assistance and exercised reasonable professional

27  judgment.  *Williams v. Woodford*, 384 F.3d 567, 610 (9th Cir. 2004), *cert. denied*, 546 U.S. 934

28  (2005) (quoting *Strickland*, 466 U.S. at 689).  Courts judge the reasonableness of an attorney's

conduct "on the facts of the particular case, viewed as of the time of counsel's conduct."
*Strickland*, 466 U.S. at 690.  The court may "neither second-guess counsel's decisions, nor apply
the fabled twenty-twenty vision of hindsight." *Karis v. Calderon*, 283 F.3d 1117, 1130 (9th Cir.
2002), cert. denied, 539 U.S. 958 (2003) (citation and quotations omitted); *see Yarborough v.
Gentry*, 540 U.S. 1, 8 (2003) ("The Sixth Amendment guarantees reasonable competence, not
perfect advocacy judged with the benefit of hindsight.") (citations omitted); *Morris v.
California*, 966 F.2d 448, 456-57 (9th Cir.) (if court can conceive of reasonable tactical purpose
for counsel's action or inaction, court need not determine actual explanation), *cert. denied*, 506
U.S. 831 (1992).  A habeas petitioner bears the burden to overcome the presumption that, under
the circumstances, the challenged action constituted competent representation.  *Strickland*, 466
U.S. at 689.

To prove prejudice, it is not enough to show that counsel's errors had some conceivable
effect on the outcome.  *Strickland*, 466 U.S. at 693.  A habeas petitioner has the burden of
showing a reasonable probability, *i.e.*, "a probability sufficient to undermine confidence in the
outcome," that, but for counsel's errors, the result of the proceeding would have been different.
*Id.* at 694-95; *see also, Lord v. Wood*, 184 F.3d 1083, 1085-86 (9th Cir. 1999), *cert. denied*, 528
U.S. 1198 (2000).

In his objections to the Report, petitioner states: "Petitioner objects to all aspects of
Magistrate's rejection of ineffective assistance, however, will only expand on the one crucial
aspect which is so erroneous it needs to be fully explained."  (Obj. at 6.)

### 1.    Voluntary Intoxication as a Defense

Here, petitioner contends that trial counsel was ineffective because he failed to investigate
voluntary intoxication as a defense.  Petitioner acknowledges that he and counsel discussed the
defense of involuntary intoxication but nevertheless argues that the tactical decision was based
upon counsel's inadequate investigation of such a defense.  Petitioner also states there is no
rational, reasonable tactical decision not to have pursued the involuntary intoxication defense.
But as discussed above in reference to a jury instruction on intoxication, such a defense would
have created conflicting and irreconcilable defenses.  A voluntary intoxication defense would

vitiate the defense that petitioner was not involved in the killing at all.  Additionally, although the record indicates that petitioner had been drinking for several days prior to and on the day of the killing, there is no evidence that petitioner was intoxicated to the point where voluntary intoxication could provide a defense.

In reviewing counsel's performance, petitioner has made no showing that counsel failed to render adequate assistance or exercise reasonable professional judgment with respect to whether voluntary intoxication was available as a defense.

### 2.        Other Claims of Ineffective Assistance of Trial Counsel

Petitioner does not provide specific objections to the magistrate judge's Report concerning other instances of ineffective assistance of trial counsel.  Instead, petitioner generally objects to the Report's finding that counsel was not ineffective for failing to object to Jacobo and Sergio's testimony as coerced, to object to Thill's testimony as false, to effectively present closing argument, to request favorable jury instructions, and to competently argue motion for new trial.

As discussed above, the Court has found no basis for granting habeas relief on these same claims.  Thus there can be no errors that had some conceivable effect on the outcome of petitioner's case because of trial counsel's failure to raise them on direct appeal.

### d.        Ineffective assistance of appellate counsel (CLAIM 8)

The *Strickland* test also applies to claims of ineffective assistance by appellate counsel. *See Smith v. Murray*, 477 U.S. 527, 536 (1986); *see also Smith*, 528 U.S. at 285-86 ("the proper standard for evaluating [a petitioner's] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland*" ).  The test for deficient performance is the same as for trial counsel. *Id.* at 285 (petitioner "must first show that his counsel was objectively unreasonable").  To establish prejudice, a petitioner "must show a reasonable probability that, but for his counsel's [error], he would have prevailed on his appeal." *Id.*  Appointed appellate counsel is not required "to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *see also* Pollard v. White, 119 F.3d 1430, 1435 (9th Cir. 1997)(Appellate counsel has no

03cv276

1  constitutional obligation to raise all non-frivolous issues on appeal.)).  Appellate counsel's

2  failure to raise an issue on direct appeal cannot constitute ineffective assistance when "the appeal

3  would not have provided grounds for reversal." *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir.

4  2001) (citation omitted).

5       Petitioner focuses his objections on appellate counsel's failure to challenge the restitution

6  order but continues to generally object to the Report concerning other aspects of appellate

7  counsel's performance.

8                        **1.     Fine/restitution**

9       Petitioner contends that his appellate counsel's failure to object to the trial court's

10  imposition of a restitution fine of $10,000 constituted ineffective assistance of appellate counsel

11  because petitioner could have demonstrated that he was unable to pay any such fine.

12       The restitution fine was imposed pursuant to California Penal Code § 1202.4(b).  Under

13  Penal Code § 1202.4(c), "[t]he court shall impose the restitution fine unless it finds compelling

14  and extraordinary reasons for not doing so . . . A defendant's inability to pay shall not be

15  considered a compelling and extraordinary reason not to impose a restitution fine."  But in

16  setting a fine in excess of the statutory minimum of $200 for a felony conviction, the statute

17  provides, in relevant part, that the court "shall consider any relevant factors including . . . the

18  defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of

19  its commission." CALIFORNIA PENAL CODE § 1202.4(d).

20       The trial court enjoyed wide discretion in determining the amount of the restitution fine.

21  *People v. Urbano*, 128 Cal. App.4th 396, 406 (2005).  "[W]hen the circumstances of a particular

22  case are such that imposition of the upper term of imprisonment for a particular crime is

23  justified, a trial court does not abuse its discretion in imposing the maximum restitution fine

24  provided by law."  *People v. McGhee*, 197 Cal. App.3d 710, 717 (1988).  The Excessive Fines

25  Clause of the Eighth Amendment is implicated only where a forfeiture is "grossly

26  disproportional to the gravity of a defendant's offense."  *Id.* (quoting *United States v. Bajakajian*,

27  524 U.S. 321, 334 (1998)).

28       Given that petitioner was convicted of second degree murder with the jury finding as true

1   an allegation of armed with a firearm under Penal Code § 12022(b), and had a prior felony

2   conviction, the restitution fine was not "grossly disproportional" under the Constitution.

3   Accordingly, petitioner has not demonstrated that a different outcome would have resulted if

4   counsel had objected to the amount of the restitution fine and, therefore, has not shown prejudice

5   under *Strickland*.

**2.       Other Claims of Ineffective Assistance of Appellate Counsel**

7       Petitioner contends that appellate counsel was ineffective for failing to argue instructional

8   error, to challenge denial of a severance motion, to challenge the introduction of false testimony,

9   and to argue trial counsel was ineffective.

10      Appellate counsel's decision to press only issues on appeal that she believed, in her

11  professional judgment, had more merit than the claims suggested by petitioner is "within the

12  range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397

13  U.S. 759, 771.  Petitioner's appellate counsel had no obligation to raise meritless issues on

14  appeal.  *Strickland*, 466 U.S. at 687-88.

15      For the reasons set forth above, this court has found that petitioner failed to show any

16  constitutional violations with respect to instructional error, prosecutorial misconduct and

17  ineffective assistance of trial counsel.  Because these claims are without merit, appellate

18  counsel's failure to present them on appeal cannot constitute a deficient performance and

19  petitioner has not and cannot show that the claims would have prevailed on appeal.

20  Accordingly, petitioner is not entitled to habeas relief on his claims of ineffective assistance by

21  appellate counsel.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

23

03cv276

**C.    Conclusion**

Based on the foregoing:

1.    Petitioner's objections are **OVERRULED**;

2.    The Report and Recommendation is **ADOPTED** in its entirety;

3.    Petitioner's petition for writ of habeas corpus in **DENIED**; and

4.    The Clerk of the Court is directed to enter judgment in accordance with this Order.

**IT IS SO ORDERED.**

DATED:   September 8, 2009

_____
M. James Lorenz
United States District Court Judge

COPY TO:

HON. CATHY ANN BENCIVENGO
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL

03cv276